## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 7 |
| | ) |
| BLUEFLY ACQUISITION, LLC | ) 19-10207 (CSS) |
| | ) |
| Debtor. | ) |
| | ) |

### DECLARATION OF FRED EBRAHEMI

1.      I am an officer and Vice President of Total Fashion, Inc. ("**Movant**").  I have personal knowledge of the matters set forth in this declaration, and if I were called upon to testify, I could and would competently testify thereto.

2.      In my position with Movant, I am required to and do personally work with the books and records relating to the commercial loan currently held by Debtor, which was made to Bluefly Acquisition, LLC ("**Debtor**") in the amount of $12,250,000.00 (the "**Loan**").

3.      As to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business records of Movant which were made at or about the time the events recorded and which are maintained in the ordinary course of Movant's business at or near the time of the acts, conditions, or events to which they relate.  The specific financial information set forth below has been taken directly from such business records and has been verified by me as being accurate.

4.      On March 7, 2017, Clearlake Capital Partners II (Master), L.P. and Clearlake Capital Partners III (Master), L.P. (collectively, "**Original Lenders**") made a commercial business loan to Debtor in the original principal amount of $12,250,000.000 (the "**Loan**").

5.      In connection with the Loan, Debtor executed and delivered to Original Lenders a Term Note, dated as of March 7, 2017, in the original principal amount of $12,250,000.00 (as at any time modified or amended, the "**Note**").  The Note evidences Debtor's indebtedness to Movant under the Loan.

6.      A true and correct copy of the Note is attached as **Exhibit A**.

7.       As security for the Note, Debtor executed and delivered to Original Lenders a General Security Agreement, dated as of March 7, 2017 (the "**Security Agreement**").

8.       A true and correct copy of the Security Agreement is attached as **Exhibit B**.

9.       The Security Agreement grants Movant a first-priority security interest in substantially all of Debtor's assets, both tangible and intangible, as set forth in the Security Agreement.

10.      Also, as further security for the Note, Debtor executed and delivered to Original Lenders a Trademark Security Agreement, dated as of March 7, 2017 (the "**Trademark Agreement**").

11.      A true and correct copy of the Trademark Agreement is attached as **Exhibit C**.

12.      Under the Trademark Agreement, Debtor granted to Original Lenders a first-priority security interest in Debtor's trademarks and all other intellectual property, all as more fully described in the Trademark Agreement.

13.      Original Lenders also perfected its security interest by registering its Trademark Assignment with the USTPO on March 22, 2017

14.      A true and correct copy of the USPTO Trademark Assignment Registration is attached as **Exhibit D**.

15.      On March 7, 2017, Original Lenders recorded UCC-1 financing statements with the Delaware Secretary of State, which describe Original Lenders' security interest in substantially all of Debtor's assets.

16.      In order to further secure the indebtedness owed under the Note, Debtor and Original Lenders entered into that certain Deposit Account Control Agreement, dated as of April 30, 2017 (the "**DACA**").  A true and correct copy of the DACA is attached as **Exhibit E**.

17.       Under the DACA, Debtor granted Movant the right, upon Debtor's default, to take control of Debtor's operating bank account, number ending in 0967, held at HSBC Bank USA (the "**Debtor Account**").  The DACA also grants Movant the right to instruct the Bank to sweep the funds held in the Debtor Account and deposit them in the Movant's account.

18.    The Note, the General Security Agreement, the Trademark Security Agreement, the DACA, and all other documents further evidencing, securing or executed in connection with the indebtedness owed under the Loan, as at any time amended or supplemented, are sometimes referred to herein collectively as the "**Loan Documents**."

19.    On January 11, 2019, Original Lenders assigned the Loan and all Loan Documents to Movant.  The assignment of the Loan from Original Lenders to Movant is evidenced in part by that certain Omnibus Assignment and the related Assignment of Security Interest in trademark, both dated as of January 11, 2019.

20.    True and correct copies of the Omnibus Assignment and the related Assignment of Security Interest are attached as **Exhibits F and G** respectively.

21.    On January 11, 2019, Movant recorded the Trademark Assignment with the USPTO evidencing the assignment of Original Lenders' security interests in all of Debtor's trademarks.

22.    A true and correct copy of Movant's Trademark Assignment with the USPTO is attached as **Exhibit H**.

23.    On January 11, 2019, Original Lenders also assigned the DACA to Movant as evidenced by that certain Notice of Assignment of Deposit Account Control Agreement (the "**DACA Assignment**").

24.    A true and correct copy of the DACA Assignment is attached as **Exhibit I**.

25.    In addition, on January 14, 2019, Original Lender recorded UCC-3 statements with the Secretary of State of Delaware, which evidence the assignment to Movant of Original Lenders' security interest in substantially all of Debtor's assets.

26.    True and correct copies of the UCC-3 Statements are attached as **Exhibits J and K** respectively.

27.    Debtor is in default under the Loan Documents.  Monetary and nonmonetary Events of Default have occurred and are ongoing; Debtor has arbitrarily ceased operations, terminated its employees and is significantly impairing the value of Movant's collateral. As of

3

the Petition Date, Movant is owed $8,613,050.81. As of January 31, 2019, Debtor owes Movant $8,369,569.00 in unpaid principal. As of February 1, 2019, Debtor owes Movant $1,394.93 in accrued interest and owes $1,394.93 in per diem interest for the month of February. As of the Petition Date, Debtor owes Movant $240,691.95 in attorney's fees and costs.

28.     As of February 1, 2019, I believe that the value of any of Debtor's assets is far less than the obligations owed to Movant.

29.     A true and correct copy of Movant's Statement of Account is attached **Exhibit L**.

30.     Under Section A of the Note, Debtor is required to make payments to Movant on the last day of each calendar month at the Interest Rate defined in the Note (the "**Interest Payments**"). The Interest Rate defined in the Note is 1 percent per annum so long as Debtor has not defaulted under the Note. The Interest Rate increases to 6 percent per annum if Debtor is in default under the Note.

31.     Under Section B of the Note, Debtor is required to make payments to Movant of principal in an amount equal to the Payment Percentage of Net Sales of the Debtor for the preceding calendar month (the "**Principal Payments**"). The term "Payment Percentage" is defined by the Note as eight percent for the period from the date of the Note until the first anniversary of the Note, and seven percent for the period from and after the first anniversary of the Note until the Maturity Date.

32.     Debtor failed to make the Principal Payment and the Interest Payment for the Month of October that was due on October 31, 2018 (the "**First Payment Default**").

33.     On November 15, 2018, Original Lenders informed Debtor in writing that Debtor's failure to make the Principal Payment and Interest Payment for October was an event of default under the Note (the "**November 15 Default Notice**").

34.     A true and correct copy of the November 15 Default Notice is attached as **Exhibit M**.

35.     Debtor thereafter cured the First Payment Default on or before November 30, 2018.

4

67135166.3

36.    On December 31, 2018, Debtor again failed to make the required monthly payment of principal and interest (the "**Second Payment Default**").

37.    On January 2, 2019, Original Lenders informed Debtor in writing that the Second Payment Default is a default under the Loan Documents (the **"January 2 Default Letter"**).

38.    A true and correct copy of the January 2 Default Letter is attached as **Exhibit N**. Debtor still has not cured the Second Payment Default.

39.    Under Section 7.3(d) of the Note, within 45 days after each fiscal quarter Debtor is required to provide confirmation from an accounting firm agreeable to Movant regarding the accuracy of financial reports provided by Debtor for the prior quarter.

40.    Debtor has failed to comply with Section 7.3(d) of the Note because Debtor has failed to provide the required confirmation from an accounting firm.  On November 20, 2018, Original Lenders informed Debtor of Debtor's default under Section 7.3(d) of the Note (the "**November 20 Default Notice**").

41.    A true and correct copy of the November 20 Default Notice is attached as **Exhibit O**.

42.    Debtor still has not cured the default under Section 7.3(d).

43.    Under Section 6.1(f) of the Note, a default occurs if Debtor "shall have incurred any payment obligations (other than in the ordinary course of Debtor's business) or additional debt or granted a Lien or security interest in any of the Collateral" securing the Loan.  In addition, under 3.3(d) of the Security Agreement, Debtor warranted that all of the collateral securing the Loan would remain free and clear of all security interests, liens, attachment, levies and encumbrances of any kind.  Further, under section 3.3(g) of the Security Agreement, Debtor warranted that Debtor would not, without Movant's prior written consent, sell, assign, mortgage, lease or dispose of the collateral securing the Loan.

44.    Subsequent to executing the Note and the other Loan Documents, Debtor obtained a loan from insider Luo Yong Bin (who is an indirect owner of Debtor) in an amount greater than $6 million.

67135166.3

45.    Subsequent to executing the Note and the other Loan Documents, Debtor obtained a loan from APS Global LLC ("**APS**") in an amount greater than $3 million.

46.    Those transactions were kept secret from Movant.

47.    Debtor's receipt of the loans from Mr. Bin and APS each is yet another default under the Note and the other Loan Documents.

48.    Debtor's defaults under the Loan Documents are not surprising because Debtor's financial condition has become increasingly precarious in recent months.  For example, Debtor currently has 96 "held checks" pending.  These are checks made out to vendors that are due for payment, but which Debtor has not transmitted for payment.

49.    Debtor told Movant that the reason Debtor had not transmitted the checks for payment is because Debtor did not have sufficient funds to cover the checks.

50.    As of January 2, 2019, Debtor owed at least $2,845,853.07 in vendor invoices, and the held checks amounted to $550,206.49.    The held checks were generated as early as February 15, 2018, and most of the held checks were generated between December 4, 2018, and January 2, 2019.

51.    On January 11, 2019, Debtor provided Movant with the detailed information that included the above referenced held vendor checks ("**Financials**").

52.    A true and correct copy of the Financials Debtor provided to Movant is attached as **Exhibit P**.

53.    As reflected in the Financials, as of October 2018, Debtor held $7,769,127 in total current liabilities against $2,205,546 in total current assets.

54.    In addition, Debtor's accounts payable aging report, included in the Financials, indicates that Debtor, at least as of January 11, 2019, was far behind on paying vendors and other payees.  For example, Debtor owed one payee for debts that accrued as early as April 1, 2017, and Debtor owed payees for debts that accrued in each and every month during 2018.

67135166.3

55.     As reflected in the Financials, the total amount of Debtor's accounts payable that have been due for 30 days or greater prior to the Petition Date is $1,646,304.31.  Of that amount, $772,374.16 was at least 90 days past due.

56.     In addition to Debtor's failure to pay vendors, Debtor has not paid rent at its office location for the past three months.  Upon information and belief, as a result, prior to the Petition Date, Debtor's landlord had threatened to commence eviction proceedings.  With each passing day, Debtor's accounts payable and accrued expenses mount even higher.

57.     Upon information and belief, employees, payroll taxes, and benefits were unpaid for at least one week prior to the Petition Date and possibly more, depending upon when payroll was due.

58.     Debtor's failures to pay its debts as they become due is a default under Section 9(a)(ix) of the Security Agreement, which specifically states that the Debtor shall be in default if Debtor "shall not pay, or admits in writing its inability to pay, its debts generally as they become due."

59.     Under Section 9 of the Note, Debtor is required to pay to Movant, upon demand, all expenses, costs, charges, disbursements and reasonable attorneys' fees incurred by Movant in connection with administration, enforcement and collection of the Loan.

60.     Movant has incurred substantial expenses, costs and fees in connection with the administration, enforcement and collection of the Loan (the "**Enforcement Costs**"), and Movant has demanded payment of the Enforcement Costs.  Debtor has refused to repay the Enforcement Costs, which is another default under the Loan Documents.

61.     In light of Debtor's numerous defaults under the Loan Documents, Movant exercised its rights under the Loan Documents and DACA.

62.     On January 11, 2019, Movant informed Debtor in writing that Movant had exercised its remedy of accelerating the Loan as a result of Debtor's defaults (the "**Acceleration Letter**").

63.     A true and correct copy of Movant's Acceleration Letter is attached as **Exhibit Q**.

64.    On January 23, 2019, Movant initiated an action against the Debtor, in the Superior Court in Los Angeles, California (the "**State Court Action**"), with the case captioned as *Total Fashion, Inc. v. Bluefly Acquisition, LLC and McGann Holdings, Ltd.*, Case No. 19SMCV00102, Superior Court of the State of California, County of Los Angeles, Santa Monica Courthouse. In the State Court Action, Movant sought to appoint a receiver to take over Debtor's operations in order to protect Movant's interest in its collateral and ensure the least amount of harm to Debtor's employees.

65.    On January 29, 2019, Debtor's counsel informed Movant's counsel, in writing, that Borrower "had decided to turn the computer off and not operate. The employees are going home." Also on January 29, 2019, I accessed Borrower's website, www.bluefly.com.  A message appeared which says: "We apologize for the inconvenience, we're performing some maintenance.  Please refresh your browser in a moment to access our site.  Thank you for your patience."  (The "**Website Error Message**").

66.    A true and correct copy of Debtor's Website Error Message is attached as **Exhibit R.**

67.    On January 31, 2019, Debtor again failed to make the required monthly debt service payment (the "**Third Payment Default**").

68.    At a hearing on January 31, 2019, the Court in the State Court Action appointed the Receiver as a result of the Debtor's arbitrary shutdown of its business, termination of its employees and impairment of Movant's Collateral.

69.    A true and correct copy of the Order Granting Appointment of a Receiver is attached as **Exhibit S**.

I declare under penalty of perjury under the laws of the State of California that the foregoing is
true and correct.

Executed this ___ day of February, 2019 at Santa Monica, California.

Fred Ebrahemi
Vice President
Total Fashion, Inc.

67135166.3

# EXHIBIT "A"

## TERM NOTE

**$12,250,000.00**                                                    **March 7, 2017**

For value received, the undersigned, BLUEFLY ACQUISITION, LLC, a Delaware limited liability company ("*Borrower*"), promises to pay to the order of CLEARLAKE CAPITAL PARTNERS II (MASTER), L.P., a Delaware limited partnership, CLEARLAKE CAPITAL PARTNERS III (MASTER), L.P., a Delaware limited partnership (collectively with their respective successors and assigns, "*Lender*"), in lawful money of the United States of America, the principal sum of Twelve Million Two Hundred Fifty Thousand and No/100 Dollars ($12,250,000.00) with interest thereon to be computed from the date of disbursement under this promissory note (the "*Note*") at the rate of 1.0% per annum, (the "*Interest Rate*"), and to be paid in installments as follows:

A.    Borrower shall make payments to Lender of all accrued, unpaid interest (which interest shall begin accruing as of the Closing Date) at the Interest Rate on the last business day of each calendar month, beginning April 30, 2017 (the "*Payment Date*"); and

B.    Borrower shall make payments to Lender on the principal amount of this Note in an amount equal to the Payment Percentage of the Net Sales of the Borrower for the preceding calendar month (calculated in accordance with generally accepted accounting principles, applied on a consistent basis ("*GAAP*"), which calculations shall be set forth and certified as accurate by an officer of the Borrower and delivered to Lender along with supporting financial statements in connection with such payment (the "*Payment Certification*")) on each Payment Date, in accordance with the terms of that certain Asset Purchase Agreement dated as of even date herewith by and among Bluefly, Inc., Bluefly Holdings, Inc., DSI Assignments, LLC, solely in its capacity as assignee under an Assignment for the Benefit of Creditors of Bluefly, Inc. and Bluefly Holdings, and Debtor (the "*APA*"). The initial principal payment under this Note shall be due and payable April 30, 2017 and shall be based on the Net Sales of the Borrower for the period beginning with the Closing Date and ending March 31, 2017. "*Payment Percentage*" shall mean eight percent (8%) for the period from the date of this Note until the first anniversary of the Note, and seven percent (7%) for the period from and after the first anniversary of the Note until the Maturity Date (as defined below). "*Net Sales*" shall mean the invoice amount of the goods actually shipped and accepted by and paid for by the customer, excluding freight and transportation costs, reduced by trade and other discounts, returns, credits, allowances, chargebacks taken or accrued in accordance with GAAP, and exclusive of any applicable sales or similar taxes; and

C.    Borrower shall pay all outstanding principal and accrued interest at the Interest Rate and all other amounts owed pursuant to this Note and the other Credit Documents on March 7, 2019 (the "*Maturity Date*"), unless earlier accelerated pursuant to the terms of this Note or any other Credit Document.

All payments to be made by Borrower to Lender shall be deemed received by Lender only upon Lender's actual receipt of same.

      **1.**      **Interest.**  Interest shall accrue at the Interest Rate on the outstanding principal balance at the end of each day on which any amount is outstanding under this Note.  Interest shall be calculated on a daily basis (computed on the actual number of days elapsed over a year of 360 days), commencing on the date of this Note, and shall be based upon the outstanding principal balance at the end of each day.

      **2.**      **Default Interest.**  Upon the occurrence of an Event of Default (as hereinafter defined), including the failure of Borrower to make full payment on the Maturity Date, Lender shall be entitled to receive and Borrower shall pay interest on the then outstanding principal balance due and payable under this Note at the rate of six percent (6.0%) per annum above the Interest Rate ("*Default Rate*") but in no event greater than the maximum rate permitted by applicable law.  Interest shall accrue and be payable at the Default Rate from the occurrence of an Event of Default until all Events of Default have been fully cured.  Such accrued interest shall be secured by the Liens (as hereinafter defined) in favor of Lender under the Credit Documents (as hereinafter defined).  Borrower agrees that Lender's right to collect interest at the Default Rate is given for the purpose of compensating Lender at reasonable amounts for Lender's added costs and expenses that occur as a result of Borrower's default and that are difficult to predict in amount, such as increased general overhead, concentration of management resources on problem loans, and increased cost of funds.  Lender and Borrower agree that Lender's collection of interest at the Default Rate is not a fine or penalty, but is intended to be and shall be deemed to be reasonable compensation to Lender for increased costs and expenses that Lender will incur if an Event of Default occurs hereunder.  Collection of interest at the Default Rate shall not be construed as an agreement or privilege to extend the Maturity Date or to limit or impair any rights and remedies of Lender under any Credit Document.  If judgment is entered on this Note, interest shall continue to accrue post-judgment at the greater of (a) the Default Rate or (b) the applicable statutory judgment rate.

      **3.**      **Security; Definitions; and Construction.**

      (a)      This Note is and shall be secured by, and Lender is entitled to the benefits of, the Liens granted by Borrower in favor of Lender under the Credit Documents and all other related filings, instruments, agreements and documents providing Collateral for the Loan and the other Obligations (as hereinafter defined), whether now or hereafter in existence.

      (b)      When used herein, the following terms shall have the following meanings (terms defined in the singular to have the same meaning when used in the plural and vice versa):

      "*Closing Date*" shall have the meaning given under the APA.

      "*Code*" means the Uniform Commercial Code as in effect in the State of New York from time to time.

"*Collateral*" means all personal and real property with respect to which a Lien has been granted to or for the benefit of Lender pursuant to the Credit Documents, or which otherwise secures the payment or performance of any Obligation.

"*Credit Documents*" means, collectively, the Security Agreement, this Note, and any and all guaranties, security agreements, pledge agreements, and other instruments, agreements and documents delivered to Lender from time to time that evidence, secure or otherwise relate to any of the transactions described in or contemplated thereby, and any amendments, renewals, restatements, replacements or other modifications of the foregoing from time to time.

"*Lien*" means any mortgage, deed of trust, pledge, security interest, hypothecation, assignment, deposit arrangement, lien (statutory or other), or preference, priority, or other security agreement or preferential arrangement, charge or encumbrance of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the Code or comparable law of any jurisdiction to evidence any of the foregoing).

"*Loan*" means the loan evidenced by this Note.

"*Obligations*" means this Loan and all other term loans and revolving credit loans and all other advances, debts, liabilities, obligations, covenants and duties owing, arising, due or payable from Borrower to Lender of any kind or nature, existing or future, whether or not evidenced by any note, letter of credit, reimbursement agreement, guaranty or other instrument or document, whether arising under or issued pursuant to this Note, the Credit Documents or otherwise and whether direct or indirect (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, existing on or after the Closing Date and however acquired or extended, and whether or not of the same kind or quality or that relate to the same transactions or series of transactions, and all amendments, renewals, restatements, replacements, consolidations or other modifications of the foregoing from time to time. The term includes all principal, interest, fees, expenses and any other amounts chargeable to Borrower or any other person or entity under any of the Credit Documents.

"*Security Agreement*" means the Security Agreement dated as of the date hereof by and among Lender and Borrower, as it may be amended, modified, supplemented, or replaced from time to time.

"*Usury Law*" means any law or regulation of any governmental authority having jurisdiction, limiting the amount of interest that may be paid for the loan, use or detention of money.

(c)    The terms "include", "including" and similar terms shall be construed as if followed by the phrase "without being limited to." The term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." Words of masculine, feminine or neuter gender shall mean and include the correlative words of the other genders, and

3

words importing the singular number shall mean and include the plural number, and vice versa. All article, section, schedule, and exhibit captions are used for convenient reference only and in no way define, limit or describe the scope or intent of, or in any way affect, any such article, section, schedule, or exhibit.   Unless the context of this Note clearly requires otherwise, references to the plural include the singular, references to the singular include the plural.   Any reference in this Note or in the Credit Documents to this Note or to any of the Credit Documents shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, and supplements thereto and thereof, as applicable.

(d)     An Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by Lender.

**4.     Usury.**   All agreements contained in the Credit Documents are expressly limited so that in no event whatsoever, whether by reason of the making of advances on account of the Loan, or under any of the Credit Documents, or acceleration of maturity of the unpaid principal balance of the Loan or otherwise, shall the amount paid or agreed to be paid by or on behalf of Borrower to Lender for the use, forbearance or detention of money exceed the highest lawful rate permissible under any applicable Usury Law.   If, from any circumstances whatsoever, compliance with any of the Credit Documents, at the time performance thereunder shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable thereto, then, *ipso facto*, the obligations to be fulfilled shall be reduced to the limit of such validity.   If from any circumstance, Lender shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest.   This provision shall control every other provision of all agreements between any Borrower and Lender; provided, however, that there shall be no automatic reduction of such payments or obligations as to any party barred by law from availing itself in any action or proceeding of the defense of usury, or any party barred or exempted from the operation of any Usury Law, or in the event and to the extent the Loan, because of its amount or purpose or for any other reason, is exempt from the operation of the Usury Law.

**5.     Prepayment.**

(a)     This Note may be prepaid in whole or in part at any time after the Closing Date. Notwithstanding anything herein to the contrary, (i) if this Note is paid in full on or prior to the date that is six months after the Closing Date, the outstanding principal balance of this Note shall be reduced by $1.5 million, and (ii) if this Note is paid in full after the date that is six months after the Closing Date and on or prior to the date that is one year after the Closing Date, the outstanding principal balance of this Note shall be reduced by $1 million.

(b)     Any prepayment of principal shall be accompanied by a payment of interest accrued to date thereon; and said prepayment shall be applied to the principal installments in the inverse order of their maturities.

56067641.17

## 6.   Default.

**6.1   Events of Default.** Any one or more of the following events shall constitute an event of default (each, an "*Event of Default*") under this Note:

(a)   Borrower fails to timely pay any monetary obligation under this Note in accordance with the terms hereof; provided that no Event of Default shall have occurred if Borrower pays any monthly payment (other than the final payment due on the Maturity Date or upon the earlier acceleration by Lender) within five (5) days after Lender's delivery of written notice (which may be via electronic mail) of such failure to make such monthly payment when due; or

(b)   Borrower fails or neglects to timely perform, keep, or observe any other term, provision, condition, covenant, or agreement contained in this Note and such failure or neglect continues more than fifteen (15) days (or thirty (30) days with respect to the Borrower's obligations under Section 7.3(d) hereof) after Lender sends written notice to Borrower of such failure or neglect (provided that Borrower shall not be entitled to a cure period hereunder if Lender determines in good faith that such failure or neglect is not capable of being cured or is not capable of being cured within such 15-day period); or

(c)   Borrower fails to timely pay any monetary obligation or fails or neglects to timely perform, keep, or observe any term, provision, condition, covenant or agreement under any other Credit Document in accordance with the terms thereof and such failure or neglect continues beyond any applicable notice and cure period provided in such Credit Document; or

(d)   any event (whether in one or more transactions) which results in (i) Mcgann Holdings Ltd. failing to own, directly or indirectly, 100% of the equity interests of Borrower, (ii) Ascend Vantage Ltd. failing to own, directly or indirectly, 100% of the stock or equity interests of Mcgann Holdings Ltd., (iii) Luo Yong Bin failing to own, directly or indirectly, 100% of the stock or equity interests of Ascend Vantage Ltd., or (iv) any merger or consolidation or sale of all or substantially all of the property or assets of Borrower; or

(e)   failure to deliver the Payment Certification within fifteen (15) after the Payment Date; or

(f)   Borrower shall have incurred any payment obligations (other than in the ordinary course of Borrower's business) or additional debt or granted a Lien or security interest in any of the Collateral (provided Borrower may incur obligations for letters of credit so long as they are fully cash collateralized and do not exceed, in the aggregate, $100,000.00), in each case without Lender's prior written consent; or

(g)   an "Event of Default" under any other Credit Document shall have occurred.

**6.2   Acceleration upon Event of Default.** Upon the occurrence of any Event of Default (whether or not Lender has knowledge that such Event of Default exists), then the Loan and all other Obligations of Borrower to Lender under this Note and the other Credit

56067641.17

Documents shall, at the option of Lender and notwithstanding any cure period allowed in any other Credit Document, immediately become due and payable without demand and without notice to Borrower or any other person or entity.

### 7.    Lender's Rights and Remedies.

**7.1    Rights and Remedies.**  Upon the occurrence, and during the continuation, of an Event of Default: (a) Lender shall have all rights and remedies available to it at law or equity for collection of the amounts due under this Note; (b) Lender shall have all rights, powers and remedies set forth in the other Credit Documents relating to the Collateral as security for the Loan and the other Obligations, as well as any and all rights and remedies available to it under any applicable law or as otherwise provided at law or in equity; (c) Borrower shall pay to Lender, in addition to the sums stated above, the reasonable costs of collection, regardless of whether litigation is commenced, including any reasonable attorneys' (and any other consultants' or experts') fees, expenses and other costs, to the extent not prohibited by law; and (d) notwithstanding any other provision of this Note, during the period of existence of such Event of Default, interest on the Loan evidenced by this Note shall accrue and be paid, not at the Interest rate, but at the lesser of (i) the Default Rate, or (ii) the maximum lawful rate of interest under the applicable Usury Law, if any.

**7.2    Remedies Cumulative.**  Lender's rights and remedies under this Note, the Credit Documents and all other agreements related to the transactions described in the Credit Documents shall be cumulative.  Lender shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law or in equity.  No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default shall be deemed a continuing waiver.  No delay by Lender shall constitute a waiver, election, or acquiescence by it.

### 7.3    Borrower's Approvals, Ratifications, and Waivers.

(a)    Except as expressly set forth herein, to the fullest extent permitted by applicable law, Borrower, for itself, and its successors and assigns, expressly waives presentment, demand, protest, notice of dishonor, protest, notice of protest, notice of intent to accelerate, notice of acceleration, and any and all other notices, demands and consents in connection with the delivery, acceptance, performance, default or enforcement of this Note, and hereby further waives stay of execution and all suretyship defenses to payment generally.  No release of any security held for the payment of this Note, or extension of any time periods for any payments due hereunder, or release of Collateral that may be granted by Lender from time to time, and no alteration, amendment or waiver of any provision of this Note or of any of the other Credit Documents, shall modify, waive, extend, change, discharge, terminate or affect the liability of Borrower under this Note or the other Credit Documents.

(b)    No delay or omission on the part of Lender or any holder hereof in exercising its rights under this Note or under any other Credit Document, or course of conduct relating thereto, shall operate as a waiver of such rights or any other right of Lender or any holder hereof, nor shall any waiver by Lender, or any holder hereof, of any such right or rights

6

on any one occasion be deemed a bar to, or waiver of, the same right or rights on any future occasion.

(c)     Borrower covenants and agrees that it is liable with respect to all of the Obligations, including the Loan. Upon the occurrence of any Event of Default and at any time thereafter, Borrower covenants and agrees that Lender may, in its sole and absolute discretion, proceed directly against Borrower or any other person or entity liable for the payment or performance of the Obligations, or any or all of the Collateral, or other security for the Obligations, and/or any combination of the foregoing, in one or more claims, actions or proceedings, whether or not any such claims, actions or proceedings are instituted simultaneously or at different times. Borrower covenants and agrees that until all Obligations are paid in full Borrower shall not make any payments on any debt or obligations other than in the ordinary course of Borrower's business and shall not declare or pay any dividend or other distribution (whether in cash or in kind) on any of its equity interests.

(d)     Borrower covenants and agrees that it will deliver to Lender during the term of the Note (i) within thirty (30) days after the close of each month, monthly income statements, balance sheets, and cash flow statements, and (ii) within forty-five (45) days after the close of each fiscal quarter of the Borrower, confirmation from Moss Adams or another third party accounting firm mutually agreeable to Lender and Borrower as to the Borrower's financial statements for the previous quarter.

**8.     Revival and Reinstatement of Note.** To the extent that any payment to Lender and/or any payment or proceeds of any Collateral received by Lender in reduction of the Loan is subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, to Borrower (or Borrower's successor) as a debtor-in-possession, or to a receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then the portion of the Loan intended to have been satisfied by such payment or proceeds shall remain due and payable hereunder, be evidenced by this Note, and shall continue in full force and effect as if such payment or proceeds had never been received by Lender whether or not this Note has been marked "paid" or otherwise canceled or satisfied and/or has been delivered to Borrower, and in such event Borrower shall immediately return the original Note to Lender and any marking of "paid" or other similar marking shall be of no force and effect.

**9.     Lender's Fees, Expenses and Costs.** Borrower shall pay to Lender, upon demand, all expenses, costs, charges, disbursements, and reasonable attorneys' fees incurred by Lender in connection with the underwriting, origination, making, documentation, administration, enforcement and/or collection of the Loan, the Obligations and/or the Credit Documents, and the creation, perfection, and enforcement of the Liens granted under the Credit Documents, and all such amounts incurred by Lender shall be part of the Obligations.

**10.     Authority.** Borrower warrants and represents that the persons or officers who are executing this Note and the other Credit Documents on behalf of Borrower have full right, power and authority to do so, and that this Note and the other Credit Documents constitute valid and binding documents, enforceable against Borrower in accordance with their terms, and that no other person, entity, or party is required to sign, approve, or consent to, this Note.

7

**11.     Transfer of Note.** Lender may assign, by sale, participation, or otherwise all or any portion of its rights and obligations under this Note to any affiliate of Lender without Borrower's consent.

**12.     Governing Law; Consent to Forum.** This Note shall be governed by the laws of the State of New York without giving effect to any choice of law rules thereof; provided, however, that if any of the Collateral shall be located in any jurisdiction other than New York, the laws of such jurisdiction shall govern the method, manner and procedure for foreclosure of Lender's Lien upon such Collateral and the enforcement of Lender's other remedies in respect of such Collateral to the extent that the laws of such jurisdiction are different from or inconsistent with the laws of New York. AS PART OF THE CONSIDERATION FOR NEW VALUE THIS DAY RECEIVED, BORROWER HEREBY CONSENTS TO THE JURISDICTION OF COURT LOCATED IN NEW YORK, AND WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS BE MADE BY CERTIFIED OR REGISTERED MAIL AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT THEREOF.   BORROWER WAIVES ANY OBJECTION TO JURISDICTION AND VENUE OF ANY ACTION INSTITUTED AGAINST IT AS PROVIDED HEREIN AND AGREES NOT TO ASSERT ANY DEFENSE BASED ON LACK OF JURISDICTION OR VENUE.    BORROWER FURTHER AGREES NOT TO ASSERT AGAINST LENDER (EXCEPT BY WAY OF A DEFENSE OR COUNTERCLAIM IN A PROCEEDING INITIATED BY LENDER) ANY CLAIM OR OTHER ASSERTION OF LIABILITY WITH RESPECT TO THE CREDIT DOCUMENTS, LENDER'S CONDUCT OR OTHERWISE IN ANY JURISDICTION OTHER THAN THE FOREGOING JURISDICTIONS.  NOTWITHSTANDING THE FOREGOING, LENDER HAS THE RIGHT TO BRING ANY ACTION OR PROCEEDING AGAINST BORROWER OR ITS PROPERTY IN ANY COURTS OF ANY OTHER JURISDICTION LENDER DEEMS NECESSARY OR APPROPRIATE IN ORDER TO REALIZE ON THE COLLATERAL.

**13.     WAIVER OF JURY TRIAL AND COUNTERCLAIMS.** TO THE FULLEST EXTENT PERMITTED BY LAW, AND AS SEPARATELY BARGAINED-FOR CONSIDERATION TO LENDER, BORROWER HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY (WHICH LENDER ALSO WAIVES) IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR OTHERWISE RELATING TO ANY OF THE CREDIT DOCUMENTS, THE OBLIGATIONS, THE COLLATERAL, OR LENDER'S CONDUCT IN RESPECT OF ANY OF THE FOREGOING.  TO EFFECTUATE THE FOREGOING, LENDER IS HEREBY GRANTED AN IRREVOCABLE POWER OF ATTORNEY TO FILE, AS ATTORNEY-IN-FACT FOR BORROWER, A COPY OF THIS NOTE IN ANY NEW YORK COURT, AND THE COPY OF THIS NOTE SO FILED SHALL CONCLUSIVELY BE DEEMED TO CONSTITUTE BORROWER'S WAIVER OF TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR OTHERWISE RELATING TO ANY OF THE CREDIT DOCUMENTS, THE OBLIGATIONS, THE COLLATERAL OR LENDER'S CONDUCT IN RESPECT OF ANY OF THE FOREGOING.

**14.     Miscellaneous.**

(a)     Time is of the essence in this Note.

8

(b)     Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdiction.

(c)     This Note and the other Credit Documents collectively: (i) constitute the final expression of the agreement between Borrower and Lender concerning the Loan; (ii) contain the entire agreement between Borrower and Lender respecting the matters set forth herein and in such other Credit Documents; and (iii) may not be contradicted by evidence of any prior or contemporaneous oral agreements or understandings between Borrower and Lender. Neither this Note nor any of the terms hereof may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing executed by the party against which enforcement of the termination, amendment, supplement, waiver or modification is sought.

(d)     If there is a conflict between or among the terms, covenants, conditions or provisions of this Note and the other Credit Documents, any term, covenant, condition and/or provision that Lender may elect to enforce from time to time so as to enlarge the interest of Lender in its security for the Obligations, afford Lender the maximum financial benefits or security for the Obligations, and/or provide Lender the maximum assurance of payment of the Loan and the Obligations in full shall control. BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS BEEN PROVIDED WITH SUFFICIENT AND NECESSARY TIME AND OPPORTUNITY TO REVIEW THE TERMS OF THIS NOTE AND EACH OF THE CREDIT DOCUMENTS WITH ANY AND ALL COUNSEL IT DEEMS APPROPRIATE, AND THAT NO INFERENCE IN FAVOR OF, OR AGAINST, LENDER OR BORROWER SHALL BE DRAWN FROM THE FACT THAT EITHER SUCH PARTY HAS DRAFTED ANY PORTION OF THIS NOTE OR ANY OF THE CREDIT DOCUMENTS.

9

IN WITNESS WHEREOF, Borrower has executed and delivered this Note to Lender and Lender has accepted this Note from Borrower as of the day and year first above written.

**BLUEFLY ACQUISITION, LLC**

By:_____

Name:_____Richard Cohen_____

Title:_____Manager_____

[SIGNATURE PAGE TO TERM NOTE]

## ALLONGE

This Allonge forms a part of that certain Term Note dated March 7, 2017, in the original principal amount of $12,250,000.00, given by **BLUEFLY ACQUISITION, LLC**, a Delaware limited liability company, to the order of **CLEARLAKE CAPITAL PARTNERS II (MASTER), L.P.**, a Delaware limited partnership and **CLEARLAKE CAPITAL PARTNERS III (MASTER), L.P.**, a Delaware limited partnership.

Pay to the order of **TOTAL FASHION, INC.**, a Delaware corporation, without recourse, representation or warranty.

Executed this _14_ day of _January_, 2019

[SIGNATURE ON FOLLOWING PAGE]

**CLEARLAKE CAPITAL PARTNERS II (MASTER, L.P.,** a Delaware limited partnership

By:  Clearlake General Partners II GP, L.P.,
       its General Partner

    By:  Clearlake Capital Partners, LLC,
             its General Partner

        By: _____
               Name: Fred Ebrahemi
               Title: General Counsel

**CLEARLAKE CAPITAL PARTNERS III (MASTER, L.P.,** a Delaware limited partnership

By:  Clearlake General Partners III GP, L.P.,
       its General Partner

    By:  Clearlake Capital Partners, LLC,
             its General Partner

        By: _____
               Name: Fred Ebrahemi
               Title: General Counsel

EXHIBIT "B"

### GENERAL SECURITY AGREEMENT

This General Security Agreement (the *"Agreement"*) is dated as of March 7, 2017, between BLUEFLY ACQUISITION, LLC, a Delaware limited liability company (the *"Debtor"*), with its mailing address as set forth in Section 12(b) hereof, and CLEARLAKE CAPITAL PARTNERS II (MASTER), L.P., a Delaware limited partnership (*"CCP II"*) and CLEARLAKE CAPITAL PARTNERS III (MASTER), L.P., a Delaware limited partnership (*"CCP III"*, and together with CCP II, the *"Secured Party"*), with its mailing address as set forth in Section 12(b) hereof.

### PRELIMINARY STATEMENT

A.    Debtor desires that Secured Party make a loan to Debtor in the principal amount of Twelve Million Two Hundred Fifty Thousand and NO/100 Dollars ($12,250,000.00) (the *"Loan"*), as partial payment of the Purchase Price (as defined in that certain Asset Purchase Agreement dated as of even date herewith by and among Bluefly, Inc., Bluefly Holdings, Inc., DSI Assignments, LLC. solely in its capacity as assignee under an Assignment for the Benefit of Creditors of Bluefly, Inc. and Bluefly Holdings, and Debtor (the *"APA"*)) and as a partial prepayment of certain loans made by Secured Party to Bluefly, Inc. (*"Bluefly"*) evidenced by those certain 8% Subordinated Secured Promissory Notes due 2017 from Bluefly to Secured Party dated as of August 1, 2016.

B.    As a condition to extending credit or otherwise making financial accommodations available to or for the account of the Debtor, the Secured Party requires, among other things, that the Debtor grant the Secured Party a security interest in the Debtor's personal property described herein subject to the terms and conditions hereof.

NOW, THEREFORE, in consideration of the benefits accruing to the Debtor, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

*Section 1.    Grant of Security Interest.* The Debtor hereby grants to the Secured Party, for the benefit of itself and as representative for the benefit of its affiliates, a lien on and security interest in, and acknowledges and agrees that the Secured Party has and shall continue to have a continuing lien on and security interest in, all right, title, and interest of the Debtor, whether now owned or existing or hereafter created, acquired, or arising, in and to all of the following:

(a)    Accounts;

(b)    Chattel Paper;

(c)    Instruments (including Promissory Notes);

     (d)     Documents;

     (e)     General Intangibles (including Payment Intangibles and Software, patents, trademarks, tradestyles, copyrights, and all other intellectual property rights, including all applications, registration, and licenses therefor, and all goodwill of the business connected therewith or represented thereby);

     (f)     Letter-of-Credit Rights;

     (g)     Supporting Obligations;

     (h)     Deposit Accounts;

     (i)     Investment Property (including certificated and uncertificated Securities, Securities Accounts, Security Entitlements, Commodity Accounts, and Commodity Contracts);

     (j)     Inventory;

     (k)     Equipment (including all software, whether or not the same constitutes embedded software, used in the operation thereof);

     (l)     Fixtures;

     (m)     Commercial Tort Claims (as described on Schedule G hereto or on one or more supplements to this Agreement);

     (n)     Rights to merchandise and other Goods (including rights to returned or repossessed Goods and rights of stoppage in transit) which is represented by, arises from, or relates to any of the foregoing;

     (o)     Monies, personal property, and interests in personal property of the Debtor of any kind or description now held by the Secured Party or at any time hereafter transferred or delivered to, or coming into the possession, custody, or control of, the Secured Party, or any agent or affiliate of the Secured Party, whether expressly as collateral security or for any other purpose (whether for safekeeping, custody, collection or otherwise), and all dividends and distributions on or other rights in connection with any such property;

     (p)     Supporting evidence and documents relating to any of the above-described property, including, without limitation, computer programs, disks, tapes and related electronic data processing media, and all rights of the Debtor to retrieve the same from third parties, written applications, credit information, account cards, payment records, correspondence, delivery and installation certificates, invoice copies, delivery receipts, notes, and other evidences of indebtedness, insurance certificates and the like, together

-2-

with all books of account, ledgers, and cabinets in which the same are reflected or maintained;

(q)    Accessions and additions to, and substitutions and replacements of, any and all of the foregoing; and

(r)    Proceeds and products of the foregoing, and all insurance of the foregoing and proceeds thereof;

all of the foregoing being herein sometimes referred to as the *"Collateral"*.  All terms which are used in this Agreement which are defined in the Uniform Commercial Code of the State of New York as in effect from time to time (*"UCC"*) shall have the same meanings herein as such terms are defined in the UCC, unless this Agreement shall otherwise specifically provide.  For purposes of this Agreement, the term *"Receivables"* means all rights to the payment of a monetary obligation, whether or not earned by performance, and whether evidenced by an Account, Chattel Paper, Instrument, General Intangible, or otherwise.

*Section 2.    Obligations Hereby Secured.*  The lien and security interest herein granted and provided for is made and given to secure, and shall secure. the payment and performance of (a) the Loan and any and all indebtedness, obligations, and liabilities of whatsoever kind and nature of the Debtor to the Secured Party (whether arising before or after the filing of a petition in bankruptcy and including, without limitation, interest which but for the filing of a petition in bankruptcy would accrue on such obligations), whether direct or indirect, absolute or contingent, due or to become due, and whether now existing or hereafter arising and howsoever held, evidenced, or acquired, and whether several, joint or joint and several, and (b) any and all expenses and charges, legal or otherwise, suffered or incurred by the Secured Party or any affiliate of the Secured Party in collecting or enforcing any of such indebtedness, obligations or liabilities or in realizing on or protecting or preserving any security therefor, including, without limitation, the lien and security interest granted hereby (all of the foregoing being hereinafter referred to collectively as the *"Obligations"*).

*Section 3.    Covenants, Agreements, Representations and Warranties.*  The Debtor hereby covenants and agrees with, and represents and warrants to, the Secured Party that:

(a)    The Debtor is a limited liability company duly organized and validly existing in good standing under the laws of the jurisdiction of its organization. The Debtor shall not change its jurisdiction of organization without the Secured Party's prior written consent.  The Debtor is the sole and lawful owner of the Collateral, and has full right, power and authority to enter into this Security Agreement and to perform each and all of the matters and things herein provided for. The execution and delivery of this Security Agreement, and the observance and performance of each of the matters and things herein set forth, will not (i) contravene or constitute a default under any provision of law or any judgment, injunction, order or decree binding upon the Debtor or any provision of the Debtor's organizational documents (*e.g.*, charter, articles or certificate of incorporation and by-laws, articles or certificate of formation and limited liability company operating agreement, partnership agreement, or similar organizational documents) or any covenant, indenture or agreement of or affecting the Debtor or any of its property or (ii) result in

-3-

the creation or imposition of any lien or encumbrance on any property of the Debtor except for the lien and security interest granted to the Secured Party hereunder. The Debtor's organizational registration number (if any) is 6317561.

(b)    The Debtor's chief executive office and principal place of business is at, and the Debtor keeps and shall keep all of its books and records relating to Receivables only at its address set forth in Section 12(b); and the Debtor has no other executive offices or places of business other than those listed under Item 1 on Schedule A. The Collateral is and shall remain in the Debtor's possession or control at the locations listed under Item 2 on Schedule A attached hereto (collectively, the *"Permitted Collateral Locations"*), except for (i) Collateral which in the ordinary course of the Debtor's business is in transit between Permitted Collateral Locations and (ii) Collateral subject to a bailee agreement for the benefit of Secured Party. If for any reason any Collateral is at any time kept or located at a location other than a Permitted Collateral Location, the Secured Party shall nevertheless have and retain a lien on and security interest therein. The Debtor owns and shall at all times own all Permitted Collateral Locations, except to the extent otherwise disclosed under Item 2 on Schedule A. The Debtor shall not move its chief executive office or maintain a place of business at a location other than those specified under Item 1 on Schedule A or permit the Collateral to be located at a location other than those specified under Item 2 on Schedule A, in each case without first providing the Secured Party 30 days' prior written notice of the Debtor's intent to do so; *provided* that the Debtor shall at all times maintain its chief executive office and, unless otherwise specifically agreed to in writing by the Secured Party, Permitted Collateral Locations in the United States of America and, with respect to any new chief executive office or place of business or location of Collateral, the Debtor shall have taken all action requested by the Secured Party to maintain the lien and security interest of the Secured Party in the Collateral at all times fully perfected and in full force and effect.

(c)    The Debtor's legal name and jurisdiction of organization is correctly set forth in the first paragraph of this Agreement. The Debtor has not transacted business at any time during the immediately preceding five-year period, and does not currently transact business, under any other legal names or trade names other than the prior legal names and trade names (if any) set forth on Schedule B attached hereto. The Debtor shall not change its legal name or transact business under any other trade name without first giving 30 days' prior written notice of its intent to do so to the Secured Party.

(d)    The Collateral and every part thereof is and shall be free and clear of all security interests, liens (including, without limitation, mechanics', laborers' and statutory liens), attachments, levies, and encumbrances of every kind, nature and description, whether voluntary or involuntary, except for the lien and security interest of the Secured Party therein and as otherwise provided on Schedule C attached hereto. The Debtor shall warrant and defend the Collateral against any claims and demands of all persons at any time claiming the same or any interest in the Collateral adverse to the Secured Party.

(e)    The Debtor shall promptly pay when due all taxes, assessments and governmental charges and levies upon or against the Debtor or any of the Collateral, in each case before the same become delinquent and before penalties accrue thereon, unless and to the extent that the same are being contested in good faith by appropriate proceedings which prevent foreclosure or

-4-

other realization upon any of the Collateral and preclude interference with the operation of the Debtor's business in the ordinary course, and the Debtor shall have established adequate reserves therefor.

(f)     The Debtor shall not use, manufacture, sell, or distribute any Collateral in violation of any statute, ordinance, or other governmental requirement. The Debtor shall not waste or destroy the Collateral or any part thereof or be negligent in the care or use of any Collateral. The Debtor shall perform in all material respects its obligations under any contract or other agreement constituting part of the Collateral, it being understood and agreed that the Secured Party has no responsibility to perform such obligations.

(g)     Subject to Sections 4(b), 6(b), 6(c), and 7(c) hereof, the Debtor shall not, without the Secured Party's prior written consent, sell, assign, mortgage, lease or otherwise dispose of the Collateral or any interest therein.

(h)     The Debtor shall at all times insure the Collateral consisting of tangible personal property against such risks and hazards as other persons similarly situated insure against, and including in any event loss or damage by fire, theft, burglary, pilferage, loss in transit and such other hazards as the Secured Party may specify. All insurance required hereby shall be maintained in amounts and under policies and with insurers acceptable to the Secured Party, and all such policies shall contain loss payable clauses naming the Secured Party as loss payee as its interest may appear (and, if the Secured Party requests, naming the Secured Party as an additional insured therein) in a form acceptable to the Secured Party. All premiums on such insurance shall be paid by the Debtor. Certificates of insurance evidencing compliance with the foregoing and, at the Secured Party's request, the policies of such insurance shall be delivered by the Debtor to the Secured Party. All insurance required hereby shall provide that any loss shall be payable to the Secured Party notwithstanding any act or negligence of the Debtor, shall provide that no cancellation thereof shall be effective until at least 30 days after receipt by the Debtor and the Secured Party of written notice thereof, and shall be satisfactory to the Secured Party in all other respects. In case of any material loss, damage to, or destruction of the Collateral or any part thereof, the Debtor shall promptly give written notice thereof to the Secured Party generally describing the nature and extent of such damage or destruction. In case of any loss, damage to or destruction of the Collateral or any part thereof, the Debtor, whether or not the insurance proceeds, if any, received on account of such damage or destruction shall be sufficient for that purpose, at the Debtor's cost and expense, shall promptly repair or replace the Collateral so lost, damaged, or destroyed. In the event the Debtor shall receive any proceeds of such insurance, the Debtor shall immediately pay over such proceeds to the Secured Party. The Debtor hereby authorizes the Secured Party, at the Secured Party's option, to adjust, compromise and settle any losses under any insurance afforded, and the Debtor does hereby irrevocably constitute the Secured Party, and each of its nominees, officers, agents, attorneys, and any other person whom the Secured Party may designate, as the Debtor's attorneys-in-fact, with full power and authority to effect such adjustment, compromise and/or settlement and to endorse any drafts drawn by an insurer of the Collateral or any part thereof and to do everything necessary to carry out such purposes and to receive and receipt for any unearned premiums due under policies of such insurance. Unless the Secured Party elects to adjust, compromise or settle losses as aforesaid, any adjustment, compromise and/or settlement of any losses under any insurance shall be made by the

-5-

Debtor subject to final approval of the Secured Party (regardless of whether or not an Event of Default shall have occurred). Net insurance proceeds received by the Secured Party under the provisions hereof or under any policy of insurance covering the Collateral or any part thereof shall be applied to the reduction of the Obligations (whether or not then due); *provided, however,* that the Secured Party may in its sole discretion release any or all such insurance proceeds to the Debtor. All insurance proceeds shall be subject to the lien and security interest of the Secured Party hereunder.

UNLESS THE DEBTOR PROVIDES THE SECURED PARTY WITH EVIDENCE OF THE INSURANCE COVERAGE REQUIRED BY THIS SECURITY AGREEMENT, THE SECURED PARTY MAY PURCHASE INSURANCE AT THE DEBTOR'S EXPENSE TO PROTECT THE SECURED PARTY'S INTERESTS IN THE COLLATERAL. THIS INSURANCE MAY, BUT NEED NOT, PROTECT THE DEBTOR'S INTERESTS IN THE COLLATERAL. THE COVERAGE PURCHASED BY THE SECURED PARTY MAY NOT PAY ANY CLAIMS THAT THE DEBTOR MAKES OR ANY CLAIM THAT IS MADE AGAINST THE DEBTOR IN CONNECTION WITH THE COLLATERAL. THE DEBTOR MAY LATER CANCEL ANY SUCH INSURANCE PURCHASED BY THE SECURED PARTY, BUT ONLY AFTER PROVIDING THE SECURED PARTY WITH EVIDENCE THAT THE DEBTOR HAS OBTAINED INSURANCE AS REQUIRED BY THIS SECURITY AGREEMENT. IF THE SECURED PARTY PURCHASES INSURANCE FOR THE COLLATERAL, THE DEBTOR WILL BE RESPONSIBLE FOR THE COSTS OF THAT INSURANCE, INCLUDING INTEREST AND ANY OTHER CHARGES THAT THE SECURED PARTY MAY IMPOSE IN CONNECTION WITH THE PLACEMENT OF THE INSURANCE, UNTIL THE EFFECTIVE DATE OF THE CANCELLATION OR EXPIRATION OF THE INSURANCE. THE COSTS OF THE INSURANCE MAY BE ADDED TO THE OBLIGATIONS SECURED HEREBY. THE COSTS OF THE INSURANCE MAY BE MORE THAN THE COST OF INSURANCE THE DEBTOR MAY BE ABLE TO OBTAIN ON ITS OWN.

(i)    The Debtor shall at all times allow the Secured Party and its representatives free access to and right of inspection of the Collateral.

(j)    If any Collateral is in the possession or control of any of the Debtor's agents or processors and the Secured Party so requests, the Debtor agrees to notify such agents or processors in writing of the Secured Party's security interest therein and instruct them to hold all such Collateral for the Secured Party's account and subject to the Secured Party's instructions. The Debtor shall, upon the request of the Secured Party, authorize and instruct all bailees and other parties, if any, at any time processing, labeling, packaging, holding, storing, shipping or transferring all or any part of the Collateral to permit the Secured Party and its representatives to examine and inspect any of the Collateral then in such party's possession and to verify from such party's own books and records any information concerning the Collateral or any part thereof which the Secured Party or its representatives may seek to verify. As to any premises not owned by the Debtor wherein any of the Collateral is located, the Debtor shall, (i) within thirty (30) days from the date of this Agreement with respect to in place Collateral or (ii) prior to the date of such Collateral being moved to premises not owned by the Debtor after the date of this Agreement, cause each party having any right, title or interest in, or lien on, any of such premises to enter into an agreement (any such agreement to contain a legal description of such premises) whereby such party disclaims any right, title and interest in, and lien on, the Collateral and allows the removal of

such Collateral by the Secured Party and is otherwise in form and substance acceptable to the Secured Party.

(k)   The Debtor agrees from time to time to deliver to the Secured Party such evidence of the existence, identity and location of the Collateral and of its availability as collateral security pursuant hereto (including, without limitation, schedules describing all Receivables created or acquired by the Debtor, copies of customer invoices or the equivalent and original shipping or delivery receipts for all merchandise and other goods sold or leased or services rendered, together with the Debtor's warranty of the genuineness thereof, and reports stating the book value of Inventory and Equipment by major category and location), in each case as the Secured Party may request.  The Secured Party shall have the right to verify all or any part of the Collateral in any manner, and through any medium, which the Secured Party considers appropriate (including, without limitation, the verification of Collateral by use of a fictitious name), and the Debtor agrees to furnish all assistance and information, and perform any acts, which the Secured Party may require in connection therewith.  The Debtor shall promptly notify the Secured Party of any Collateral which the Debtor has determined to have been rendered obsolete, stating the prior book value of such Collateral, its type and location.

(l)   The Debtor shall comply with the terms and conditions of all leases, easements, right-of-way agreements and other similar agreements binding upon the Debtor or affecting the Collateral or any part thereof, and all orders, ordinances, laws and statutes of any city, state or other governmental entity, department, or agency having jurisdiction with respect to the premises wherein such Collateral is located or the conduct of business thereon.

(m)   Schedule D attached hereto contains a true, complete, and current listing of all patents, trademarks, tradestyles, copyrights, and other intellectual property rights (including all registrations and applications therefor) owned by the Debtor as of the date hereof that are registered with any governmental authority.  The Debtor shall promptly notify the Secured Party in writing of any additional intellectual property rights acquired or arising after the date hereof, and shall submit to the Secured Party a supplement to Schedule D to reflect such additional rights (provided the Debtor's failure to do so shall not impair the Secured Party's security interest therein).  The Debtor owns or possesses rights to use all franchises, licenses, patents, trademarks, trade names, tradestyles, copyrights, and rights with respect to the foregoing which are required to conduct its business.  No event has occurred which permits, or after notice or lapse of time or both would permit, the revocation or termination of any such rights, and the Debtor is not liable to any person for infringement under applicable law with respect to any such rights as a result of its business operations.

(n)   Schedule G attached hereto contains a true, complete and current listing of all Commercial Tort Claims held by the Debtor as of the date hereof, each described by reference to the specific incident given rise to the claim.  The Debtor agrees to execute and deliver to the Secured Party a supplement to this Agreement in the form attached hereto as Schedule H, or in such other form acceptable to the Secured Party, promptly upon becoming aware of any other Commercial Tort Claim held or maintained by the Debtor arising after the date hereof (provided the Debtor's failure to do so shall not impair the Secured Party's security interest therein).

56065060.7

(o)     The Debtor agrees to execute and deliver to the Secured Party such further agreements, assignments, instruments, and documents and to do all such other things as the Secured Party may deem necessary or appropriate to assure the Secured Party its lien and security interest hereunder, including, without limitation, (i) such financing statements, and amendments thereof or supplements thereto, and such other instruments and documents as the Secured Party may from time to time require in order to comply with the UCC and any other applicable law, (ii) such agreements with respect to patents, trademarks, copyrights, and similar intellectual property rights as the Secured Party may from time to time require to comply with the filing requirements of the United States Patent and Trademark Office and the United States Copyright Office, and (iii) such control agreements with respect to Deposit Accounts, Investment Property, Letter-of-Credit Rights, and electronic Chattel Paper, and to cause the relevant depository institutions, financial intermediaries, and issuers to execute and deliver such control agreements, as the Secured Party may from time to time require.  The Debtor hereby agrees that a carbon, photographic or other reproduction of this Security Agreement or any such financing statement is sufficient for filing as a financing statement by the Secured Party without notice thereof to the Debtor wherever the Secured Party in its sole discretion desires to file the same.  The Debtor hereby authorizes the Secured Party to file any and all financing statements covering the Collateral or any part thereof as the Secured Party may require, including financing statements describing the Collateral as "all assets" or "all personal property" or words of like meaning.  The Secured Party may order lien searches from time to time against the Debtor and the Collateral, and the Debtor shall promptly reimburse the Secured Party for all costs and expenses incurred in connection with such lien searches.  In the event for any reason the law of any jurisdiction other than New York becomes or is applicable to the Collateral or any part thereof, or to any of the Obligations, the Debtor agrees to execute and deliver all such instruments and documents and to do all such other things as the Secured Party in its sole discretion deems necessary or appropriate to preserve, protect, and enforce the lien and security interest of the Secured Party under the law of such other jurisdiction.  The Debtor agrees to mark its books and records to reflect the lien and security interest of the Secured Party in the Collateral.

(p)     On failure of the Debtor to perform any of the covenants and agreements herein contained, the Secured Party may, at its option, perform the same and in so doing may expend such sums as the Secured Party may deem advisable in the performance thereof, including, without limitation, the payment of any insurance premiums, the payment of any taxes, liens and encumbrances, expenditures made in defending against any adverse claims, and all other expenditures which the Secured Party may be compelled to make by operation of law or which the Secured Party may make by agreement or otherwise for the protection of the security hereof.  All such sums and amounts so expended shall be repayable by the Debtor immediately without notice or demand, shall constitute additional Obligations secured hereunder and shall bear interest from the date said amounts are expended at the rate per annum (computed on the basis of a 360-day year for the actual number of days elapsed) determined by adding 6.0% to the rate per annum from time to time announced or otherwise established by the Secured Party as its prime commercial rate with any change in such rate per annum as so determined by reason of a change in such prime commercial rate to be effective on the date of such change in said prime commercial rate (such rate per annum as so determined being hereinafter referred to as the *"Default Rate"*).  No such performance of any covenant or agreement by the Secured Party on behalf of the Debtor, and no such advancement or expenditure therefor, shall relieve the Debtor of any default under

-8-

the terms of this Security Agreement or in any way obligate the Secured Party to take any further or future action with respect thereto. The Secured Party, in making any payment hereby authorized, may do so according to any bill, statement or estimate procured from the appropriate public office or holder of the claim to be discharged without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax assessment, sale, forfeiture, tax lien or title or claim. The Secured Party, in performing any act hereunder, shall be the sole judge of whether the Debtor is required to perform same under the terms of this Security Agreement. The Secured Party is hereby authorized to charge any account of the Debtor maintained with the Secured Party for the amount of such sums and amounts so expended.

### Section 4.    Special Provisions Re: Receivables.

(a)    As of the time any Receivable becomes subject to the security interest provided for hereby, and at all times thereafter, the Debtor shall be deemed to have warranted as to each and all of such Receivables that all warranties of the Debtor set forth in this Security Agreement are true and correct with respect to each such Receivable; that each Receivable and all papers and documents relating thereto are genuine and in all respects what they purport to be; that each Receivable is valid and subsisting; that no such Receivable is evidenced by any Instrument or Chattel Paper unless such Instrument or Chattel Paper has theretofore been endorsed by the Debtor and delivered to the Secured Party (except to the extent the Secured Party specifically requests the Debtor not to do so with respect to any such Instrument or Chattel Paper); that no surety bond was required or given in connection with such Receivable or the contracts or purchase orders out of which the same arose; that the amount of the Receivable represented as owing is the correct amount actually and unconditionally owing, except for normal cash discounts on normal trade terms in the ordinary course of business; and that the amount of such Receivable represented as owing is not disputed and is not subject to any set-offs, credits, deductions or countercharges other than those arising in the ordinary course of the Debtor's business which are disclosed to the Secured Party in writing promptly upon the Debtor becoming aware thereof. Without limiting the foregoing, if any Receivable arises out of a contract with the United States of America, or any state or political subdivision thereof, or any department, agency or instrumentality of any of the foregoing, the Debtor agrees to notify the Secured Party and, at the Secured Party's request, execute whatever instruments and documents are required by the Secured Party in order that such Receivable shall be assigned to the Secured Party and that proper notice of such assignment shall be given under the federal Assignment of Claims Act (or any successor statute) or any similar state or local statute, as the case may be.

(b)    Unless and until an Event of Default occurs, any merchandise or other goods which are returned by a customer or account debtor or otherwise recovered may be resold by the Debtor in the ordinary course of its business as presently conducted in accordance with Section 6(b) hereof; and, during the existence of any Event of Default, such merchandise and other goods shall be set aside at the request of the Secured Party and held by the Debtor as trustee for the Secured Party and shall remain part of the Secured Party's Collateral. Unless and until an Event of Default occurs, the Debtor may settle and adjust disputes and claims with its customers and account debtors, handle returns and recoveries and grant discounts, credits and allowances in the ordinary course of its business as presently conducted for amounts and on terms which the Debtor in good faith considers advisable; and, during the existence of any Event of Default, **at the Secured**

56065060.7

**Party's request,** the Debtor shall notify the Secured Party promptly of all returns and recoveries and, on the Secured Party's request, deliver any such merchandise or other goods to the Secured Party. During the existence of any Event of Default, the Debtor shall also notify the Secured Party promptly of all disputes and claims and settle or adjust them at no expense to the Secured Party, but no discount, credit or allowance other than on normal trade terms in the ordinary course of business as presently conducted shall be granted to any customer or account debtor and no returns of merchandise or other goods shall be accepted by the Debtor without the Secured Party's consent. The Secured Party may, at all times during the existence of any Event of Default, settle or adjust disputes and claims directly with customers or account debtors for amounts and upon terms which the Secured Party considers advisable.

(c)     Unless delivered to the Secured Party or its agent, all tangible Chattel Paper and Instruments shall contain a legend acceptable to the Secured Party indicating that such Chattel Paper or Instrument is subject to the security interest of the Secured Party contemplated by this Security Agreement.

     *Section 5.     Collection of Receivables.*

(a)     Except as otherwise provided in this Security Agreement, the Debtor shall make collection of all Receivables and may use the same to carry on its business in accordance with sound business practice and otherwise subject to the terms hereof.

(b)     Whether or not any Event of Default has occurred and whether or not the Secured Party has exercised any or all of its rights under other provisions of this Section 5, in the event the Secured Party requests the Debtor to do so:

(i)     all Instruments and Chattel Paper at any time constituting part of the Receivables or any other Collateral (including any postdated checks) shall, upon receipt by the Debtor, be immediately endorsed to and deposited with the Secured Party; and/or

(ii)     the Debtor shall instruct all customers and account debtors to remit all payments in respect of Receivables or any other Collateral to a lockbox or lockboxes under the sole custody and control of the Secured Party as directed by the Secured Party.

(c)     Whether or not any Event of Default has occurred and whether or not the Secured Party has exercised any or all of its rights under other provisions of this Section 5, the Secured Party or its designee may notify the Debtor's customers and account debtors at any time that Receivables or any other Collateral have been assigned to the Secured Party or of the Secured Party's security interest therein, and either in its own name, or the Debtor's name, or both, demand, collect (including, without limitation, through a lockbox analogous to that described in Section 5(b)(ii) hereof), receive, receipt for, sue for, compound and give acquittance for any or all amounts due or to become due on Receivables or any other Collateral, and in the Secured Party's discretion file any claim or take any other action or proceeding which the Secured Party may deem necessary or appropriate to protect or realize upon the security interest of the Secured Party in the Receivables or any other Collateral.

-10-

56065060.7

(d)     Any proceeds of Receivables or other Collateral transmitted to or otherwise received by the Secured Party pursuant to any of the provisions of Sections 5(b) or 5(c) hereof may be handled and administered by the Secured Party in and through a remittance account at the Secured Party, and the Debtor acknowledges that the maintenance of such remittance account by the Secured Party is solely for the Secured Party's convenience and that the Debtor does not have any right, title or interest in such remittance account or any amounts at any time standing to the credit thereof. The Secured Party may apply all or any part of any proceeds of Receivables or other Collateral received by it from any source to the payment of the Obligations (whether or not then due and payable), such applications to be made in such amounts, in such manner and order and at such intervals as the Secured Party may from time to time in its discretion determine, but not less often than once each week. The Secured Party need not apply or give credit for any item included in proceeds of Receivables or other Collateral until the Secured Party has received final payment therefor at its office in cash. However, if the Secured Party does give credit for any item prior to receiving final payment therefor and the Secured Party fails to receive such final payment or an item is charged back to the Secured Party for any reason, the Secured Party may at its election in either instance charge the amount of such item back against the remittance account or any account of the Debtor maintained with the Secured Party, together with interest thereon at the Default Rate. Concurrently with each transmission of any proceeds of Receivables or other Collateral to the remittance account, the Debtor shall furnish the Secured Party with a report in such form as the Secured Party shall require identifying the particular Receivable or other Collateral from which the same arises or relates. Unless and until an Event of Default or an event or condition which with the lapse of time or the giving of notice, or both, would constitute an Event of Default shall have occurred, the Secured Party will release proceeds of Collateral which the Secured Party has not applied to the Obligations as provided above from the remittance account from time to time promptly after receipt thereof. The Debtor hereby indemnifies the Secured Party from and against all liabilities, damages, losses, actions, claims, judgments, costs, expenses, charges and attorneys' fees suffered or incurred by the Secured Party because of the maintenance of the foregoing arrangements; *provided, however,* that the Debtor shall not be required to indemnify the Secured Party for any of the foregoing to the extent they arise solely from the gross negligence or willful misconduct of the Secured Party. The Secured Party shall have no liability or responsibility to the Debtor for accepting any check, draft or other order for payment of money bearing the legend "payment in full" or words of similar import or any other restrictive legend or endorsement whatsoever or be responsible for determining the correctness of any remittance.

*Section 6.     Special Provisions Re: Inventory and Equipment.*

(a)     The Debtor shall at its own cost and expense maintain, keep and preserve the Inventory in good and merchantable condition and keep and preserve the Equipment in good repair, working order and condition, ordinary wear and tear excepted, and, without limiting the foregoing, make all necessary and proper repairs, replacements and additions to the Equipment so that the efficiency thereof shall be fully preserved and maintained.

(b)     The Debtor may, until otherwise notified by the Secured Party, use, consume and sell the Inventory in the ordinary course of its business, but a sale in the ordinary course of business

56065060.7

shall not under any circumstance include any transfer or sale in satisfaction, partial or complete, of a debt owing by the Debtor.

(c)    The Debtor may, until otherwise notified by the Secured Party, sell obsolete, worn out or unusable Equipment which is concurrently replaced with similar Equipment at least equal in quality and condition to that sold and owned by the Debtor free of any lien, charge or encumbrance other than the security interest granted hereby.

(d)    As of the time any Inventory or Equipment becomes subject to the security interest provided for hereby and at all times thereafter, the Debtor shall be deemed to have warranted as to any and all of such Inventory and Equipment that all warranties of the Debtor set forth in this Security Agreement are true and correct with respect to such Inventory and Equipment; that all of such Inventory and Equipment is located at a location set forth pursuant to Section 3(b) hereof; and that, in the case of Inventory, such Inventory is new and unused and in good and merchantable condition.   The Debtor warrants and agrees that no Inventory is or will be consigned to any other person without the Secured Party's prior written consent.

(e)    The Debtor shall at its own cost and expense cause the lien of the Secured Party in and to any portion of the Collateral subject to a certificate of title law to be duly noted on such certificate of title or to be otherwise filed in such manner as is prescribed by law in order to perfect such lien and shall cause all such certificates of title and evidences of lien to be deposited with the Secured Party.

(f)    Except for Equipment from time to time located on the real estate described on Schedule E attached hereto and as otherwise disclosed to the Secured Party in writing, none of the Equipment is or will be attached to real estate in such a manner that the same may become a fixture.

(g)    If any of the Inventory is at any time evidenced by a document of title, such document shall be promptly delivered by the Debtor to the Secured Party except to the extent the Secured Party specifically requests the Debtor not to do so with respect to any such document.

    *Section 7.    Special Provisions Re: Investment Property and Deposits.*

(a)    Unless and until an Event of Default has occurred and is continuing and thereafter until notified to the contrary by the Secured Party pursuant to Section 9(d) hereof:

    (i)    the Debtor shall be entitled to exercise all voting and/or consensual powers pertaining to the Investment Property or any part thereof, for all purposes not inconsistent with the terms of this Security Agreement or any other document evidencing or otherwise relating to any Obligations; and

    (ii)    the Debtor shall be entitled to receive and retain all cash dividends paid upon or in respect of the Investment Property.

(b)     All Investment Property (including all securities, certificated or uncertificated, securities accounts, and commodity accounts) of the Debtor on the date hereof is listed and identified on Schedule F attached hereto and made a part hereof. The Debtor shall promptly notify the Secured Party of any other Investment Property acquired or maintained by the Debtor after the date hereof, and shall submit to the Secured Party a supplement to Schedule F to reflect such additional rights (provided the Debtor's failure to do so shall not impair the Secured Party's security interest therein). Certificates for all certificated securities now or at any time constituting Investment Property shall be promptly delivered by the Debtor to the Secured Party duly endorsed in blank for transfer or accompanied by an appropriate assignment or assignments or an appropriate undated stock power or powers, in every case sufficient to transfer title thereto including, without limitation, all stock received in respect of a stock dividend or resulting from a split-up, revision or reclassification of the Investment Property or any part thereof or received in addition to, in substitution of or in exchange for the Investment Property or any part thereof as a result of a merger, consolidation or otherwise. With respect to any uncertificated securities or any Investment Property held by a securities intermediary, commodity intermediary, or other financial intermediary of any kind, unless the Secured Party requests otherwise, the Debtor shall execute and deliver, and shall cause any such issuer or intermediary to execute and deliver, an agreement among the Debtor, the Secured Party, and such issuer or intermediary in form and substance satisfactory to the Secured Party which provides, among other things, for the issuer's or intermediary's agreement that it shall comply with entitlement orders, and apply any value distributed on account of any such Investment Property, as directed by the Secured Party without further consent by the Debtor. The Secured Party may at any time, cause to be transferred into its name or the name of its nominee or nominees all or any part of the Investment Property hereunder.

(c)     Unless and until an Event of Default, or an event or condition which with the lapse of time or the giving of notice, or both, would constitute an Event of Default, has occurred the Debtor may sell or otherwise dispose of any Investment Property, *provided that* the Debtor shall not sell or otherwise dispose of any capital stock of or other equity interests in any direct or indirect subsidiary without the prior written consent of the Secured Party. After the occurrence of any Event of Default or of any event or condition which with the lapse of time or the giving of notice, or both, would constitute an Event of Default, the Debtor shall not sell all or any part of the Investment Property without the prior written consent of the Secured Party.

(d)     The Debtor represents that on the date of this Security Agreement, none of the Investment Property consists of margin stock (as such term is defined in Regulation U of the Board of Governors of the Federal Reserve System) except to the extent the Debtor has delivered to the Secured Party a duly executed and completed Form U-1 with respect to such stock. If at any time the Investment Property or any part thereof consists of margin stock, the Debtor shall promptly so notify the Secured Party and deliver to the Secured Party a duly executed and completed Form U-1 and such other instruments and documents reasonably requested by the Secured Party in form and substance satisfactory to the Secured Party.

(e)     Notwithstanding anything to the contrary contained herein, in the event any Investment Property is subject to the terms of a separate security agreement in favor of the

-13-

Secured Party, the terms of such separate security agreement shall govern and control unless otherwise agreed to in writing by the Secured Party.

(f)     All Deposit Accounts of the Debtor on the date hereof are listed and identified (by account number and depository institution) on Schedule F attached hereto and made a part hereof. The Debtor shall promptly notify the Secured Party of any other Deposit Account opened or maintained by the Debtor after the date hereof, and shall submit to the Secured Party a supplement to Schedule F to reflect such additional accounts (provided the Debtor's failure to do so shall not impair the Secured Party's security interest therein). With respect to any Deposit Account maintained by a depository institution other than the Secured Party, and as a condition to the establishment and maintenance of any such Deposit Account except as otherwise agreed to in writing by the Secured Party, the Debtor, the depository institution, and the Secured Party shall execute and deliver an account control agreement in form and substance satisfactory to the Secured Party which provides, among other things, for the depository institution's agreement that it will comply with instructions originated by the Secured Party directing the disposition of the funds in the Deposit Account without further consent by such Debtor.

*Section 8.     Power of Attorney.*  In addition to any other powers of attorney contained herein, the Debtor hereby appoints the Secured Party, its nominee, and any other person whom the Secured Party may designate, as the Debtor's attorney-in-fact, with full power and authority to sign the Debtor's name on verifications of Receivables and other Collateral; to send requests for verification of Collateral to the Debtor's customers, account debtors and other obligors; to endorse the Debtor's name on any checks, notes, acceptances, money orders, drafts and any other forms of payment or security that may come into the Secured Party's possession or on any assignments, stock powers, or other instruments of transfer relating to the Collateral or any part thereof; to sign the Debtor's name on any invoice or bill of lading relating to any Collateral, on claims to enforce collection of any Collateral, on notices to and drafts against customers and account debtors and other obligors, on schedules and assignments of Collateral, on notices of assignment and on public records; to notify the post office authorities to change the address for delivery of the Debtor's mail to an address designated by the Secured Party; to receive, open and dispose of all mail addressed to the Debtor; and to do all things necessary to carry out this Agreement.  The Debtor hereby ratifies and approves all acts of any such attorney and agrees that neither the Secured Party nor any such attorney will be liable for any acts or omissions nor for any error of judgment or mistake of fact or law other than such person's gross negligence or willful misconduct.  The Secured Party may file one or more financing statements disclosing its security interest in any or all of the Collateral without the Debtor's signature appearing thereon.  The Debtor also hereby grants the Secured Party a power of attorney to execute any such financing statements, or amendments and supplements to financing statements, on behalf of the Debtor without notice thereof to the Debtor.  The foregoing powers of attorney, being coupled with an interest, are irrevocable until the Obligations have been fully paid and satisfied and all agreements of the Secured Party to extend credit to or for the account of the Debtor have expired or otherwise have been terminated.

56065060.7

*Section 9.    Defaults and Remedies.*

(a)    The occurrence of any one or more of the following events shall constitute an *"Event of Default"* hereunder:

(i)    default in the payment when due (whether by demand, lapse of time, acceleration or otherwise) of the Obligations or any part thereof; or

(ii)    default in the observance or performance of any covenant set forth in Sections 5(b), 7(b), or 7(f) hereof or of any provision hereof requiring the maintenance of insurance on the Collateral or dealing with the use or remittance of proceeds of Collateral; or

(iii)    default in the observance or performance of any other provision hereof which is not remedied within 20 days after the earlier of (a) the date on which such default shall first become known to any officer of the Debtor or (b) written notice thereof is given to the Debtor by the Secured Party; or

(iv)    any representation or warranty made by the Debtor herein, or in any statement or certificate furnished by it pursuant hereto, or in connection with any loan or extension of credit made to or on behalf of or at the request of the Debtor by the Secured Party, shall be false in any material respect as of the date of the issuance or making thereof; or

(v)    default in the observance or performance of any terms or provisions of any mortgage, security agreement or any other instrument or document securing any Obligations or setting forth terms and conditions applicable thereto or otherwise relating thereto, or this Security Agreement or any such other mortgage, security agreement, instrument or document shall for any reason not be or shall cease to be in full force and effect or any of the foregoing is declared to be null and void; or

(vi)    default shall occur under any evidence of indebtedness issued, assumed or guaranteed by the Debtor or under any indenture, agreement or other instrument under which the same may be issued, and such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such indebtedness (whether or not such maturity is in fact accelerated), or any such indebtedness shall not be paid when due (whether by lapse of time, acceleration or otherwise); or

(vii)    the Debtor makes any payment on account of the principal of or interest on any indebtedness which is prohibited under the terms of any instrument subordinating such indebtedness to any indebtedness owed to the Secured Party; or

(viii)    any judgment or judgments, writ or writs, or warrant or warrants of attachment, or any similar process or processes shall be entered or filed against the Debtor or against any of its property or assets and which remains unvacated, unbonded, unstayed or unsatisfied for a period of 30 days; or

(ix)    the Debtor shall (a) have entered involuntarily against it an order for relief under the United States Bankruptcy Code, as amended, (b) not pay, or admit in writing its inability to pay, its debts generally as they become due, (c) make an assignment for the benefit of creditors, (d) apply for, seek, consent to, or acquiesce in, the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official for it or any substantial part of its property, (e) institute any proceeding seeking to have entered against it an order for relief under the United States Bankruptcy Code, as amended, to adjudicate it insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it, (f) take any action in furtherance of any matter described in parts (a) through (e) above, or (g) fail to contest in good faith any appointment or proceeding described in Section 9(a)(x) hereof; or

(x)    a custodian, receiver, trustee, examiner, liquidator or similar official shall be appointed for the Debtor or any substantial part of any of its property, or a proceeding described in Section 9(a)(ix)(e) shall be instituted against the Debtor, and such appointment continues undischarged or such proceeding continues undismissed or unstayed for a period of 60 days; or

(xi)    any guarantor of any Obligations shall die or shall terminate, breach, repudiate or disavow its guarantee or any part thereof, or any event specified in Sections 9(a)(vi), 9(a)(viii), 9(a)(ix) or 9(a)(x) hereof shall occur with regard to said guarantor.

NOTHING HEREIN CONTAINED SHALL IMPAIR THE DEMAND CHARACTER OF ANY OF THE OBLIGATIONS WHICH ARE EXPRESSED TO BE PAYABLE ON DEMAND.

(b)    Upon the occurrence of any Event of Default, the Secured Party shall have, in addition to all other rights provided herein or by law, the rights and remedies of a secured party under the UCC (regardless of whether the UCC is the law of the jurisdiction where the rights or remedies are asserted and regardless of whether the UCC applies to the affected Collateral), and further the Secured Party may, without demand and without advertisement, notice, hearing or process of law, all of which the Debtor hereby waives, at any time or times, sell and deliver all or any part of the Collateral (and any other property of the Debtor attached thereto or found therein) held by or for it at public or private sale, for cash, upon credit or otherwise, at such prices and upon such terms as the Secured Party deems advisable, in its sole discretion.  In addition to all other sums due the Secured Party hereunder, the Debtor shall pay the Secured Party all costs and expenses incurred by the Secured Party, including attorneys' fees and court costs, in obtaining, liquidating or enforcing payment of Collateral or the Obligations or in the prosecution or defense of any action or proceeding by or against the Secured Party or the Debtor concerning any matter arising out of or connected with this Security Agreement or the Collateral or the Obligations, including, without limitation, any of the foregoing arising in, arising under or related to a case under the United States Bankruptcy Code (or any successor statute).  Any requirement of reasonable notice shall be met if such notice is personally served on or mailed, postage prepaid, to the Debtor in accordance with Section 12(b) hereof at least 10 days before the time of sale or

56065060.7

other event giving rise to the requirement of such notice; *provided however,* no notification need be given to the Debtor if the Debtor has signed, after an Event of Default has occurred, a statement renouncing any right to notification of sale or other intended disposition. The Secured Party shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. The Secured Party may be the purchaser at any such sale. The Debtor hereby waives all of its rights of redemption from any such sale. The Secured Party may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, be made at the time and place to which the sale was postponed or the Secured Party may further postpone such sale by announcement made at such time and place. The Secured Party has no obligation to prepare the Collateral for sale. The Secured Party may sell or otherwise dispose of the Collateral without giving any warranties as to the Collateral or any part thereof, including disclaimers of any warranties of title or the like, and the Debtor acknowledges and agrees that the absence of such warranties shall not render the disposition commercially unreasonable.

(c)     Without in any way limiting the foregoing, upon the occurrence of any Event of Default, the Secured Party shall have the right, in addition to all other rights provided herein or by law, to take physical possession of any and all of the Collateral and anything found therein, the right for that purpose to enter without legal process any premises where the Collateral may be found (provided such entry be done lawfully), and the right to maintain such possession on the Debtor's premises (the Debtor hereby agreeing to lease such premises without cost or expense to the Secured Party or its designee if the Secured Party so requests) or to remove the Collateral or any part thereof to such other places as the Secured Party may desire. Upon the occurrence of any Event of Default, the Secured Party shall have the right to exercise any and all rights with respect to all Deposit Accounts of the Debtor, including, without limitation, the right to direct the disposition of the funds in each Deposit Account and to collect, withdraw and receive all amounts due or to become due or payable under each such Deposit Account. Upon the occurrence of any Event of Default, the Debtor shall, upon the Secured Party's demand, promptly assemble the Collateral and make it available to the Secured Party at a place designated by the Secured Party. If the Secured Party exercises its right to take possession of the Collateral, the Debtor shall also at its expense perform any and all other steps requested by the Secured Party to preserve and protect the security interest hereby granted in the Collateral, such as placing and maintaining signs indicating the security interest of the Secured Party, appointing overseers for the Collateral and maintaining Collateral records.

(d)     Without in any way limiting the foregoing, upon the occurrence of any Event of Default, all rights of the Debtor to exercise the voting and/or consensual powers which it is entitled to exercise pursuant to Section 7(a)(i) hereof and/or to receive and retain the distributions which it is entitled to receive and retain pursuant to Section 7(a)(ii) hereof, shall, at the option of the Secured Party, cease and thereupon become vested in the Secured Party, which, in addition to all other rights provided herein or by law, shall then be entitled solely and exclusively to exercise all voting and other consensual powers pertaining to the Investment Property (including, without limitation, the right to deliver notice of control with respect to any Investment Property held in a securities account or commodity account and deliver all entitlement orders with respect thereto) and/or to receive and retain the distributions which the Debtor would otherwise have been authorized to retain pursuant to Section 7(a)(ii) hereof and shall then be entitled solely and

-17-

exclusively to exercise any and all rights of conversion, exchange or subscription or any other rights, privileges or options pertaining to any Investment Property as if the Secured Party were the absolute owner thereof. Without limiting the foregoing, the Secured Party shall have the right to exchange, at its discretion, any and all of the Investment Property upon the merger, consolidation, reorganization, recapitalization or other readjustment of the respective issuer thereof or upon the exercise by or on behalf of any such issuer or the Secured Party of any right, privilege or option pertaining to any Investment Property and, in connection therewith, to deposit and deliver any and all of the Investment Property with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Secured Party may determine. In the event the Secured Party in good faith believes any of the Collateral constitutes restricted securities within the meaning of any applicable securities laws, any disposition thereof in compliance with such laws shall not render the disposition commercially unreasonable.

(e)    Without in any way limiting the foregoing, the Debtor hereby grants to the Secured Party a royalty-free irrevocable license and right to use all of the Debtor's patents, patent applications, patent licenses, trademarks, trademark registrations, trademark licenses, trade names, trade styles, copyrights, copyright applications, copyright licenses, and similar intangibles in connection with any foreclosure or other realization by the Secured Party on all or any part of the Collateral. The license and right granted the Secured Party hereby shall be without any royalty or fee or charge whatsoever.

(f)    The powers conferred upon the Secured Party hereunder are solely to protect its interest in the Collateral and shall not impose on it any duty to exercise such powers. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession or control if such Collateral is accorded treatment substantially equivalent to that which the Secured Party accords its own property, consisting of similar type assets, it being understood, however, that the Secured Party shall have no responsibility for ascertaining or taking any action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any such Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters. This Security Agreement constitutes an assignment of rights only and not an assignment of any duties or obligations of the Debtor in any way related to the Collateral, and the Secured Party shall have no duty or obligation to discharge any such duty or obligation. The Secured Party shall have no responsibility for taking any necessary steps to preserve rights against any parties with respect to any Collateral or initiating any action to protect the Collateral against the possibility of a decline in market value. Neither the Secured Party nor any party acting as attorney for the Secured Party shall be liable for any acts or omissions or for any error of judgment or mistake of fact or law other than their gross negligence or willful misconduct.

(g)    Failure by the Secured Party to exercise any right, remedy or option under this Security Agreement or any other agreement between the Debtor and the Secured Party or provided by law, or delay by the Secured Party in exercising the same, shall not operate as a waiver; and no waiver by the Secured Party shall be effective unless it is in writing and then only to the extent specifically stated. The rights and remedies of the Secured Party under this Security Agreement shall be cumulative and not exclusive of any other right or remedy which the Secured Party may have.

56065060.7

*Section 10.*   *Application of Proceeds.*   The proceeds and avails of the Collateral at any time received by the Secured Party after the occurrence of any Event of Default shall, when received by the Secured Party in cash or its equivalent, be applied by the Secured Party as follows:

(i)   first, to the payment and satisfaction of all sums paid and costs and expenses incurred by the Secured Party hereunder or otherwise in connection herewith, including such monies paid or incurred in connection with protecting, preserving or realizing upon the Collateral or enforcing any of the terms hereof, including **reasonable** attorneys' fees and court costs, together with any interest thereon (but without preference or priority of principal over interest or of interest over principal), to the extent the Secured Party is not reimbursed therefor by the Debtor; and

(ii)   second, to the payment and satisfaction of the remaining Obligations, whether or not then due (in whatever order the Secured Party elects), both for interest and principal.

The Debtor shall remain liable to the Secured Party for any deficiency. Any surplus remaining after the full payment and satisfaction of the foregoing shall be returned to the Debtor or to whomsoever the Secured Party reasonably determines is lawfully entitled thereto.

*Section 11.*   *Continuing Agreement.*   This Security Agreement shall be a continuing agreement in every respect and shall remain in full force and effect until all of the Obligations, both for principal and interest, have been fully paid and satisfied and all agreements of the Secured Party to extend credit to or for the account of the Debtor have expired or otherwise have been terminated. Upon such termination of this Security Agreement, the Secured Party shall, upon the request and at the expense of the Debtor, forthwith release its security interest hereunder.

*Section 12.*   *Miscellaneous.*

(a)   This Security Agreement cannot be changed or terminated orally. All of the rights, privileges, remedies and options given to the Secured Party hereunder shall inure to the benefit of its successors and assigns, and all the terms, conditions, covenants, agreements, representations and warranties of and in this Security Agreement shall bind the Debtor and its legal representatives, successors and assigns, provided that the Debtor may not assign its rights or delegate its duties hereunder without the Secured Party's prior written consent.

(b)   Except as otherwise specified herein, all notices hereunder shall be in writing (including, without limitation, notice by telecopy) and shall be given to the relevant party at its address or telecopier number set forth below (or, if no such address is set forth below, at the address of the Debtor as shown on the records of the Secured Party), or such other address or telecopier number as such party may hereafter specify by notice to the other given by courier, by United States certified or registered mail, by telecopy or by other telecommunication device capable of creating a written record of such notice and its receipt. Notices hereunder shall be addressed:

-19-

to the Debtor at:

Bluefly Acquisition, LLC
42 West 39th Street
New York, New York 10018
Attention: _____
Telephone: (___) _____

to the Secured Party at:

c/o Clearlake Capital
  233 Wilshire Blvd., Suite 800
  Santa Monica, California 90401
  Attention:  Fred Ebrahemi
  Telephone:  (310) 400-8875

Each such notice, request or other communication shall be effective (i) if given by telecopier, when such telecopy is transmitted to the telecopier number specified in this Section and a confirmation of such telecopy has been received by the sender, (ii) if given by mail, five (5) days after such communication is deposited in the mail, certified or registered with return receipt requested, addressed as aforesaid or (iii) if given by any other means, when delivered at the addresses specified in this Section.

(c)     In the event and to the extent that any provision hereof shall be deemed to be invalid or unenforceable by reason of the operation of any law or by reason of the interpretation placed thereon by any court, this Security Agreement shall to such extent be construed as not containing such provision, but only as to such locations where such law or interpretation is operative, and the invalidity or unenforceability of such provision shall not affect the validity of any remaining provisions hereof, and any and all other provisions hereof which are otherwise lawful and valid shall remain in full force and effect.

(d)     This Security Agreement shall be deemed to have been made in the State of New York and shall be governed by, and construed in accordance with, the laws of the State of New York. The headings in this Security Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning of any provision hereof.

(e)     This Security Agreement may be executed in any number of counterparts and by different parties hereto on separate counterpart signature pages, each constituting an original, but all together one and the same instrument. The Debtor acknowledges that this Security Agreement is and shall be effective upon its execution and delivery by the Debtor to the Secured Party, and it shall not be necessary for the Secured Party to execute this Security Agreement or any other acceptance hereof or otherwise to signify or express its acceptance hereof.

(f)     The Debtor hereby submits to the non-exclusive jurisdiction in any court in New York for purposes of all legal proceedings arising out of or relating to this Agreement or the transactions contemplated hereby. The Debtor irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient form. THE DEBTOR AND THE SECURED PARTY EACH HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

[SIGNATURE PAGE TO FOLLOW]

-20-

IN WITNESS WHEREOF, the Debtor has caused this General Security Agreement to be duly executed and delivered, as of the date and year first above written.

BLUEFLY ACQUISITION, LLC

By: _____

Name: _____Richard Cohen_____

Title: _____Manager_____

Accepted and agreed to as of the date and year first above written.

**CLEARLAKE CAPITAL PARTNERS III (MASTER), L.P.**

By: Clearlake General Partners III GP, L.P., its General Partner

  By: Clearlake Capital Partners, LLC, its General Partner

    By: CCG Operations, LLC, its Managing Member

      By:_____
      Name: Behdad Eghbali
      Title: Manager

**CLEARLAKE CAPITAL PARTNERS II (MASTER), L.P.**

By: Clearlake General Partners II GP, L.P., its General Partner

  By: Clearlake Capital Partners, LLC, its General Partner

    By: CCG Operations, LLC, its Managing Member

      By:_____
      Name: Behdad Eghbali
      Title: Manager

[SIGNATURE PAGE TO GENERAL SECURITY AGREEMENT]

IN WITNESS WHEREOF, the Debtor has caused this General Security Agreement to be duly executed and delivered, as of the date and year first above written.

BLUEFLY ACQUISITION, LLC

By:_____

Name:_____

Title:_____

Accepted and agreed to as of the date and year first above written.

CLEARLAKE CAPITAL PARTNERS
III (MASTER), L.P.

By: Clearlake General Partners III GP, L.P.,
its General Partner

   By:  Clearlake Capital Partners, LLC, its
   General Partner

     By: CCG Operations, LLC, its
     Managing Member

     By:_____

     Name: Behdad Eghbali
     Title: Manager

CLEARLAKE CAPITAL PARTNERS II
(MASTER), L.P.

By: Clearlake General Partners II GP, L.P.,
its General Partner

   By:  Clearlake Capital Partners, LLC, its
   General Partner

     By: CCG Operations, LLC, its
     Managing Member

     By:_____

     Name: Behdad Eghbali
     Title: Manager

## SCHEDULE A

### LOCATIONS

Item 1.     Places of Business (including Debtor's chief executive office and principal place of business):

ADDRESS

1515 E. 15TH STREET, LOS ANGELES, CA 90021

42 WEST 39TH ST., NEW YORK NY 10018

Item 2.     Permitted Collateral Locations:

ADDRESS                                             OWNER OF PREMISES

42 WEST 39TH ST., NEW YORK NY 10018        42-52 WEST 39 STREET, LLC
                                                     C/O ADAMS & COMPANY
                                                     REAL    ESTATE,    LLC
                                                     411 FIFTH AVE., 9TH FLOOR
                                                     NEW YORK, NY 10016

## SCHEDULE B

## OTHER NAMES

A.    PRIOR LEGAL NAMES

None.

B.    TRADE NAMES

None.

## SCHEDULE C

### PERMITTED ENCUMBRANCES

| SECURED PARTY | COLLATERAL | DESCRIPTION OF OBLIGATION (INCLUDING OUTSTANDING PRINCIPAL BALANCE) |
|---|---|---|
| N/A | N/A | N/A |

## SCHEDULE D

## INTELLECTUAL PROPERTY RIGHTS

| Trade mark name | Trade mark office | Application number / Registration number |
|---|---|---|
| BF | US | 86252323 / 4640964 |
| BLUE FLY BF | US | 86252320 / 4737779 |
| BLUEFLY | CA | 1109089-00 / TMA630657 |
| BELLE AND CLIVE | EM | 010716967 / 010716967 |
| BLUEFLY | EM | 001796218 / 001796218 |
| BELLE AND CLIVE | CA | 1569302-00 / TMA899820 |
| FLY AND MIGHTY | US | 85427960 / 4223135 |
| BELLE AND CLIVE | US | 85429665 / 4199995 |
| COLETTE NICOLAI | US | 85438060 / 4219316 |

| BLUEFLY | US | 75499951 / 2769397 |
| FLYPAPER | US | 75942461 / 2427015 |
| BLUEFLY | US | 75981821 / 2579760 |
| HADLEY & JAMES | US | 85923247 / 4602437 |

## DOMAIN NAMES:

| Domain Name | Registered Owner | Domain Name Registrar | Registration Expiration |
|---|---|---|---|
| bluefly.com | Bluefly, Inc. | Network Solutions, LLC | 05-29-2026 |
| belleandclive.com | Bluefly, Inc. | Network Solutions, LLC | 09-16-2017 |
| azurli.com | Bluefly, Inc. | Network Solutions, LLC | 09-16-2017 |
| bellaandclive.com | Bluefly, Inc. | Network Solutions, LLC | 09-20-2017 |
| bella-and-clive.com | Bluefly, Inc. | Network Solutions, LLC | 09-22-2017 |
| bellaandclyve.com | Bluefly, Inc. | Network Solutions, LLC | 09-20-2017 |
| Bella-and-clyve.com | Bluefly, Inc. | Network | 09-22-2017 |

| Domain Name | Registered Owner | Domain Name Registrar | Registration Expiration |
|---|---|---|---|
| | | Solutions, LLC | |
| bellaclive.com | Bluefly, Inc. | Network Solutions, LLC | 09-20-2017 |
| bella-clive.com | Bluefly, Inc. | Network Solutions, LLC | 09-22-2017 |
| bellaclyve.com | Bluefly, Inc. | Network Solutions, LLC | 09-20-2017 |
| bella-clyve.com | Bluefly, Inc. | Network Solutions, LLC | 09-22-2017 |
| bellanclive.com | Bluefly, Inc. | Network Solutions, LLC | 09-20-2017 |
| bellanclyve.com | Bluefly, Inc. | Network Solutions, LLC | 09-20-2017 |
| bellandclive.com | Bluefly, Inc. | Network Solutions, LLC | 09-20-2017 |
| bell-and-clive.com | Bluefly, Inc. | Network Solutions, LLC | 09-22-2017 |
| bellandclyve.com | Bluefly, Inc. | Network Solutions, LLC | 09-20-2017 |
| bell-and-clyve.com | Bluefly, Inc. | Network Solutions, LLC | 09-22-2017 |
| bellaplum.com | Bluefly, Inc. | Network Solutions, LLC | 09-16-2017 |
| bellclive.com | Bluefly, Inc. | Network Solutions, LLC | 09-20-2017 |
| bell-clive.com | Bluefly, Inc. | Network Solutions, LLC | 09-22-2017 |
| bellclyve.com | Bluefly, Inc. | Network Solutions, LLC | 09-20-2017 |

| Domain Name | Registered Owner | Domain Name Registrar | Registration Expiration |
|---|---|---|---|
| bell-clyve.com | Bluefly, Inc. | Network Solutions, LLC | 09-22-2017 |
| belle-and-clive.com | Bluefly, Inc. | Network Solutions, LLC | 09-22-2017 |
| belleandclive.net | Bluefly, Inc. | Network Solutions, LLC | 10-07-2017 |
| belleandclive.org | Bluefly, Inc. | Network Solutions, LLC | 10-07-2017 |
| bellcandclyve.com | Bluefly, Inc. | Network Solutions, LLC | 09-20-2017 |
| belle-and-clyve.com | Bluefly, Inc. | Network Solutions, LLC | 09-22-2017 |
| belleclive.com | Bluefly, Inc. | Network Solutions, LLC | 09-16-2017 |
| belle-clive.com | Bluefly, Inc. | Network Solutions, LLC | 09-22-2017 |
| belleclyve.com | Bluefly, Inc. | Network Solutions, LLC | 09-20-2017 |
| belle-clyve.com | Bluefly, Inc. | Network Solutions, LLC | 09-22-2017 |
| bellcnclive.com | Bluefly, Inc. | Network Solutions, LLC | 09-20-2017 |
| bellenclyve.com | Bluefly, Inc. | Network Solutions, LLC | 09-20-2017 |
| belleplum.com | Bluefly, Inc. | Network Solutions, LLC | 09-16-2017 |
| bellnclive.com | Bluefly, Inc. | Network Solutions, LLC | 09-20-2017 |
| bellnclyve.com | Bluefly, Inc. | Network | 09-20-2017 |

| Domain Name | Registered Owner | Domain Name Registrar | Registration Expiration |
|---|---|---|---|
| | | Solutions, LLC | |
| blewfly.com | Bluefly, Inc. | Network Solutions, LLC | 11-27-2017 |
| blueflyadvertising.com | Bluefly, Inc. | Network Solutions, LLC | 08-26-2017 |
| blue-fly.com | Bluefly, Inc. | Network Solutions, LLC | 08-18-2017 |
| bluefly.net | Bluefly, Inc. | Network Solutions, LLC | 08-18-2017 |
| blue-fly.net | Bluefly, Inc. | Network Solutions, LLC | 02-25-2017 |
| blueflytech.com | Bluefly, Inc. | Network Solutions, LLC | 06-15-2017 |
| blueflytv.com | Bluefly, Inc. | Network Solutions, LLC | 08-26-2017 |
| blue-fly.us | Bluefly, Inc. | Network Solutions, LLC | 12-03-2016 |
| envite.com | Bluefly, Inc. | Network Solutions, LLC | 04-11-2021 |
| flyandmighty.com | Bluefly, Inc. | Network Solutions, LLC | 08-16-2017 |
| flyandmighty.net | Bluefly, Inc. | Network Solutions, LLC | 08-16-2017 |
| flyandmighty.org | Bluefly, Inc. | Network Solutions, LLC | 08-16-2017 |
| flysociety.com | Bluefly, Inc. | Network Solutions, LLC | 12-08-2017 |
| ibluefly.com | Bluefly, Inc. | Network Solutions, LLC | 08-26-2017 |

| Domain Name | Registered Owner | Domain Name Registrar | Registration Expiration |
|---|---|---|---|
| plumluster.com | Bluefly, Inc. | Network Solutions, LLC | 09-16-2017 |
| Plumlustre.com | Bluefly, Inc. | Network Solutions, LLC | 09-16-2017 |
| steal-a-day.com | Bluefly, Inc. | Network Solutions, LLC | 05-19-2017 |
| stealaday.com | Bluefly, Inc. | Network Solutions, LLC | 05-19-2017 |
| stealaday.net | Bluefly, Inc. | Network Solutions, LLC | 05-19-2017 |
| steal-a-day.net | Bluefly, Inc. | Network Solutions, LLC | 05-19-2017 |
| steal-a-day.org | Bluefly, Inc. | Network Solutions, LLC | 05-19-2017 |
| stealaday.org | Bluefly, Inc. | Network Solutions, LLC | 05-19-2017 |
| thatswhyibluefly.com | Bluefly, Inc. | Network Solutions, LLC | 08-26-2017 |
| thelistdeals.com | Bluefly, Inc. | Network Solutions, LLC | 09-27-2017 |
| thelistdeals.net | Bluefly, Inc. | Network Solutions, LLC | 10-01-2017 |
| thelistdeals.org | Bluefly, Inc. | Network Solutions, LLC | 10-01-2017 |

## SCHEDULE E

### REAL ESTATE DESCRIPTIONS

42 WEST 39TH ST., NEW YORK NY 10018

## SCHEDULE F

## INVESTMENT PROPERTY AND DEPOSITS

A. INVESTMENT PROPERTY

None.

B. DEPOSITS

[To come]

## SCHEDULE G

### COMMERCIAL TORT CLAIMS

None.

## SCHEDULE H

## SUPPLEMENT TO SECURITY AGREEMENT

THIS SUPPLEMENT TO SECURITY AGREEMENT (the *"Supplement"*) is dated as of this _____ day of _____, ____, from BLUEFLY ACQUISITION, LLC, a Delaware limited liability company (the *"Debtor"*), to CLEARLAKE CAPITAL PARTNERS II (MASTER), L.P., a Delaware limited partnership (*"CCP II"*) and CLEARLAKE CAPITAL PARTNERS III (MASTER), L.P., a Delaware limited partnership (*"CCP III"*, and together with CCP II, the *"Secured Party"*).

### PRELIMINARY STATEMENTS

A.    The Debtor and the Secured Party are parties to that certain Security Agreement dated as of March ____, 2017 (such Security Agreement, as the same may from time to time be amended, modified or restated, being hereinafter referred to as the *"Security Agreement"*). All capitalized terms used herein without definition shall have the same meanings herein as such terms are defined in the Security Agreement.

B.    Pursuant to the Security Agreement, the Debtor granted to the Secured Party, among other things, a continuing security interest in all Commercial Tort Claims.

C.    The Debtor has acquired a Commercial Tort Claim, and executes and delivers this Supplement to confirm and assure the Secured Party's security interest therein.

NOW, THEREFORE, in consideration of the benefits accruing to the Debtor, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    In order to secure payment of the Obligations, whether now existing or hereafter arising, the Debtor does hereby grant to the Secured Party a continuing lien on and security interest in the Commercial Tort Claim described below:

_____
_____
_____
_____

2.    Schedule G (Commercial Tort Claims) to the Security Agreement is hereby amended to include reference to the Commercial Tort Claim referred to in Section 1 above.    The Commercial Tort Claim described herein is in addition to, and not in substitution or replacement for, the Commercial Tort Claims heretofore described in and subject to the Security Agreement, and nothing contained herein shall in any manner impair the priority of the liens and security

interests heretofore granted by the Debtor in favor of the Secured Party under the Security Agreement.

3.    The Debtor agrees to execute and deliver such further instruments and documents and do such further acts and things as the Secured Party may deem necessary or proper to carry out more effectively the purposes of this Supplement.

4.    No reference to this Supplement need be made in the Security Agreement or in any other document or instrument making reference to the Security Agreement, any reference to the Security Agreement in any of such items to be deemed a reference to the Security Agreement as supplemented hereby.  The Debtor acknowledges that this Supplement shall be effective upon its execution and delivery by the Debtor to the Secured Party, and it shall not be necessary for the Secured Party to execute this Supplement or any other acceptance hereof or otherwise to signify or express its acceptance hereof.

5.    This Agreement shall be governed by and construed in accordance with the State of New York (without regard to principles of conflicts of law).

BLUEFLY ACQUISITION, LLC

By
 Name _____
 Title _____

EXHIBIT "C"

**EXECUTION VERSION**

## TRADEMARK SECURITY AGREEMENT

This Trademark Security Agreement (this *"Trademark Security Agreement"*) is made as of this 7th day of March, 2017, between BLUEFLY ACQUISITION, LLC, a Delaware limited liability company (*"Grantor"*), and CLEARLAKE CAPITAL PARTNERS II (MASTER), L.P., a Delaware limited partnership (*"CCP II"*) and CLEARLAKE CAPITAL PARTNERS III (MASTER), L.P., a Delaware limited partnership (*"CCP III"* and together with CCP II, the *"Lender"*).

### W I T N E S S E T H :

WHEREAS, Lender has extended credit to Grantor pursuant to that certain Term Note dated as of even date herewith (the *"Note"*);

WHEREAS, in connection with the foregoing, Grantor is executing and delivering that certain General Security Agreement, dated as of the date hereof, made by the Grantor in favor of Lender (the *"Security Agreement"*); and

WHEREAS, to further induce the Lender to extend credit to the Grantor, Grantor intends to grant to Lender a security interest in the Grantor's Trademark Collateral (as defined below).

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor hereby agrees as follows:

1.      DEFINED TERMS. All capitalized terms used but not otherwise defined herein have the meanings given to them in the Note, or if not defined in the Note, in the Security Agreement.

2.      GRANT OF SECURITY INTEREST IN TRADEMARK COLLATERAL. Grantor hereby grants to Lender, a continuing first priority security interest in all of Grantor's right, title and interest in, to and under the following, whether presently existing or hereafter created or acquired (collectively, the *"Trademark Collateral"*):

(a)      all of Grantor's trademarks, trademark applications, service marks, trade names, mask works and associated goodwill (collectively, *"Trademarks"*), including those referred to on Schedule I hereto, and licenses for any of the foregoing (*"Licenses"*);

(b)      all reissues, continuations, continuations-in-part, substitutes, extensions or renewals of and improvements on the foregoing; and

(c)      all products and proceeds of the foregoing, including any claim by Grantor against third parties for past, present or future infringement or dilution of any Trademark or any Trademark licensed under any License.

Notwithstanding the foregoing, the Trademark Collateral shall not include, and Grantor shall not be deemed to have granted a security interest in, (a) unless otherwise expressly granted pursuant to any other Credit Document, any rights or interests in any license, lease, contract, or agreement to which Grantor is a party and all software or related goods and/or databases licensed or provided thereunder, to the extent, but only to the extent, that such a grant would, under the terms of such license, lease, contract or agreement, result in a breach of the terms of, or constitute a default under, such license, lease, contract or agreement (other than to the extent that any such term would be rendered ineffective pursuant to 9-406, 9-407 or 9-408 of the Uniform Commercial Code or other applicable law) or (b) any rights or property, including, without limitation, any intent to use trademark applications, to the extent that any valid and enforceable law or regulation applicable to such rights or property prohibits the creation of a security interest in such rights or property or would otherwise result in a material loss of rights from the creation of such security interest therein (other than to the extent that any such term would be rendered ineffective pursuant to 9-406, 9-407 or 9-408 of the Uniform Commercial Code or other applicable law); provided, that, with respect to each of the foregoing clauses (a) and (b), immediately upon the ineffectiveness, lapse or termination of any such restriction, the Trademark Collateral shall include, and Grantor shall be deemed to have granted a security interest in, all such rights and interests or other assets, as the case may be, as if such provision had never been in effect; and provided, further that, notwithstanding any such restriction in any of the foregoing, the Trademark Collateral shall, to the extent such referenced restriction does not by its terms apply thereto, include all rights incident or appurtenant to any such rights or interests and shall in any event include the right to receive all proceeds derived from or in connection with the sale, assignment or transfer of such rights and interests.

3.    SECURITY FOR OBLIGATIONS.  This Trademark Security Agreement and the security interest created hereby secure the payment and performance of all the Obligations, whether now existing or arising hereafter.  Without limiting the generality of the foregoing, this Trademark Security Agreement secures the payment of all amounts which constitute part of the Obligations and would be owed by Grantor, to Lender or any of them, whether or not they are unenforceable or not allowable due to the existence of an insolvency proceeding involving Grantor.

4.    PLEDGE AND SECURITY AGREEMENT.  The security interests granted pursuant to this Trademark Security Agreement are granted in conjunction with the security interests granted to Lender, pursuant to the Security Agreement.  Grantor hereby acknowledges and affirms that the rights and remedies of Lender with respect to the security interest in the Trademark Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.

5.    AUTHORIZATION TO SUPPLEMENT.  If Grantor shall obtain rights to any new Trademarks or Licenses for Trademarks, this Trademark Security Agreement shall automatically apply thereto.  Grantor shall give prompt notice in writing to Lender with respect to any such new Trademarks or Licenses for Trademarks.  Without limiting Grantor's obligations under this Section 5, Grantor hereby authorizes Lender unilaterally to modify this Trademark Security Agreement by amending Schedule I to include any such new Trademarks or Licenses for Trademarks of Grantor.  Notwithstanding the foregoing, no failure to so modify this

2

Trademark Security Agreement or amend Schedule I shall in any way affect, invalidate or detract from Lender's continuing security interest in all Collateral, whether or not listed on Schedule I.

6.     COUNTERPARTS.  This Trademark Security Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument.   In proving this Trademark Security Agreement or any other Credit Document in any judicial proceedings, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom such enforcement is sought.   Any signatures delivered by a party by facsimile transmission or by e-mail transmission shall be deemed an original signature hereto.

7.     CONSTRUCTION.  Unless the context of this Trademark Security Agreement or any other Credit Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Trademark Security Agreement or any other Credit Document refer to this Trademark Security Agreement or such other Credit Document, as the case may be, as a whole and not to any particular provision of this Trademark Security Agreement or such other Credit Document, as the case may be.   Section, subsection, clause, schedule, and exhibit references herein are to this Trademark Security Agreement unless otherwise specified.   Any reference in this Trademark Security Agreement or in any other Credit Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein).   Any reference herein or in any other Credit Document to the satisfaction or repayment in full of the Obligations shall mean the repayment in full in cash of all Obligations (other than contingent indemnification and reimbursement obligations for which no claim has been made).   Any reference herein to any Person shall be construed to include such Person's permitted successors and assigns.

*[Remainder of page intentionally left blank; signature page follows.]*

IN WITNESS WHEREOF, Grantor has caused this Trademark Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

GRANTOR:

BLUEFLY ACQUISITION, LLC,
a Delaware limited liability company

By: _____
Name: _____Richard Cohen_____
Title: _____Manager_____

**ACKNOWLEDGED AND AGREED TO:**

CLEARLAKE CAPITAL PARTNERS II (MASTER), L.P.

By:    Clearlake Capital Partners II GP, L.P.
       its General Partner

    By:    Clearlake Capital Partners, LLC
           its General Partner

        By:    CCG Operations, LLC
               its Managing Member

            By:_____
            Name:  Behdad Eghbali
            Title:  Manager

CLEARLAKE CAPITAL PARTNERS III (MASTER), L.P.

By:    Clearlake Capital Partners III GP, L.P.
       its General Partner

    By:    Clearlake Capital Partners, LLC
           its General Partner

        By:    CCG Operations, LLC
               its Managing Member

            By:_____
            Name:  Behdad Eghbali
            Title:  Manager

[Signature Page to Trademark Security Agreement]

IN WITNESS WHEREOF, Grantor has caused this Trademark Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

GRANTOR:                                          BLUEFLY ACQUISITION, LLC,
                                                  a Delaware limited liability company

                                                  By:_____
                                                  Name:_____
                                                  Title:_____


**ACKNOWLEDGED AND AGREED TO:**

CLEARLAKE CAPITAL PARTNERS II (MASTER), L.P.

By:   Clearlake Capital Partners II GP, L.P.
      its General Partner

      By:   Clearlake Capital Partners, LLC
            its General Partner

            By:   CCG Operations, LLC
                  its Managing Member
                  By:_____
                  Name:  Behdad Eghbali
                  Title:  Manager


CLEARLAKE CAPITAL PARTNERS III (MASTER), L.P.

By:   Clearlake Capital Partners III GP, L.P.
      its General Partner

      By:   Clearlake Capital Partners, LLC
            its General Partner

            By:   CCG Operations, LLC
                  its Managing Member
                  By:_____
                  Name:  Behdad Eghbali
                  Title:  Manager

[Signature Page to Trademark Security Agreement]
S-1

SCHEDULE I
TO
TRADEMARK SECURITY AGREEMENT

| Trade mark name | Trade mark office | Application number / Registration number |
|---|---|---|
| BF | US | 86252323 / 4640964 |
| BLUE FLY BF | US | 86252320 / 4737779 |
| BLUEFLY | CA | 1109089-00 / TMA630657 |
| BELLE AND CLIVE | EM | 010716967 / 010716967 |
| BLUEFLY | EM | 001796218 / 001796218 |
| BELLE AND CLIVE | CA | 1569302-00 / TMA899820 |
| FLY AND MIGHTY | US | 85427960 / 4223135 |
| BELLE AND CLIVE | US | 85429665 / 4199995 |
| COLETTE NICOLAI | US | 85438060 / 4219316 |

56072651.6

| | | |
|---|---|---|
| BLUEFLY | US | 75499951 / 2769397 |
| FLYPAPER | US | 75942461 / 2427015 |
| BLUEFLY | US | 75981821 / 2579760 |
| HADLEY & JAMES | US | 85923247 / 4602437 |

2

EXHIBIT "D"

 **United States Patent and Trademark Office**
Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help 

*Electronic Trademark Assignment System*

# Confirmation Receipt

Your assignment has been received by the USPTO.
The coversheet of the assignment is displayed below:

### TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

| SUBMISSION TYPE: | NEW ASSIGNMENT |
| --- | --- |
| NATURE OF CONVEYANCE: | SECURITY INTEREST |

**CONVEYING PARTY DATA**

| Name | Formerly | Execution Date | Entity Type |
| --- | --- | --- | --- |
| Bluefly Acquisition, LLC | | 03/07/2017 | Limited Liability Company |

**RECEIVING PARTY DATA**

| | |
| --- | --- |
| Name: | CLEARLAKE CAPITAL PARTNERS II (MASTER), L.P. |
| Street Address: | 233 Wilshire Boulevard |
| Internal Address: | Suite 800 |
| City: | Santa Monica |
| State/Country: | CALIFORNIA |
| Postal Code: | 90401 |
| Entity Type: | Limited Partnership: DELAWARE |

| | |
| --- | --- |
| Name: | CLEARLAKE CAPITAL PARTNERS III (MASTER), L.P. |
| Street Address: | 233 Wilshire Boulevard |
| Internal Address: | Suite 800 |
| City: | Santa Monica |
| State/Country: | CALIFORNIA |
| Postal Code: | 90401 |
| Entity Type: | Limited Partnership: DELAWARE |

**PROPERTY NUMBERS** Total: 9

| Property Type | Number | Word Mark |
| --- | --- | --- |
| Registration Number: | 4640964 | BF |
| Registration Number: | 4737779 | BLUE FLY BF |
| Registration Number: | 4223135 | FLY AND MIGHTY |
| Registration Number: | 4199995 | BELLE AND CLIVE |
| Registration Number: | 4219316 | COLETTE NICOLAI |
| Registration Number: | 2769397 | BLUEFLY |
| Registration Number: | 2427015 | FLYPAPER |
| Registration Number: | 2579780 | BLUEFLY |
| Registration Number: | 4602437 | HADLEY & JAMES |

**CORRESPONDENCE DATA**

| | |
| --- | --- |
| Email: | uspt@polsinelli.com |
| | Correspondence will be sent to the e-mail address first; If that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail. |
| Correspondent Name: | Andrea Porterfield |
| Address Line 1: | 900 West 48th Place |
| Address Line 4: | Kansas City, MISSOURI 64112 |

| ATTORNEY DOCKET NUMBER: | 087845-554934 |
| --- | --- |
| NAME OF SUBMITTER: | Andrea M. Porterfield |
| Signature: | /Andrea Porterfield/ |
| Date: | 03/22/2017 |

**Total Attachments: 7**
source=SecurityAgreement#page1.tif
source=SecurityAgreement#page2.tif
source=SecurityAgreement#page3.tif
source=SecurityAgreement#page4.tif
source=SecurityAgreement#page5.tif

EXHIBIT "E"

## DEPOSIT ACCOUNT CONTROL AGREEMENT

Executed and Delivered as of April 30, 2017

### PARTIES

This Agreement is among the persons signing this Agreement as the *"Secured Party"*, the *"Debtor"* and the *"Bank"*.

### BACKGROUND

The Debtor is the Bank's customer with respect to one or more deposit accounts identified by the account numbers specified below (individually and collectively, as re-numbered and including any funds in the account or accounts, the *"Deposit Account"*). The Debtor has granted the Secured Party a security interest in the Deposit Account. The Bank is willing to do so upon the terms contained in this Agreement.

This Agreement includes the General Terms, the Specific Terms and the Exhibit, each as defined or referred to below.

### AGREEMENTS

A.    GENERAL TERMS.   This Agreement is subject to the General Terms for Deposit Account Control Agreement (the *"General Terms"*), attached herewith as Attachment B. The General Terms are incorporated in this Agreement by reference and without modification except as may be provided in Section 10 of the Specific Terms.

B.    SPECIFIC TERMS.    The following terms (the *"Specific Terms"*) complete, supplement or modify the General Terms:

1.    Deposit Account *(see "Background" above)*. The following deposit account(s) comprise the Deposit Account:

HSBC Account No.: 269090967

2.    Business Day *(see definition of "Business Day" in Section 1 of the General Terms)*:

A day will not be considered as a "Business Day" if commercial banks in **Buffalo, New York** are closed on that day.

3.    Outside Time *(see definition of "Outside Time" in Section 1 of the General Terms)*:

The Outside Time is to be based on a period of two Business Days.

RESTRICTED - - A-1
HSBC Bank USA, National Association DACA Part A Specific Terms

4.      Disposition of less than all or multi-disposition of funds *(see Section 4(a)(ii)(E) of the General Terms)*:

A Disposition Instruction originated by the Secured Party must be for a disposition of all of the funds, and must require that the funds be sent to a single recipient.

5.      Reimbursement Claim Period *(see Section 6(b) of the General Terms)*:

The number of days following the termination of the Agreement in which a reimbursement claim must be made against the Secured Party under Section 6(b) of the General Terms is 90.

6.      Electronic Records *(see definition of "writing" in Section 1 of the General Terms)*:

The parties do not permit a writing to include an electronic record and do not permit communications by email.

7.      Governing Law *(see Section 13(a) of the General Terms)*:

The jurisdiction whose law governs this Agreement is the State of New York.

8.      Bank's Jurisdiction for UCC Purposes *(see Section 13(b) of the General Terms)*:

The Bank's jurisdiction for purposes of part 3 of UCC Article 9 is the State of New York.

9.      Delivery of Executed Copy *(see Part D)*:

The delivery of an executed copy of this Agreement may not be made by a form of electronic transmission other than facsimile or other electronic imaging means in pdf format.

10.     Additional Provisions *(see Section 12(b) of the General Terms)*:

The following provisions modify or supplement the General Terms:

If no provisions are inserted above in this Section 10, then there are no modifications to or supplements of the General Terms.

RESTRICTED - A-2

C.    EXHIBIT. The parties have completed and attach hereto the Exhibit to be used as the form of the Initial Instruction.

D.    SINGLE AGREEMENT; COUNTERPARTS. The General Terms, the Specific Terms and the Exhibit shall be read and construed together with the other provisions of this Agreement as a single agreement. Delivery of executed copies of this Agreement may be made by facsimile or other electronic imaging means in pdf format. Delivery of an executed counterpart of this Agreement electronically or by facsimile shall be effective as delivery of an original or manually executed counterpart of this Agreement. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which collectively shall constitute a single agreement.

[remainder of page intentionally left blank]

SIGNATURES

Debtor:

BLUEFLY ACQUISITION LLC

By: _____
    Ron Wulf
    Chief Financial Officer

Address: 42 W. 39th Street, 10th Floor, New York, NY 10018

Attention: Ron Wulf
Telephone Number (for information only):
Facsimile Number:


Secured Party:

CLEARLAKE CAPTIAL PARTNERS III (MASTER), L.P., as Collateral Agent

By: _____
    Behdad Eghbali
    General Partner

Address: 233 Wilshire Blvd, #800, Santa Monica, CA 90401

Attention: Behdad Eghbali
Telephone Number (for information only): 310-400-8800
Facsimile Number: 310 - 400 - 8801

Bank:

HSBC Bank USA, National Association

By: _____

      Richard Barnsley
      Senior Vice President, Corporate Banking

Address for Notice:    **Legal Paper Processing**
                           2929 Walden Avenue, C84
                           Depew, NY 14043
                           Telephone Number (for information only): 877-874-2403
                           Facsimile Number: 716-841-7651

With a copy to:       HSBC Bank USA, National Association
                           601 Montgomery Street
                           San Francisco, CA 94111
                           Attention: Divya Tailang or Richard Barnsley

                           Facsimile Number: _____

Exhibit

[LETTERHEAD OF THE SECURED PARTY]

DEPOSIT ACCOUNT CONTROL AGREEMENT

INITIAL INSTRUCTION

[Date]

HSBC Bank USA, National Association
2929 Walden Avenue, C84
Depew, NY 14043

    Attention:    Legal Paper Processing

Ladies and Gentlemen:

This is the Initial Instruction as defined in the Deposit Account Control Agreement dated _____ __, 2017 among you, us and Bluefly Acquisition LLC (the "*Debtor*") (as currently in effect, the "*Control Agreement*"). A copy of the Control Agreement as fully executed is attached. Capitalized terms used in this Initial Instruction have the meanings given them in the Control Agreement.

This Initial Instruction directs the Bank no longer to comply with the Debtor's Disposition Instructions.

As an included Disposition Instruction, we direct you to send the funds in the Deposit Account to us by the method and at the address indicated below. We recognize that, as a condition to your complying with this Disposition Instruction and to the extent that we have not already done so, we must provide to you evidence reasonably required by you as to the authority of the person giving this Disposition Instruction to act for us. We also recognize that your obligation to comply with this Disposition Instruction is subject to the other provisions of Section 4(a)(ii) of the General Terms.

Funds transfer instructions:

Receiving bank: _____

ABA routing number for domestic wire: _____.

ABA routing number for ACH transaction:_____.

RESTRICTED - A-6

International: Swift Code No. _____

Reference details: _____

Very truly yours,

Clearlake Capital Partners III (Master), L.P.

By:_____

Title:_____

HSBC Bank, USA, National Association DACA Specific Terms

## GENERAL TERMS FOR DEPOSIT ACCOUNT CONTROL AGREEMENT

1.    Definitions and Rules of Interpretation.  In this Agreement (a) terms defined in the UCC and not otherwise defined in this Agreement have the same meanings in this Agreement as in the UCC, (b) the rules of interpretation in Article 1 of the UCC apply to the interpretation of this Agreement and (c) the term "or" is not exclusive.  Unless otherwise stated, section references are to sections of these General Terms.  In addition, the following terms in this Agreement have the following meanings or interpretations:

This *"Agreement"* means the Deposit Account Control Agreement dated the Agreement Date among the Secured Party, the Debtor and the Bank.  The Deposit Account Control Agreement includes these General Terms (incorporated by reference), the Specific Terms and the Exhibit read and construed together as a single agreement.

*"Agreement Date"* means the date set forth at the beginning of this Agreement as the date as of which this Agreement was executed and delivered by the parties.

An *"address"* includes the person or persons or department of the Bank on an "attention" line.

*"Bank"* means the organization signing this Agreement as the Bank.

*"Business Day"* means:

(i) for communications to the Bank, a day other than a day (A) that is not a "business day" as defined in Federal Reserve Board Regulation CC, 12 CFR Part 229, (B) on which the office, branch or department of the Bank specified as the Bank's address in the Exhibit is closed, or (C) on which commercial banks are closed in the city or cities set forth in the Specific Terms; and

(ii) for communications to any other party, a day, other than a Saturday or Sunday, on which the other party is open for business at the location to which the communication is sent.

*"Claim"* means a claim, loss, cost or expense, and includes out-of-pocket or allocable internal legal fees and expenses incurred in bringing or defending a claim.

A *"communication"* includes the Initial Instruction, a Disposition Instruction or a notice.

*"Debtor"* means the person signing this Agreement as the Debtor.

*"Deposit Account"* has the meaning set forth in the "Background" of this Agreement. The Deposit Account is identified in Section 1 of the Specific Terms.

*"Deposit-related Agreements"* means, collectively, the deposit account agreement and any other agreements between the Bank and the Debtor governing the Deposit Account and any cash management or similar services provided by the Bank to the Debtor in connection with the Deposit Account.

*"Disposition Instruction"* means an instruction to the Bank directing the disposition of the funds in the Deposit Account.

*"Exhibit"* means the Exhibit referred to in Part C of and attached to this Agreement as the form to be used as the Initial Instruction.

*"Initial Instruction"* means the first instruction to the Bank originated by the Secured Party directing that the Bank no longer comply with the Debtor's Disposition Instructions.  The Initial Instruction may also contain a Disposition Instruction originated by the Secured Party.

*"Order or Process"* means an order, judgment, decree or injunction, or a garnishment, restraining notice or other legal process, directing, or

prohibiting or otherwise restricting, the disposition of the funds in the Deposit Account.

"*Outside Time*" means, unless an earlier Outside Time is stated in the Specific Terms, the opening of business on the second Business Day after the Business Day on which the Initial Instruction in substantially the form of the Exhibit is actually received at the address for the Bank specified in the Exhibit. If the Initial Instruction is actually received at that address after 12:00 noon, local time, at that address, then in determining the Outside Time, the Initial Instruction will be considered to have been actually received on the following Business Day.

"*Secured Party*" means the person signing this Agreement as the Secured Party, whether the person is acting in a representative capacity or otherwise.

"*Specific Terms*" means the terms contained in Part B of this Agreement.

"*UCC*" means the Uniform Commercial Code of the jurisdiction whose law governs this Agreement or, if relevant to any matter other than the meaning of a defined term, the Uniform Commercial Code of the jurisdiction whose law applies to the matter under the choice of law rules of the jurisdiction whose law governs this Agreement.

A "*writing*" means a tangible writing, including a facsimile and, if the Specific Terms permit, an electronic record; "*written*" refers to a communication in the form of a writing.

2.    The Debtor's Dealings with the Deposit Account.

(a)    Except as provided in Section 2(b), the Bank may comply with the Debtor's Disposition Instructions in accordance with the Deposit-related Agreements.

(b)    The Bank will not comply with the Debtor's Disposition Instructions after the Outside Time. In its discretion the Bank may cease complying with the Debtor's Disposition Instructions at an earlier time as permitted by Section 4(a)(iv).

3.    The Secured Party's Right to Give Instructions as to the Deposit Account. The Bank will comply with the Initial Instruction, and with any Disposition Instructions originated by the Secured Party, in each case (i) without the Debtor's further

consent, and (ii) even if following the instruction results in the dishonoring by the Bank of items presented for payment from the Deposit Account or the Bank otherwise not complying with the Debtor's Disposition Instructions. The Initial Instruction may not be rescinded or otherwise modified without the Bank's consent.

4.    Exculpation of the Bank.

(a)    Notwithstanding the Bank's agreements in Sections 2 and 3, the Bank will not be liable to any other party for:

(i)    either failing to follow an Initial Instruction that (A) is not in the form of the Exhibit, (B) does not specify the address to which the Initial Instruction was to have been sent, (C) is not otherwise completed, or (D) does not have attached to it a copy of this Agreement as fully executed or, as a result of any such defect in the Initial Instruction, continuing to comply with the Debtor's Disposition Instructions;

(ii)    failing to follow a Disposition Instruction originated by the Secured Party (A) before the Outside Time, (B) that requires the disposition of the funds in the Deposit Account by a method not available to the Debtor under the Deposit-related Agreements, (C) that the Bank determines would result in the Bank's failing to comply with a statute, rule or regulation, or an Order or Process, binding upon the Bank, (D) that requires the disposition of funds that are not immediately available in the Deposit Account, (E) that, unless otherwise set forth in the Specific Terms, directs the disposition of less than all the funds in the Deposit Account or directs that the funds be sent to more than one recipient, or (F) for which the Bank has not received evidence reasonably required by the Bank as to the authority of the person giving the Disposition Instruction to act for the Secured Party;

(iii)    complying with the Debtor's Disposition Instructions, or otherwise completing a transaction involving the Deposit Account, that the Bank or an affiliate had started to process before the Outside Time; or

(iv)     after the Bank becomes aware that the Secured Party has sent the Initial Instruction, but before the Outside Time, complying with the Initial Instruction or a Disposition Instruction originated by the Secured Party, notwithstanding any fact or circumstance and even if the Initial Instruction (A) has not been actually received at the address specified in the Exhibit, (B) fails to have attached to it a copy of this Agreement as fully executed, or (C) is not completed or otherwise fails to be in the form of Initial Instruction set forth on the Exhibit.

(b)     The Bank will not be liable to any other party for:

(i)     wrongful dishonor of any item as a result of the Bank following the Initial Instruction or any Disposition Instruction originated by the Secured Party,

(ii)     failing to comply or delaying in complying with the Initial Instruction, any Disposition Instruction or any provision of this Agreement due to a computer malfunction, interruption of communication facilities, labor difficulties, act of God, war, terrorist attack, or other cause, in each case beyond the Bank's reasonable control,

(iii)     any other Claim, except to the extent directly caused by the Bank's gross negligence or willful misconduct, or

(iv)     any indirect, special, consequential or punitive damages.

(c)     The Bank will have no fiduciary duties under this Agreement to any other party, whether as trustee, agent, bailee or otherwise. The Bank will have no duties to the Secured Party except as expressly set forth in this Agreement. The Bank will have no duty to inquire into or determine the existence or enforceability of the Debtor's obligations to the Secured Party or whether, under any separate agreement between the Debtor and the Secured Party, the Debtor's obligations to the Secured Party are in default, the Debtor may originate a Disposition Instruction or the Secured Party may originate the Initial Instruction or any Disposition Instruction.

5.     The Bank's Recourse to the Deposit Account.

(a)     Except for amounts referred to in Section 5(b), the Bank (i) subordinates any security interest, lien or other encumbrance against the Deposit Account to the Secured Party's security interest and (ii) will not exercise any right of recoupment, setoff or debit against the Deposit Account. This subordination will not apply to any security interest that the Bank has in an item under UCC Article 4 as a collecting bank.

(b)     Notwithstanding Section 5(a), and regardless of any agreement of the Debtor to compensate the Bank by means of balances in the Deposit Account, the Bank may charge the Deposit Account, to the extent permitted by any of the Deposit-related Agreements or applicable law, for:

(i) the face amount of a check, draft, money order, instrument, wire transfer of funds, automated clearing house entry, credit from a merchant card transaction, other electronic transfer of funds or other item (A) deposited in or credited to the Deposit Account, whether before or after the Agreement Date, and returned unpaid or otherwise uncollected or subject to an adjustment entry, whether for insufficient funds or for any other reason and without regard to the timeliness of the return or adjustment or the occurrence or timeliness of any other person's notice of nonpayment or adjustment, (B) subject to a claim against the Bank for breach of transfer, presentment, encoding, retention or other warranty under Federal Reserve Regulations or Operating Circulars, clearing house rules, the UCC or other applicable law, or (C) for a merchant card transaction, against which a contractual demand for chargeback has been made;

(ii) normal service charges or fees payable to the Bank in connection with the Deposit Account or any related services;

(iii) any adjustments or corrections of any posting or encoding errors; and

(iv) reimbursements for out-of-pocket or allocable internal legal fees and expenses in connection with the negotiation, administration or enforcement of this Agreement by the Bank.

6.    Indemnification and Reimbursement.

(a)    The Debtor indemnifies the Bank against all Claims incurred, sustained or payable by the Bank arising out of this Agreement except to the extent directly caused by the Bank's gross negligence or willful misconduct.

(b)    The Secured Party agrees to reimburse the Bank for any charge against the Deposit Account under Section 5(b) for which there were insufficient funds in the Deposit Account to satisfy the charge.    Such reimbursement will be limited to the aggregate amount transferred from the Deposit Account as a result of the Bank's acting upon Disposition Instructions originated by the Secured Party or pursuant to Section 9(b).  Any demand by the Bank for reimbursement must be made within the number of days after the termination of this Agreement set forth in the Specific Terms. The Bank may not make a Claim for reimbursement under this subsection unless (i) the Debtor fails to satisfy the Claim within 15 days after the Bank makes a demand on the Debtor under Section 6(a) or (ii) the Bank is enjoined, stayed or prohibited by operation of law from making the demand on the Debtor.

(c)    The Secured Party's reimbursement obligations under Section 6(b) will not apply to (i) a charge for reimbursement of or indemnification for any out-of-pocket or allocable internal legal fees and expenses incurred by the Bank in connection with any claim or defense by the Bank against the Secured Party relating to this Agreement or (ii) the amount of any loss incurred by the Bank to the extent directly caused by the Bank's gross negligence or willful misconduct.  If the Bank satisfies any Claim against the Debtor referred to in the foregoing clause (i) by charging the Deposit Account, the amount of the Secured Party's maximum liability for reimbursement obligations under Section 6(b) will be reduced by the amount of the Claim so satisfied.

(d)    If the Secured Party fails to reimburse the Bank for any amount under Section 6(b), the Secured Party will pay the Bank's out-of-pocket or allocable internal legal fees and expenses in collecting from the Secured Party the amount payable.

(e)    The Secured Party indemnifies the Bank against all other Claims incurred, sustained or payable by the Bank arising from the Bank following an Initial Instruction or a Disposition Instruction originated by the Secured Party, or from the Bank's remittance of funds pursuant to Section 9(b), except

to the extent directly caused by the Bank's gross negligence or willful misconduct.

7.    Representations    and    Warranties; Agreements with Other Persons.    The Bank represents and warrants to the Secured Party that the Bank (i) is an organization engaged in the business of banking, (ii) maintains the Deposit Account as a demand deposit account or accounts in the ordinary course of the Bank's business and (iii) has not entered into any currently effective agreement with any person under which the Bank may be obligated to comply with Disposition Instructions originated by a person other than the Debtor or the Secured Party. The Bank will not enter into any agreement with any person under which the Bank may be obligated to comply with Disposition Instructions originated by a person other than the Debtor or the Secured Party.

8.    Deposit Account Information.    If the Secured Party so requests, to the extent that the Bank has the operational ability to do so, the Bank will provide to the Secured Party, whether by Internet access or otherwise, a copy of each periodic account statement relating to the Deposit Account ordinarily furnished by the Bank to the Debtor.  The Bank's liability for failing to provide the account statement will not exceed the Bank's cost of providing the statement.    The Debtor authorizes the Bank to provide to the Secured Party, whether by Internet access or otherwise, any other information concerning the Deposit Account that the Bank may agree to provide to the Secured Party at the Secured Party's request.

9    Termination; Closure of the Deposit Account.

(a)    Neither the Debtor nor the Bank will close the Deposit Account prior to termination of this Agreement.    This Agreement may not be terminated by the Debtor except by a notice to the Bank given jointly by the other parties.    This Agreement may be terminated (i) by the Secured Party at any time by notice to the other parties and (ii) by the Bank (A) immediately upon notice to the other parties if the Bank becomes obligated to terminate this Agreement or to close the Deposit Account under any statute, rule or regulation, or any Order or Process, binding upon the Bank, (B) upon five Business Days' notice to the other parties if any other party is in material breach of any of the Deposit-related Agreements or this Agreement, and (C) otherwise upon 30 days' notice to the other parties.

(b)      If the Bank terminates this Agreement pursuant to clause (A) of Section 9(a)(ii), the Bank will remit any funds in the Deposit Account on the date of termination (i) at the direction of the Secured Party if the direction is received by the Bank prior to the date of termination of this Agreement or (ii) if no such direction is received by the Bank prior to such date, by check mailed to the address of the Secured Party for receiving communications under this Agreement.    If the Bank terminates this Agreement pursuant to clause (B) or (C) of Section 9(a)(ii), the Bank will remit any funds in the Deposit Account on the date of termination at the direction of the Secured Party only if the direction is received by the Bank prior to the date of termination of this Agreement. Any obligation of the Bank to remit any funds to or at the direction of the Secured Party under this subsection is subject to clauses (B) through (F) of Section 4(a)(ii).

(c)      Except as provided in Section 9(b) and in any event if the Secured Party has communicated to the Bank that the Secured Party does not wish to receive or direct the disposition of the funds, the Secured Party will not receive from the Bank any remittance of funds from the Deposit Account upon termination of this Agreement by the Bank.

(d)      The termination of this Agreement will not affect any rights created or obligations incurred under this Agreement before the termination.    Sections 4 and 6 will survive the termination of this Agreement for actions taken or omitted before the termination. Sections 9(b) and (c) will survive the termination of this Agreement, and Section 5 will survive the termination of this Agreement solely for any funds to be remitted to or at the direction of the Secured Party pursuant to Section 9(b).

10.    Communications

(a)      All communications under this Agreement must be in writing and must be delivered by hand or overnight courier service, mailed by certified or registered mail, or sent by facsimile to the party addressee.    If the Specific Terms permit a writing to include an electronic record, a communication, other than the Initial Instruction, may be sent by email.

(b)      For a communication under this Agreement to be effective, it must be received (i) for the Initial Instruction, at the Bank's address specified on the Exhibit and (ii) in all other cases, at the party's address indicated below the party's signature to this Agreement, in each case subject to any change in address provided in Section 10(c). Receipt of the Initial Instruction does not occur until it is received by the person or persons or department specified on the "attention" line on the Exhibit. If more than one person is specified, receipt occurs when the Initial Instruction is received by one of the persons.

(c)      The Bank may communicate to the Secured Party changes in the address for the Initial Instruction, and any party may communicate to the other parties changes in its address for communications under this Agreement.

11.    Successors and Transferees.

(a)      This Agreement will inure to the benefit of, and be binding upon, the parties and their respective successors and other transferees permitted under this Section    Except as provided in this Section, a voluntary transfer of a party's rights or duties under this Agreement without the written consent of the other parties will be void.

(b)      The Bank may transfer its rights and duties under this Agreement to a transferee to which, by contract or operation of law, the Bank transfers substantially all of its rights and duties under the Deposit-related Agreements.

(c)      The Secured Party may transfer its rights and duties under this Agreement to (i) a transferee to which, by contract or operation of law, the Secured Party transfers substantially all of its rights and duties under the financing or other arrangements between the Secured Party and the Debtor for which the Deposit Account acts as collateral security or (ii) if the Secured Party is acting as a trustee, indenture trustee, agent, collateral agent, or other representative in whose favor a security interest is created or provided for, a transferee that is a successor trustee, indenture trustee, agent, collateral agent, or other representative.

(d)      No transfer under this Section will be binding upon a non-transferring party until the transferring party or the transferee notifies the non-transferring parties of the transfer in a writing signed by the transferee that identifies the transferee, gives the transferee's address for communications under this Agreement, and states that the transferee is a successor of the transferor or other transferee permitted under this Section and is entitled to the benefit of the transferring party's rights and has

assumed all of the transferring party's duties under this Agreement.

(e) A non-transferring party need not request proof of any transfer or that the transferee is a successor of the transferor or other transferee permitted by this Section. If requested by a non-transferring party, however, the transferring party or the transferee will provide reasonable proof thereof. If the Bank or the Secured Party, as a non-transferring party, requests such proof, then the effectiveness of the notification of transfer as to the non-transferring party will be suspended until the proof is provided.

(f) When a transfer becomes binding on the non-transferring parties, the transferring party will not be entitled to exercise any rights, and will be relieved of its obligations, accruing under this Agreement from and after that time. Those rights may be exercised and those obligations will be incurred by the transferee.

(g) The provisions of subsections (d) and (e) requiring notification for a transfer to be binding on the non-transferring parties and suspending the effectiveness of the notification of transfer until reasonable proof of the transfer has been provided do not apply to the Bank as the transferring party if the transfer is by operation of law and by operation of the law (i) the transferee succeeds to all or substantially all of the rights and becomes generally bound by all of the duties of the Bank, including the Bank's duties under this Agreement, and (ii) the Bank ceases to exist.

12. Entire Agreement; Relation to Other Agreements.

(a) This Agreement constitutes the entire agreement of the parties, and supersedes all previous and contemporaneous negotiations, understandings and agreements, with respect to its subject matter, all of which have become merged and finally integrated into this Agreement.

(b) If a term in the Specific Terms conflicts with a term of this Agreement not in the Specific Terms, the term in the Specific Terms controls.

(c) If this Agreement conflicts with any of the Deposit-related Agreements, this Agreement will control. However, this Agreement will not (i) derogate from any Claim or defense that the Bank may have against the Debtor under any of the Deposit-related Agreements or (ii) create any third party beneficiary rights under any of the Deposit-related Agreements in favor of the Secured Party.

(d) This Agreement does not amend or otherwise modify any of the agreements between the Debtor and the Secured Party or provide any rights for the Debtor to originate a Disposition Instruction in contravention of any agreement between the Debtor and the Secured Party.

13. Governing Law, Depositary Bank's Jurisdiction and Waiver of Jury Trial.

(a) Except as otherwise required by Article 9 of the UCC, this Agreement will be governed by the law of that jurisdiction set forth in the Specific Terms without giving effect to any choice of law rule that would require the application of the law of another jurisdiction.

(b) If the Specific Terms are completed expressly to designate the Bank's jurisdiction for purposes of part 3 of Article 9 of the UCC, then the Deposit-related Agreements are amended to provide that for those purposes that jurisdiction is the Bank's jurisdiction so designated.

(c) **To the extent permitted by applicable law, each party waives all rights to trial by jury in any action, claim or proceeding (including any counterclaim) of any type arising out of or directly or indirectly relating to this Agreement.**

14. Miscellaneous.

(a) No amendment to this Agreement will be binding on any party unless it is in writing and signed by all of the parties. Any provision of this Agreement benefiting a party may be waived only by a writing signed by that party.

(b) If a provision of this Agreement is held invalid or unenforceable in any respect, the validity or enforceability of the remaining provisions will not in any way be affected, it being understood that the invalidity or unenforceability of an affected provision in a particular jurisdiction will not in and of itself affect the validity or enforceability of the provision in any other jurisdiction.

## SCHEDULE OF FEES DEPOSIT ACCOUNT CONTROL AGREEMENT

### (Standard Agreement)

One Time Fee for Acceptance and Review of the
Deposit Account Control Agreement..............................................$2,500.00/each
If the customer needs amendments or changes..................................$5,000.00/each

Renewal Fee for Deposit Account Control Agreement...........................$500.00 annually

Applicable from execution date until termination of Agreement for each full or partial year.

The forgoing fees may be changed at any time without notice. Additional fees may apply depending on services required.

HSBC DACA General Terms

EXHIBIT "F"

## OMNIBUS ASSIGNMENT
### (Assignment")

CLEARLAKE CAPITAL PARTNERS II (MASTER), L.P., a Delaware limited partnership ("CCP II") and CLEARLAKE CAPITAL PARTNERS III (MASTER), L.P., a Delaware limited partnership ("CCP III", and together with CCP II, the "Assignor"), for good and valuable consideration, the receipt and sufficiency of which are acknowledged, hereby sells, transfers, assigns, conveys, and sets over to TOTAL FASHION, INC., a Delaware corporation ("Assignee"), all right, title and interest of Assignor in, to, and under, or arising out of that certain loan in the original principal amount of Twelve Million Two Hundred Fifty Thousand and NO/100 Dollars ($12,250,000.00) (the "Loan"), which Loan is evidenced, secured by and more particularly described in those documents set forth in Exhibit A attached hereto and made a part hereof (collectively, the "Loan Documents"), TOGETHER WITH all right, title and interest of Assignor in, to and under or arising out of:

(a)    the Loan Documents and all collateral given as security therefor;

(b)    all guaranties, insurance policies, indemnifications, releases, affidavits, certificates, title insurance policies, certificates of deposit, performance bonds, letters of credit, reserves, escrows and other documents, reports, opinions, agreements, and instruments executed and/or delivered in connection with the Loan to the extent permitted by applicable law or expressly permitted per the terms of any such documents;

(c)    all modifications, amendments, consolidations, renewals, extensions or restatements of any of the foregoing; and

(d)    all demands, claims, causes of action and judgments relating to any of the foregoing and all rights accrued or to accrue thereunder.

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns, forever.

It is expressly understood that, except as expressly set forth herein, this Assignment is made by Assignor without any guarantee, representation or warranty of any kind on the part of Assignor and without recourse to Assignor in any event or for any cause.

Dated:       As of _____ Jan  11  2015 .

[SIGNATURE ON FOLLOWING PAGE]

66795928.1

IN WITNESS WHEREOF, the parties hereto have caused this Omnibus Assignment to be executed as of the date first above written.

**ASSIGNOR:**

**CLEARLAKE CAPITAL PARTNERS II (MASTER, L.P.,** a Delaware limited partnership

By:  Clearlake General Partners II GP, L.P.,
       its General Partner

    By:  Clearlake Capital Partners, LLC,
        its General Partner

By: _____
Name: Fred Ebrahemi
Title: General Counsel

**CLEARLAKE CAPITAL PARTNERS III (MASTER, L.P.,** a Delaware limited partnership

By:  Clearlake General Partners III GP, L.P.,
       its General Partner

    By:  Clearlake Capital Partners, LLC,
        its General Partner

By: _____
Name: Fred Ebrahemi
Title: General Counsel

## EXHIBIT A

Loan Documents (All documents dated as of March 7, 2017 unless otherwise indicated):

1.  Term Note given by Bluefly Acquisition, LLC, a Delaware limited liability company ("**Borrower**") for the benefit of Assignor;

2.  General Security Agreement given by Borrower to Assignor;

3.  Pledge Agreement made by McGann Holdings Ltd., as Pledgor, in favor of Assignor; and

4.  Deposit Account Control Agreement dated April 30, 2017, between Borrower, CCP III, and HSBC Bank USA, National Association.

EXHIBIT "G"

## ASSIGNMENT OF SECURITY INTEREST

THIS ASSIGNMENT OF SECURITY INTEREST (this "Assignment"), dated as of January 11, 2019, is made by Clearlake Capital Partners II (Master), L.P., a Delaware limited partnership ("CCP II") and Clearlake Capital Partners III (Master), L.P., a Delaware limited partnership ("CCP III" and together with CCP II, the "Lender").

WHEREAS, Bluefly Acquisition, LLC, a Delaware limited liability company ("Grantor") granted a security interest to Lender pursuant to that certain Trademark Security Agreement, dated March 7, 2017, and recorded in the records of the United States Patent and Trademark Office on March 7, 2017, at Reel/Frame 6016/0352 (the "Security Interest");

WHEREAS, the Security Interest secures certain obligations from Grantor in favor of Lender (the "Secured Obligations");

WHEREAS, the Secured Obligations in relation to the trademark properties identified on Schedule 1 attached hereto are still outstanding; and

WHEREAS, Lender has agreed to assign the Trademark Security Agreement, the Security Interest and the Secured Obligations to Total Fashion, Inc., 233 Wilshire Blvd., Suite 800, Santa Monica, CA 90401 ("Assignee") pursuant to this Assignment by Lender to Assignee.

NOW, THEREFORE, for good and valuable consideration, Lender hereby assigns to Assignee its Security Interest in the following:

1.    each trademark, trademark registration and trademark application of Grantor referred to in Schedule 1 attached hereto and all licenses, general intangibles, intangible intellectual property or other similar property relating to the foregoing and all of the goodwill symbolized thereby;

2.    the proceeds of any of the foregoing property;

3.    each trademark license to the foregoing to which Grantor is a party; and

4.    any other Collateral as defined in that certain Trademark Security Agreement.

## [SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Lender has caused this Assignment of Security Interest to be duly executed as of the date first set forth above.

**CLEARLAKE CAPITAL PARTNERS II (MASTER), L.P.**

By:    Clearlake Capital Partners II GP, L.P.
       its General Partner

       By:    Clearlake Capital Partners, LLC
           its General Partner

           By:    CCG Operations, LLC
               its Managing Member

               By: _____
               Name: Behdad Eghbali
               Title:  Manager

STATE OF _____ )
                     ) ss.
COUNTY OF _____ )

On this _____ day of January, 2019, before me personally appeared Behdad Eghbali, to me known and known to be the individual described in and who executed the foregoing instrument, and he did duly acknowledge to me that he executed the same.

In Testimony Whereof, I have hereunto set my hand and affixed my official seal the day and year first above written.

_____
NOTARY PUBLIC

My Commission Expires:

_____

\* Acknowledgment attached \*

# CALIFORNIA ALL- PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California _____ }

County of Los Angeles _____ }

On January 11, 2019 before me, Kelly Wigmore, Notary Public,
(Here insert name and title of the officer)

personally appeared Behdad Fahkali,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public Signature            (Notary Public Seal)

> **KELLY WIGMORE**
> COMM. # 2158061
> NOTARY PUBLIC-CALIFORNIA
> LOS ANGELES COUNTY
> MY COMM. EXP. JUNE 25, 2020

---

## ADDITIONAL OPTIONAL INFORMATION

**DESCRIPTION OF THE ATTACHED DOCUMENT**

_____
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages ____ Document Date_____

**CAPACITY CLAIMED BY THE SIGNER**
- ☐ Individual (s)
- ☐ Corporate Officer
  _____
  (Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM
*This form complies with current California statutes regarding notary wording and, if needed, should be completed and attached to the document. Acknowledgments from other states may be completed for documents being sent to that state so long as the wording does not require the California notary to violate California notary law.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document with a staple.

2015 Version www.NotaryClasses.com 800-873-9865

**CLEARLAKE CAPITAL PARTNERS III (MASTER), L.P.**

By:   Clearlake Capital Partners III GP, L.P.
its General Partner

     By:   Clearlake Capital Partners, LLC
its General Partner

          By:   CCG Operations, LLC
its Managing Member

              By: _____
Name: Behdad Eghbali
Title:  Manager

STATE OF _____  )
               ) ss.
COUNTY OF _____  )

On this _____ day of January, 2019, before me personally appeared Behdad Eghbali, to me known and known to be the individual described in and who executed the foregoing instrument, and he did duly acknowledge to me that he executed the same.

In Testimony Whereof, I have hereunto set my hand and affixed my official seal the day and year first above written.

_____
NOTARY PUBLIC

My Commission Expires:

_____

\* Acknowledgment attached \*

66798789.1          3

# CALIFORNIA ALL-PURPOSE CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California _____ }

County of Los Angeles _____ }

On January 11, 2019 before me, Kelly Wigmore Notary Public
(Here insert name and title of the officer)

personally appeared Behdad Eghbali _____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public Signature            (Notary Public Seal)

KELLY WIGMORE
COMM. # 2158651
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY
MY COMM. EXP. JUNE 25, 2020

## ADDITIONAL OPTIONAL INFORMATION

**DESCRIPTION OF THE ATTACHED DOCUMENT**

_____
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _____ Document Date_____

**CAPACITY CLAIMED BY THE SIGNER**
- ☐ Individual (s)
- ☐ Corporate Officer

_____
(Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

2015 Version www.NotaryClasses.com 800-873-9865

## INSTRUCTIONS FOR COMPLETING THIS FORM

*This form complies with current California statutes regarding notary wording and, if needed, should be completed and attached to the document. Acknowledgments from other states may be completed for documents being sent to that state so long as the wording does not require the California notary to violate California notary law.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document with a staple.

**SCHEDULE 1**

**TRADEMARKS**

| Trademark | Application/Registration No. | Trademark Office |
|---|---|---|
| BF | 86252323 / 4640964 | US |
| BLUE FLY BF | 86252320 / 4737779 | US |
| BLUEFLY | 1109089-00 / TMA630657 | CA |
| BELLE AND CLIVE | 010716967 / 0010716967 | EU |
| BLUEFLY | 001796218 / 001796218 | EU |
| BELLE AND CLIVE | 1569302-00 / TMA899820 | CA |
| FLY AND MIGHTY | 85427960 / 4223135 | US |
| BELLE AND CLIVE | 85429665 / 4199995 | US |
| COLETTE NICOLAI | 85438060 / 4219316 | US |
| BLUEFLY | 75499951 / 2769397 | US |
| FLYPAPER | 75942461 / 2427015 | US |
| BLUEFLY | 75981821 / 2579760 | US |
| HADLEY & JAMES | 85923247 / 4602437 | US |

# EXHIBIT "H"

## TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | Assignment of Security Interest |

### CONVEYING PARTY DATA

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| CLEARLAKE CAPITAL PARTNERS II (Master), L.P. | | 01/11/2019 | Limited Partnership: DELAWARE |
| CLEARLAKE CAPITAL PARTNERS III (Master), L.P. | | 01/11/2019 | Limited Partnership: DELAWARE |

### RECEIVING PARTY DATA

| | |
|---|---|
| Name: | TOTAL FASHION, INC. |
| Street Address: | 233 WILSHIRE BLVD |
| Internal Address: | SUITE 800 |
| City: | SANTA MONICA |
| State/Country: | CALIFORNIA |
| Postal Code: | 90401 |
| Entity Type: | Corporation: CALIFORNIA |

### PROPERTY NUMBERS Total: 9

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 4640964 | BF |
| Registration Number: | 4737779 | BLUE FLY BF |
| Registration Number: | 4223135 | FLY AND MIGHTY |
| Registration Number: | 4199995 | BELLE AND CLIVE |
| Registration Number: | 4219316 | COLETTE NICOLAI |
| Registration Number: | 2769397 | BLUEFLY |
| Registration Number: | 2427015 | FLYPAPER |
| Registration Number: | 2579760 | BLUEFLY |
| Registration Number: | 4602437 | HADLEY & JAMES |

### CORRESPONDENCE DATA

| | |
|---|---|
| Fax Number: | 8167531536 |
| Phone: | 8167531000 |
| Email: | uspt@polsinelli.com |

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

| | |
|---|---|
| **Correspondent Name:** | POLSINELLI PC |
| **Address Line 1:** | 900 W. 48TH PLACE |
| **Address Line 2:** | SUITE 900 |
| **Address Line 4:** | KANSAS CITY, MISSOURI  64118 |

| | |
|---|---|
| **ATTORNEY DOCKET NUMBER:** | 089361-564526 |
| **NAME OF SUBMITTER:** | Andrea Porterfield |
| **Signature:** | /Andrea Porterfield/ |
| **Date:** | 01/11/2019 |

**Total Attachments: 6**
source=CCP_AssignmentofSecurityInterest_Bluefly_Trademarks_Executed#page1.tif
source=CCP_AssignmentofSecurityInterest_Bluefly_Trademarks_Executed#page2.tif
source=CCP_AssignmentofSecurityInterest_Bluefly_Trademarks_Executed#page3.tif
source=CCP_AssignmentofSecurityInterest_Bluefly_Trademarks_Executed#page4.tif
source=CCP_AssignmentofSecurityInterest_Bluefly_Trademarks_Executed#page5.tif
source=CCP_AssignmentofSecurityInterest_Bluefly_Trademarks_Executed#page6.tif

**RECEIPT INFORMATION**

| | |
|---|---|
| **ETAS ID:** | TM505624 |
| **Receipt Date:** | 01/11/2019 |
| **Fee Amount:** | $240 |

EXHIBIT "I"

## NOTICE OF ASSIGNMENT AND TRANSFER OF SECURED PARTY'S RIGHTS AND DUTIES UNDER THE DACA TO TOTAL FASHION, INC.

January 11, 2019

**Via Facsimile: 716-841-7651**

To:                Legal Paper Processing
                   2929 Walden Avenue, C84
                   Depew, NY 14043
                   Telephone Number (for information only): 877-874-2403

With a copy to:    HSBC Bank USA, National Association
                   601 Montgomery Street
                   San Francisco, CA 94111
                   Attention: Divya Tailang or Richard Barnsley

**Via Email: richardcohen414@gmail.com**

To:                Bluefly Acquisition, LLC
                   42 W. 39th Street
                   New York, NY 10018
                   Attention: Richard Cohen, Manager

**Re: Deposit Account Control Agreement Executed and Delivered as of April 30, 2017 ("DACA")**

**TO THE ABOVE NAMED PARTIES:**

**NOTICE IS HEREBY GIVEN** that pursuant to Section 11(c) of Attachment B to the General Terms for the DACA, Secured Party Clearlake Capital Partners III (MASTER), L.P., as Collateral Agent for itself and Clearlake Capital Partners II (MASTER), L.P., has assigned and transferred substantially all of its rights and duties under the financing between the Secured Party and the Debtor (as defined in the DACA) for which the DACA acts as collateral security to Total Fashion, Inc.

**NOTICE IS FURTHER GIVEN** that pursuant to Section 11(d) of Attachment B to the General Terms for the DACA, Total Fashion, Inc. is the successor of Secured Party permitted under Section 11(d) of Attachment B to the General Terms for the DACA and is entitled to the benefit of the Secured Party's rights and has assumed all of the transferring party's duties under the DACA.

**NOTICE IS FURTHER GIVEN** that pursuant to Section 11(d) of Attachment B to the General Terms for the DACA, the above referenced assignment and transfer of Secured Party's rights and

duties under the DACA to Total Fashion, Inc. shall be deemed binding on all parties to the DACA.

<div align="center">

**SIGNATURES**

</div>

**Secured Party/Transferor**

**CLEARLAKE CAPITAL PARTNERS III (MASTER), L.P., as Collateral Agent**

By: _____

      Behdad Eghbali, General Partner

**Successor Secured Party/Transferee**

**TOTAL FASHION, INC.**

By: _____

      Behdad Eghbali, President

# EXHIBIT "J"



UCC-3
DE SOS

## UCC FINANCING STATEMENT **AMENDMENT**
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Polsinelli PC
Attn: Kristin Croce
900 W. 48th Place, Suite 900
Kansas City, MO  64112

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
**2017 1513628 filed 03/07/2017**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION**: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☒ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION**: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:     AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record

☐ CHANGE name and/or address: Complete item 6a or 6b, and item 7a or 7b and item 7c

☐ ADD name: Complete item 7a or 7b, and item 7c

☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION**: Complete for Party Information Change - provide only one name (6a or 6b)

| | | | | |
|---|---|---|---|---|
| 6a. ORGANIZATION'S NAME | | | | |
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

7. **CHANGED OR ADDED INFORMATION**: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | | | | |
|---|---|---|---|---|
| 7a. ORGANIZATION'S NAME Total Fashion, Inc. | | | | |
| OR 7b. INDIVIDUAL'S SURNAME | | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 233 Wilshire Blvd., Suite 800 | Santa Monica | CA | 90401 | USA |

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral:

9. **NAME OF SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT**: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | | | | |
|---|---|---|---|---|
| 9a. ORGANIZATION'S NAME Clearlake Capital Partners II, L.P. | | | | |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
Debtor: Bluefly Acquisition, LLC

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM

FOLLOW INSTRUCTIONS

11. INITIAL FINANCING STATEMENT FILE NUMBER: Same as Item 1a on Amendment form
**2017 1513628 filed 03/07/2017**

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT: Same as Item 9 on Amendment form

12a. ORGANIZATION'S NAME

OR 12b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)     SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13): Provide only one Debtor name (13a or 13b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

13a. ORGANIZATION'S NAME

OR 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral)

Additional Secured Party: **Clearlake Capital Partners III, L.P.**

15. This FINANCING STATEMENT AMENDMENT:
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

16. Name and address of a RECORD OWNER of real estate described in item 17 (if Debtor does not have a record interest):

17. Description of real estate:

16. MISCELLANEOUS:
**Debtor:  Bluefly Acquisition, LLC / File with DE SOS**

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)     International Association of Commercial Administrators (IACA)

# EXHIBIT "K"

## UCC FINANCING STATEMENT **AMENDMENT**
**FOLLOW INSTRUCTIONS**

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |
| (816) 360-4242 |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |
| CADAMS@POLSINELLI.COM |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
POLSINELLI PC

900 W. 48TH PLACE

SUITE 900

KANSAS CITY, MO 64112
```

Delaware Department of State
U.C.C. Filing Section
Filed: 10:26 AM 01/14/2019
U.C.C. Initial Filing No: 2017 1513628
Amendment No: 2019 0303540
Service Request No:  20190238449

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
| --- | --- |
| **20171513628** | (or recorded) in the REAL ESTATE RECORDS |
| | Filer: **attach** Amendment Addendum (Form UCC3Ad) **and** provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☑ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, **and** address of Assignee in item 7c **and** name of Assignor in item 9
For partial assignment, complete items 7 and 9 **and** also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check **one** of these two boxes:   **AND** Check **one** of these three boxes to:
This Change affects ☐ Debtor **or** ☐ Secured Party of record
☐ CHANGE name and/or address: Complete item 6a or 6b; **and** item 7a or 7b **and** item 7c
☐ ADD name: Complete item 7a or 7b, **and** item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only **one** name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only **one** name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| **TOTAL FASHION, INC.** | | | |
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |
| 233 WILSHIRE BLVD., SUITE 800 | SANTA MONICA | CA | 90401 | US |

8. ☐ **COLLATERAL CHANGE:** **Also** check **one** of these four boxes:   ☐ ADD collateral   ☐ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral
Indicate collateral:

9. **NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT:** Provide only **one** name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a **DEBTOR**, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| **CLEARLAKE CAPITAL PARTNERS II, L.P.** | | | |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
**BLUEFLY ACQUISITION, LLC**

International Association of Commercial Administrators
**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM

FOLLOW INSTRUCTIONS

| 11. INITIAL FINANCING STATEMENT FILE NUMBER: Same as Item 1a on Amendment form |
|---|
| 20171513628 |

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT: Same as item 9 on Amendment form

| | 12a. ORGANIZATION'S NAME |
|---|---|
| | CLEARLAKE CAPITAL PARTNERS II, L.P. |
| OR | 12b. INDIVIDUAL'S SURNAME |
| | FIRST PERSONAL NAME |
| | ADDITIONAL NAME(S)/INITIAL(S)    SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13). Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name), see instructions if name does not fit

| | 13a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):

| 15. This FINANCING STATEMENT AMENDMENT:  ☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing | 17. Description of real estate: |
|---|---|
| 16. Name and address of a RECORD OWNER of real estate described in item 17 (if Debtor does not have a record interest): | |

18. MISCELLANEOUS:
ADDITIONAL SECURED PARTY: CLEARLAKE CAPITAL PARTNERS III, L.P.

EXHIBIT "L"

## Total Fashion, Inc.
Statement of Account

| | | |
|---|---|---|
| (a) Unpaid principal as of January 31, 2019: | $ | 8,369,569.00 |
| (b) Accrued interest to February 1, 2019, beginning February 1, 2019; (1) | $ | 1,394.93 |
| (c) Per diem interest (for the month of February) (1) | $ | 1,394.93 |
| (d) Late charges, if any, to February 1, 2019 and specify the beginning date; | $ | - |
| (e) Attorneys' fees and costs; | $ | 240,691.95 |
| (f) Unearned interest, if any; and | $ | - |
| (g) Any other charges; | $ | - |
| **Total** | $ | 8,613,050.81 |

(1) Unpaid interest accrues to balance after due (January interest accrued on January 31, 2019 when not paid)

EXHIBIT "M"



2049 Century Park East, Suite 2900, Los Angeles, CA 90067 • (310) 556-1801

November 15, 2018

<u>Via E-Mail and First Class U.S. Mail</u>

Randye B. Soref

(310) 203-5367
(310) 388-5592  Direct Fax
rsoref@polsinelli.com

Jeffrey Kapor, Esq.
Buchalter Nemer
1000Wilshire Blvd., Suite, 1500
Los Angeles, CA 90017
jkapor@buchalter.com

**TO: BLUEFLY ACQUISITION, LLC**
**42 W. 39th Street**
**New York, NY 10018**
**Attention: Richard Cohen, Manager**

Re:    **Term Note dated March 7, 2017 by and between Bluefly Acquisition,**
**LLC ("Borrower") and Clearlake Capital Partners II (Master), L.P.,**
**Clearlake Capital Partners III (Master), L.P. (collectively, "Lender")**
**("Note"); General Security Agreement dated March 7, 2017 by and**
**between Borrower and Lender, as amended, supplemented and**
**otherwise modified from time to time ("Security Agreement");**
**Trademark Security Agreement dated March 7, 2017 by and between**
**Borrower and Lender ("Trademark Agreement"); and Pledge**
**Agreement dated March 7, 2017 by and between Borrower and Lender**
**("Pledge Agreement and together with the Term Note, Security**
**Agreement, Trademark Agreement, the "Credit Documents")**

## NOTICE OF DEFAULT AND DEMAND

**NOTICE IS HEREBY GIVEN** that Borrower is in default under Sections A and B of the Note
for failure to make the full monthly interest and principal payments to Lender for the month of
October, 2018.

polsinelli.com

Atlanta    Boston    Chicago    Dallas    Denver    Houston    Kansas City    Los Angeles    Nashville    New York    Phoenix
St. Louis    San Francisco    Seattle    Washington, D.C.    Wilmington
Polsinelli PC, Polsinelli LLP in California

66129603.1



November 15, 2018
Page 2

**NOTICE IS FURTHER GIVEN** that pursuant to Section 2 of the Note, upon the occurrence of an Event of Default[1], Lender shall be entitled to receive and Borrower shall pay interest on the then outstanding principal balance due and payable under the Note at the rate of six percent (6%) per annum above the Interest Rate. Pursuant to Section 2 of the Note, Interest shall accrue and be payable at the Default Rate from the occurrence of an Event of Default until all Events of Default have been fully cured.

**NOTICE IS FURTHER GIVEN** that under the Security Agreement, Lender holds a blanket security interest in all Collateral (as defined in the Security Agreement) to secure payment of the Obligations (as defined in the Security Agreement") under the Credit Documents. Under the Security Agreement, an event of default under the Note is an event of default under the Credit Agreements.

**NOTICE IS FURTHER GIVEN** that under the Trademark Agreement, Lender holds a security interest in the Trademark Collateral (as defined in the Trademark Agreement) to secure payment of the Obligations under the Credit Documents.

**NOTICE IS FURTHER GIVEN** that pursuant to that Pledge Agreement, Lender holds a security interest in all of McGann Holdings Ltd.'s ("Pledgor") right, title, and interest in and to all of the stock, membership interests and/or partnership interests in Borrower, and all security entitlements of Pledgor with respect thereto, whether now owned or hereafter acquired, together with all additions, substitutions, replacements and proceeds thereof and all income, interest, dividends and other distributions thereon (collectively, the "Pledged Collateral") to secure payment of the Obligations. In accordance with Section 10 of the Pledge Agreement and Section 12(b) of the Security Agreement this Notice of Default and Demand is delivered to the Borrower and shall be deemed to have been delivered to the Pledgor.

**NOTICE IS FURTHER GIVEN** that if the above referenced defaults are not cured within twenty (20) days of this Notice of Default and Demand, Borrower will continue to be in default and Lender may pursue any and all available remedies under the Credit Documents or at law or in equity, without further notice or demand. Such rights and remedies include, but are not limited to, acceleration of the Note, the direct collection of all accounts receivable and a foreclosure sale, in whole or in part, of the Collateral and Pledged Collateral, by private sale or sales under the Uniform Commercial Code.

---

[1] Unless otherwise defined herein, all capitalized terms shall have the same meaning as set forth in the Credit Documents.



November 15, 2018
Page 3

This Notice of Default and Demand is without prejudice to and Lender expressly reserves, any and all rights, options, and remedies under the Credit Documents, and any other agreements executed or delivered in connection therewith, at law, in equity, or otherwise.

Sincerely,

Randye B. Soref

RBS:sla

cc:     Fred Ebrahemi, Esq. via email
        Arta Tabaee, via email

EXHIBIT "N"

2049 Century Park East, Suite 2900, Los Angeles, CA 90067 • (310) 556-1801

January 2, 2019

Randye B. Soref

(310) 203-5367
(310) 388-5592 Direct Fax
rsoref@polsinelli.com

**Via E-Mail and First Class U.S. Mail**

Jeffrey Kapor, Esq.
Buchalter Nemer
1000Wilshire Blvd., Suite, 1500
Los Angeles, CA 90017
jkapor@buchalter.com

**TO: BLUEFLY ACQUISITION, LLC**
**42 W. 39th Street**
**New York, NY 10018**
**Attention: Richard Cohen, Manager**

**Re: Term Note dated March 7, 2017 by and between Bluefly Acquisition, LLC ("Borrower") and Clearlake Capital Partners II (Master), L.P., Clearlake Capital Partners III (Master), L.P. (collectively, "Lender") ("Note"); General Security Agreement dated March 7, 2017 by and between Borrower and Lender, as amended, supplemented and otherwise modified from time to time ("Security Agreement"); Trademark Security Agreement dated March 7, 2017 by and between Borrower and Lender ("Trademark Agreement"); and Pledge Agreement dated March 7, 2017 by and between Borrower and Lender ("Pledge Agreement and together with the Term Note, Security Agreement, Trademark Agreement, the "Credit Documents")**

## NOTICE OF ADDITIONAL DEFAULT AND DEMAND

**NOTICE IS HEREBY GIVEN** that in addition to those Events of Default[1] referenced in those certain Notices of Default dated November 15, 2018 and November 20, 2018, respectively, Borrower is in default under Sections A and B of the Note for failure to make the full monthly interest and principal payments to Lender for the month of November, 2018 (the Events of

[1] Unless otherwise defined herein, all capitalized terms shall have the same meaning as set forth in the Credit Documents.



January 2, 2019
Page 3

Default referenced in the Notice of Default dated November 15, 2018, Notice of Default dated November 20, 2018 and herein are sometimes collectively hereinafter referenced as, the "Existing Defaults").

**NOTICE IS FURTHER GIVEN** that pursuant to Section 2 of the Note, upon the occurrence of an Event of Default, Lender shall be entitled to receive and Borrower shall pay interest on the then outstanding principal balance due and payable under the Note at the rate of six percent (6%) per annum above the Interest Rate. As a result of the Existing Defaults, pursuant to Section 2 of the Note, Interest shall continue to accrue and be payable at the Default Rate from the occurrence of an Event of Default until all the Existing Defaults have been fully cured.

**NOTICE IS FURTHER GIVEN** that under the Security Agreement, Lender holds a blanket security interest in all Collateral (as defined in the Security Agreement) to secure payment of the Obligations (as defined in the Security Agreement") under the Credit Documents. Under the Security Agreement, an Event of Default under the Note is an Event of Default under the Credit Agreements.

**NOTICE IS FURTHER GIVEN** that under the Trademark Agreement, Lender holds a security interest in the Trademark Collateral (as defined in the Trademark Agreement) to secure payment of the Obligations under the Credit Documents.

**NOTICE IS FURTHER GIVEN** that pursuant to that Pledge Agreement, Lender holds a security interest in all of McGann Holdings Ltd.'s ("Pledgor") right, title, and interest in and to all of the stock, membership interests and/or partnership interests in Borrower, and all security entitlements of Pledgor with respect thereto, whether now owned or hereafter acquired, together with all additions, substitutions, replacements and proceeds thereof and all income, interest, dividends and other distributions thereon (collectively, the "Pledged Collateral") to secure payment of the Obligations. In accordance with Section 10 of the Pledge Agreement and Section 12(b) of the Security Agreement this Notice of Additional Default and Demand is delivered to the Borrower and shall be deemed to have been delivered to the Pledgor.

**NOTICE IS FURTHER GIVEN** that as a result of the Existing Defaults, Borrower continues to be in default and Lender may pursue any and all available remedies under the Credit Documents or at law or in equity, without further notice or demand. Such rights and remedies include, but are not limited to, acceleration of the Note, the direct collection of all accounts receivable and a foreclosure sale, in whole or in part, of the Collateral and Pledged Collateral, by private sale or sales under the Uniform Commercial Code.



January 2, 2019
Page 3

This Notice of Additional Default and Demand is without prejudice to and Lender expressly reserves, any and all rights, options, and remedies under the Credit Documents, and any other agreements executed or delivered in connection therewith, at law, in equity, or otherwise.

Sincerely,

Randye B. Soref

RBS:sla

cc:   Fred Ebrahemi, Esq. via email
      Arta Tabaee, via email

EXHIBIT "O"



2049 Century Park East, Suite 2900, Los Angeles, CA 90067 · (310) 556-1801

November 20, 2018

Randye B. Soref

(310) 203-5367
(310) 388-5592  Direct Fax
rsoref@polsinelli.com

**Via E-Mail and First Class U.S. Mail**

Jeffrey Kapor, Esq.
Buchalter Nemer
1000Wilshire Blvd., Suite, 1500
Los Angeles, CA 90017
jkapor@buchalter.com

**TO: BLUEFLY ACQUISITION, LLC
42 W. 39th Street
New York, NY 10018
Attention: Richard Cohen, Manager**

> Re:     **Term Note dated March 7, 2017 by and between Bluefly Acquisition,
> LLC ("Borrower") and Clearlake Capital Partners II (Master), L.P.,
> Clearlake Capital Partners III (Master), L.P. (collectively, "Lender")
> ("Note"); General Security Agreement dated March 7, 2017 by and
> between Borrower and Lender, as amended, supplemented and
> otherwise modified from time to time ("Security Agreement");
> Trademark Security Agreement dated March 7, 2017 by and between
> Borrower and Lender ("Trademark Agreement"); and Pledge
> Agreement dated March 7, 2017 by and between Borrower and Lender
> ("Pledge Agreement and together with the Term Note, Security
> Agreement, Trademark Agreement, the "Credit Documents")**

## NOTICE OF ADDITIONAL DEFAULT AND DEMAND

**NOTICE IS HEREBY GIVEN** that in addition to those Events of Default[1] referenced in that certain Notice of Default dated November 15, 2018, Borrower is in default under Section 7.3(d) of the Note for failure to deliver to Lender during the term of the Note (i) within thirty (30) days after the close of each month, monthly income statements, balance sheets, and cash flow

---

[1] Unless otherwise defined herein, all capitalized terms shall have the same meaning as set forth in the Credit Documents.

Atlanta    Boston    Chicago    Dallas    Denver    Houston    Kansas City    Los Angeles    Nashville    New York    Phoenix
St. Louis    San Francisco    Seattle    Washington, D.C.    Wilmington
Polsinelli PC. Polsinelli LLP in California

66191953.1



November 20, 2018
Page 2

statements, and (ii) within forty-five (45) days after the close of each fiscal quarter of the Borrower, confirmation from Moss Adams or another third party accounting firm mutually agreeable to Lender and Borrower as to the Borrower's financial statements for the previous quarter.

**NOTICE IS FURTHER GIVEN** that pursuant to Section 2 of the Note, upon the occurrence of an Event of Default, Lender shall be entitled to receive and Borrower shall pay interest on the then outstanding principal balance due and payable under the Note at the rate of six percent (6%) per annum above the Interest Rate. Pursuant to Section 2 of the Note, Interest shall accrue and be payable at the Default Rate from the occurrence of an Event of Default until all Events of Default have been fully cured.

**NOTICE IS FURTHER GIVEN** that under the Security Agreement, Lender holds a blanket security interest in all Collateral (as defined in the Security Agreement) to secure payment of the Obligations (as defined in the Security Agreement") under the Credit Documents. Under the Security Agreement, an event of default under the Note is an event of default under the Credit Agreements.

**NOTICE IS FURTHER GIVEN** that under the Trademark Agreement, Lender holds a security interest in the Trademark Collateral (as defined in the Trademark Agreement) to secure payment of the Obligations under the Credit Documents.

**NOTICE IS FURTHER GIVEN** that pursuant to that Pledge Agreement, Lender holds a security interest in all of McGann Holdings Ltd.'s ("Pledgor") right, title, and interest in and to all of the stock, membership interests and/or partnership interests in Borrower, and all security entitlements of Pledgor with respect thereto, whether now owned or hereafter acquired, together with all additions, substitutions, replacements and proceeds thereof and all income, interest, dividends and other distributions thereon (collectively, the "Pledged Collateral") to secure payment of the Obligations. In accordance with Section 10 of the Pledge Agreement and Section 12(b) of the Security Agreement this Notice of Default and Demand is delivered to the Borrower and shall be deemed to have been delivered to the Pledgor.

**NOTICE IS FURTHER GIVEN** that if the above referenced defaults are not cured within twenty (20) days of this Notice of Additional Default and Demand, Borrower will continue to be in default and Lender may pursue any and all available remedies under the Credit Documents or at law or in equity, without further notice or demand. Such rights and remedies include, but are not limited to, acceleration of the Note, the direct collection of all accounts receivable and a



November 20, 2018
Page 3

foreclosure sale, in whole or in part, of the Collateral and Pledged Collateral, by private sale or sales under the Uniform Commercial Code.

This Notice of Additional Default and Demand is without prejudice to and Lender expressly reserves, any and all rights, options, and remedies under the Credit Documents, and any other agreements executed or delivered in connection therewith, at law, in equity, or otherwise.

Sincerely,

Randye B. Soref

RBS:sla

cc:     Fred Ebrahemi, Esq. via email
        Arta Tabaee, via email

EXHIBIT "P"

# Bluefly Acquisition LLC
Table of Contents

| | Request | Comment |
|---|---|---|
| 1 | Overview and update of the Bluefly business | |
| A | P&L by month for the past 2 years | See tab 1A for what is available |
| B | Breakdown of expense departments between fixed and variable (or at a minimum, headcount expense for each department) | See tab 1B for salary by department prior to stop in operations |
| C | Break-out of marketing expenses by month and trend over time (ie how much are you spending on each of your key channels) | Unavailable |
| D | Sales and rev share by vendor and trend over time | Unavailable |
| E | % of sales by merchandise department | Unavailable, but RLL business should be good proxy |
| 2 | Balance Sheet | |
| A | Updated Balance Sheet | See tab 2A for October (latest received) not as relevant in asset sale |
| B | Detailed list of liabilities by vendor | See tabs 2B for a/p as of 12/31/18, not relevant for asset sale |
| C | Do any creditors have a lien on any of the assets | None outside of TSI that we're aware of |
| 3 | Overview of the technology platform, current headcount and people necessary to run it for us | Using Miraki Marketplace Platform, operated by one person (CTO) https://www.miraki.com/bluefly-launches-in-time-for-the-holidays/ |
| 4 | Current headcount by function | See tab 4 |
| 5 | Customer metrics | |
| A | Details around email list (# of subscribers, % open in past 6 months, % purchase in past 6 months, % of total sales generated from this list, etc) | Unavailable |
| B | Quarterly Customer data (# of active buyers, # of new buyers, sales per buyer, etc) | Unavailable |
| 6 | Other liabilities | |
| A | Employee contracts | Unavailable, not relevant as any desired employees would need to be rehired |
| B | Leases | Unavailable, not relevant as no employees and infrastructure is cloud based |
| C | Other obligations | Unavailable, assets will be foreclosed on so no unknown or undesired obligations will remain |

# Bluefly Acquisition LLC
### Income Statement

| | 2017 | 2018 | Jan-17 | Feb-17 | Mar-17 | Apr-17 | May-17 | Jun-17 | Jul-17 | Aug-17 |
|---|---|---|---|---|---|---|---|---|---|---|
| GMV prior to Order Induction Issues (1) | 38,370,835 | | | | | | | | | |
| GMV Orders Lost for Tech Issues (1) | (2,174,529) | | | | | | | | | |
| GMV | 44,393,418 | 34,196,408 | | | | | | | | |
| GMV Pop-Up | 196,258 | 40,093 | | | | | | | | |
| Total GMV | 44,549,676 | 34,243,500 | 3,446,807 | 3,159,473 | 3,663,644 | 3,718,000 | 3,962,080 | 2,927,350 | 2,955,059 | 3,221,498 |
| Gross Product Revenues | 41,614,463 | 32,821,038 | 5,425,731 | 2,730,439 | 3,507,652 | 3,451,408 | 3,878,511 | 2,833,734 | 2,704,826 | 3,119,389 |
| Pop-Up Revenue | 248,504 | 46,693 | | 5,793 | | | | | | |
| Shipping Revenues (offset cost future) | 252,505 | 402,880 | 6,579 | | 5,944 | | | 111,112 | 1,357 | 385 |
| Full/Other Revenues | 18,260 | 85,529 | | | | 5,385 | | | | |
| Total Gross Revenues | 42,133,732 | 33,356,110 | 3,432,310 | 2,736,232 | 3,514,596 | 3,451,496 | 3,883,907 | 2,864,846 | 2,706,183 | 3,119,764 |
| Bad Debts & Appeasements | (273,685) | (224,454) | (14,010) | (24,000) | (30,000) | (16,826) | (12,000) | (25,500) | (10,000) | (7,200) |
| Returns Reserves | (8,931,070) | (9,301,570) | (430,807) | (398,560) | (900,586) | (705,470) | (902,949) | (905,223) | (650,419) | (650,373) |
| Shipping Returns/Other Reserves | (9,193,686) | (3,525,479) | (444,887) | (412,560) | (850,386) | (722,555) | (914,349) | (930,723) | (660,419) | (657,573) |
| Total Net Revenues | 32,940,034 | 26,830,831 | 2,987,423 | 2,323,672 | 2,584,010 | 2,728,941 | 2,968,558 | 1,934,123 | 2,035,764 | 2,462,191 |
| Cost of Sales Mer | 26,247,439 | 21,319,066 | 2,385,723 | 1,905,164 | 2,093,862 | 2,242,303 | 2,379,745 | 1,584,240 | 1,656,604 | 1,934,180 |
| Cost of Sales-Pop Up | 158,793 | 28,096 | | | | | | | | |
| Shipping Costs & Other | 344,200 | 653,429 | | | | | | | | |
| Total Net Sales (Gross Profit) | 6,189,605 | 4,825,109 | 601,700 | 418,508 | 490,158 | 486,638 | 599,813 | 349,883 | 377,160 | 528,011 |
| Special Promotions Discount | 968,355 | 460,184 | 93,636 | 59,022 | 74,646 | 72,969 | 83,643 | 68,110 | 61,889 | 68,723 |
| Variable Commission Expense (Channel Advisor, etc.) | | 721,737 | | | | | | | | |
| Credit card ("CC") Costs | | 762,684 | | | | | | | | |
| Total Net Sales less Credit Card Costs & Variable Commissions | 5,221,250 | 3,460,504 | 508,064 | 359,486 | 415,512 | 413,640 | 506,170 | 281,773 | 315,271 | 459,288 |
| Fulfillment Payroll | 3,595,812 | 3,355,071 | 320,655 | 259,005 | 330,825 | 276,379 | 314,710 | 290,519 | 259,621 | 311,058 |
| Marketplace Overheads | 198,630 | 78,721 | 5,835 | 5,334 | 1,174 | 17,889 | 21,618 | 23,814 | 11,777 | 18,750 |
| Customer Service | 350,268 | 12,767 | 22,067 | 74,557 | 75,373 | 83,338 | 71,446 | 5,227 | 4,314 | 3,243 |
| Design | 15,747 | 3,367 | 1,966 | 818 | 508 | 2,022 | 504 | 595 | 1,056 | 601 |
| Production | 173,862 | 39,367 | | 3,279 | 2,446 | 10,000 | 1,874 | 22,143 | 22,143 | 22,983 |
| E-Commerce | 432,804 | 187,524 | 30,984 | 33,569 | 34,148 | 39,082 | 36,592 | 30,092 | 37,592 |
| Marketing | 2,341,200 | 1,596,260 | 94,370 | 125,721 | 120,385 | 198,267 | 161,284 | 134,247 | 143,142 | 250,386 |
| Technology & Development | 729,107 | 827,571 | 33,759 | 79,945 | 54,960 | 70,583 | 61,706 | 59,231 | 63,315 | 518,635 |
| Merchandising | 37,108 | 102,472 | 487 | 49 | | 2,580 | 2,882 | 4,306 | 3,195 | 9,064 |
| G&A | 928,804 | 1,594,721 | 95,312 | 100,629 | 102,608 | 98,649 | 102,137 | 180,636 | 152,862 | 160,274 |
| Pop Up Store | 425,631 | 273,270 | | | | | | | | 1,625 |
| Capitalized Software Assets written off via Depreciation (2) | | | | | | | | | | |
| Restructuring, Re-platforming & other Once-off Operating Costs (2) | | | | | | | | | | |
| Operating Expenses | 9,157,933 | 8,441,264 | 637,802 | 887,518 | 728,964 | 764,034 | 783,252 | 765,500 | 728,246 | 873,876 |
| EBITDA | (3,976,683) | (4,980,730) | (99,828) | (328,030) | (314,472) | (350,394) | (277,082) | (474,736) | (412,975) | (415,388) |
| Outside Strategic Consulting | 534,950 | 211,181 | | | | | | | | |
| Pop-Up GF & Costs including Allocations | | 55,000 | | | | | | | | |
| Capitalized Software Assets written off via Depreciation (2) | | | | | | | | | | |
| Restructuring, Re-platforming & other Once-off Operating Costs (2) | | | | | | | | | | |
| Adjusted EBITDA | (3,441,723) | (3,872,073) | (99,828) | (328,030) | (314,472) | (350,384) | (277,082) | (474,736) | (412,975) | (415,388) |
| Depreciation & Amortization Expense | 863,736 | 3,059,102 | | | | | | | | |
| Lease Expense | 1,126 | 22,137 | | | | | | | | |
| Interest Expense / Bank Fees | 105,152 | 100,782 | | | 18,035 | 11,086 | 9,897 | 10,022 | (10,022) | 10,022 |
| Bank Fees | 28,119 | | | | | 2,387 | 179 | 3,024 | 1,116 | 15,598 |
| Net Income | (5,074,816) | (8,162,731) | (99,828) | (328,030) | (332,507) | (363,667) | (287,158) | (488,582) | (404,069) | (441,008) |
| Capitalized Payroll | | 462,068 | | | | | | | | |

**EBITDA Adjustments to Show Net Income:**

(1) This amount reflects customers orders for purchases that never were included as orders in the system. The Mozu platform showed inventory as available for these orders, but the call to ATG correctly showed the inventory was not actually available for purchase and required cancellation in M2zu. This is occurring on various items upcaling inventory are not showing timely in Mozu. This is reflected in re-platforming in

(2) Reflects extraordinary costs related to replatforming

# Bluefly Acquisition LLC
Income Statement

| | Sep-17 | Oct-17 | Nov-17 | Dec-17 |
|---|---:|---:|---:|---:|
| GMV prior to Order Induction Issues (1) | 3,607,779 | 3,637,980 | 5,340,708 | 4,812,120 |
| GMV Orders Lost for Tech Issues (1) | 56,329 | 58,329 | 97,929 | |
| GMV | | | | |
| GMV Pop-Up | | | | |
| Total GMV | 3,667,779 | 3,696,309 | 5,438,637 | 4,812,120 |
| | | | | |
| Gross Product Revenues | 3,398,450 | 3,495,697 | 4,605,507 | 4,463,051 |
| Pop Up Revenue | 53,317 | 58,329 | 97,929 | 82,246 |
| Shipping Revenues (offset cost future) | | 50,021 | 80,249 | 49,902 |
| Card/Other Revenues | | | | |
| Total Gross Revenues | 3,451,767 | 3,594,047 | 4,783,685 | 4,594,899 |
| | | | | |
| Bad Debts & Appeasements | (15,000) | (73,820) | (16,100) | (30,000) |
| Returns Reserves | (721,559) | (762,289) | (341,401) | (915,807) |
| Returns/Other Reserves | (736,559) | (865,089) | (657,501) | (918,807) |
| | | | | |
| Total Net Revenues | 2,715,208 | 2,727,958 | 3,826,184 | 3,645,002 |
| | | | | |
| Cost of Sales-MP | 2,176,712 | 2,168,083 | 2,935,583 | 2,793,247 |
| Cost of Sales-Pop Up | | 39,758 | 54,882 | 87,153 |
| Shipping Costs & Other | 55,320 | 94,802 | 107,200 | 96,798 |
| Total Net Sales (Gross Profit) | 483,176 | 428,225 | 728,519 | 707,814 |
| | | | | |
| Special Promotions Discount | | | | |
| credit card ("CC") Costs | | | | |
| Variable Commission Expense (Channel/ Advisor, etc.) | 81,804 | 81,034 | 109,617 | 112,035 |
| Total Net Sales less Credit Card Costs & Variable Commissions | 401,372 | 347,191 | 618,702 | 595,781 |
| | | | | |
| Net Payroll | 308,480 | 263,468 | 318,982 | 272,905 |
| Plant/Clear. Overheads | 15,376 | 15,047 | 23,883 | 21,523 |
| Customer Service | 5,450 | 5,819 | 3,669 | 4,976 |
| Design | 459 | 1,084 | 1,071 | 3,572 |
| Revaluation | 22,143 | 13,439 | 12,143 | 40,501 |
| E-Commerce | 36,092 | 36,092 | 38,082 | 38,082 |
| Marketing | 228,211 | 244,298 | 345,846 | 310,053 |
| Technology & Development | 62,217 | 95,006 | 69,977 | 63,420 |
| Merchandising | 6,062 | 4,163 | 2,753 | 3,388 |
| G&A | 161,909 | 89,678 | 11,265 | (315,667) |
| Pop Up Store | 344 | 166,245 | 68,745 | 167,372 |
| | | | | |
| Capitalized Software Assets written off via Depreciation (2) | | | | |
| Restructuring, Re-platforming & other Once-off Operating Costs (2) | | | | |
| Pending Expenses | | | | |
| | | | | |
| EBITDA | 849,663 | 880,330 | 915,376 | 619,455 |
| | | | | |
| EBITDA Adjustments to Show Net Income: | | | | |
| Depreciation & Amortization Expense | | | | |
| Exclude Pop-Up GP & Costs including Allocations | (445,291) | (538,139) | (296,674) | (23,674) |
| Outside Strategic Consulting | | 250,032 | 121,324 | 193,004 |
| Capitalized Software Assets written off via Depreciation (2) | | | | |
| Restructuring, Re-platforming & other Once-off Operating Costs (2) | | | | |
| Adjusted EBITDA | (445,291) | (288,107) | (175,350) | 139,930 |
| | | | | |
| Taxes expense | | | | |
| Interest Expense / Bank Fees | 9,868 | 9,120 | 16,977 | 563,736 |
| Bank Fees | 4,306 | (1,675) | 1,626 | 1,126 |
| | | | | 18,127 |
| | | | | 758 |
| Net Income | (459,465) | (545,584) | (317,277) | (1,007,421) |
| | | | | |
| Capitalized Payroll | | | | |

(1) This amount reflects customer orders for purchases that never were inducted as orders available for these orders, but the call to ATG correctly showed the inventory was not a cancellation in Mozu. This is occurring as vendor feeds updating inventory are not she October 2016.

(2) Reflects extraordinary costs related to replatforming

**Bluefly Acquisition LLC**
Income Statement

| | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GMV prior to Order Induction Issues (1) | | | 3,625,000 | 3,092,000 | 3,627,358 | 2,668,839 | 3,089,084 | 3,323,607 | 3,566,140 | | |
| GMV Orders Lost for Tech Issues (1) | | | (498,000) | (440,000) | (331,371) | (174,113) | (250,638) | (320,789) | (439,869) | | |
| GMV | 3,522,922 | 2,564,070 | 3,471,000 | 2,652,000 | 3,297,987 | 2,494,526 | 2,835,445 | 2,983,016 | 3,246,771 | 1,368,000 | |
| GMV Prop-Up | 39,987 | 7,706 | | | | | | | | | |
| Total GMV | 3,561,909 | 2,571,776 | 3,471,000 | 2,652,000 | 3,297,987 | 2,494,526 | 2,835,446 | 2,983,018 | 3,246,771 | 1,368,000 | |
| Gross Product Revenues | 3,598,447 | 2,945,989 | 3,189,000 | 2,571,000 | 2,984,649 | 2,511,083 | 2,863,487 | 2,091,594 | 3,163,785 | 1,709,185 | |
| Pop-Up Revenue | 38,987 | 7,705 | | | | | | | | | |
| Shipping Revenues (offset cost future) | 97,407 | 62,381 | 42,000 | 32,000 | 31,754 | 39,568 | 28,524 | 29,182 | 28,515 | 14,425 | |
| Shipping/Other Revenues | | | | 83,000 | | | | 600 | 25 | | |
| Total Gross Revenues | 3,822,841 | 2,415,676 | 3,231,000 | 2,686,000 | 3,016,403 | 2,550,651 | 2,709,011 | 2,721,376 | 3,192,325 | 1,723,610 | |
| Returns/Other Reserves | (723,402) | (561,816) | (885,000) | (581,000) | (631,143) | (449,147) | (495,207) | (423,695) | (554,342) | (373,657) | |
| Returns Reserves | (2,400) | (40,000) | (18,000) | (21,000) | (15,000) | (15,000) | (21,701) | (15,000) | (15,000) | (18,000) | |
| Total Net Revenues | 3,097,439 | 1,853,860 | 2,546,000 | 2,106,000 | 2,385,260 | 2,101,504 | 2,213,804 | 2,291,680 | 2,637,983 | 1,349,953 | |
| Cost of Sales-MP | 2,280,690 | 1,416,855 | 1,969,000 | 1,592,000 | 1,935,359 | 1,608,158 | 1,793,402 | 1,884,728 | 2,075,656 | 1,113,299 | |
| Variable Cost of Sales-Prop Up | 22,618 | 5,418 | | | | | | | | | |
| Returns Costs & Other | | | (560,000) | (581,000) | (618,143) | (424,147) | (473,306) | (414,995) | (539,342) | (355,457) | |
| Shipping Costs & Other | 102,596 | 44,166 | 63,000 | 76,000 | 64,439 | 55,682 | 55,963 | 61,920 | 63,227 | 70,834 | |
| Total Net Sales (Gross Profit) | 691,535 | 387,421 | 487,000 | 437,000 | 385,465 | 436,864 | 364,439 | 345,534 | 499,097 | 215,820 | |
| Special Promotions Discount | | | | | | | | | | | |
| Variable Commission Expense (Channel Advisor, etc.) | 87,190 | 54,518 | 79,000 | 60,000 | 67,864 | 47,983 | 50,106 | 96,689 | 265,317 | 4,074 | |
| | | | | | | 19,960 | 12,437 | 9,426 | 9,426 | 34,051 | |
| credit card ("CC") Costs | | | | | | 63,084 | 85,486 | 83,418 | 7,020 | 177,858 | |
| Total Net Sales less Credit Card Costs & Variable Commissions | 664,336 | 332,903 | 409,000 | 377,000 | 317,601 | 313,927 | 236,244 | 175,498 | 148,331 | | |
| Net Payroll | 329,206 | 312,531 | 303,000 | 279,000 | 276,052 | 263,289 | 261,846 | 245,120 | 227,175 | 239,202 | |
| Marketplace Overheads | 13,651 | 209,926 | 9,000 | 9,000 | 5,506 | | | | | | |
| Customer Service | 7,761 | 7,139 | 8,000 | 8,000 | 7,305 | 8,571 | 7,431 | 6,744 | 8,134 | 4,793 | |
| Design | 459 | 1,056 | | | | | | | | | |
| Construction | 10,280 | | 22,000 | 15,000 | 21,123 | 15,011 | 17,935 | 10,837 | 8,329 | 13,874 | |
| E-Commerce | 37,903 | 37,592 | | | | | | | | | |
| Marketing | 219,367 | 170,504 | 147,000 | 162,000 | 174,333 | 138,748 | 147,103 | 147,157 | 205,981 | 232,760 | |
| Technology & Development | 63,524 | 62,925 | 50,000 | 24,000 | 33,319 | 68,839 | 68,308 | 52,694 | 60,789 | 61,071 | |
| Merchandising | 2,832 | 2,815 | 3,000 | 5,000 | 4,928 | 10,052 | 9,900 | 4,575 | 12,385 | 16,677 | |
| G&A | 98,377 | 134,675 | 144,000 | 107,000 | 60,664 | 71,465 | 60,467 | 69,164 | 71,818 | 91,616 | |
| Pop Up Store | 138,510 | 37,319 | 6,000 | | 30,000 | | | (102) | | | |
| Capitalized Software Assets written off via Depreciation (2) | | | | | | | | | | | |
| Restructuring, Re-performing & other Once-off Operating Costs (2) | | | | | | | | | 1,817,459 | 1,817,459 | |
| Adjusted EBITDA | 921,770 | 768,071 | 691,000 | 609,000 | 645,239 | 695,575 | 573,195 | 541,971 | 595,621 | 3,320,168 | |
| exclude Pop-Up, QP, CP & Costs including Allocations | | | | | | | | | | 842,476 | |
| Outside Strategic Consulting | (317,434) | (455,185) | (282,000) | (232,000) | (327,639) | (281,648) | (336,651) | (365,473) | (447,290) | (3,142,483) | |
| Capitalized Software Assets written off via Depreciation (2) | 143,143 | 60,249 | | 55,000 | | | | | | 1,817,459 | |
| Restructuring, Re-performing & other Once-off Operating Costs (2) | (174,291) | (404,919) | (282,000) | (177,000) | (327,639) | (281,648) | (336,651) | (366,473) | (447,290) | (482,549) | |
| **EBITDA Adjustments to Show Net Income:** | | | | | | | | | | | |
| Depreciation & Amortization Expense | 115,149 | 109,174 | 132,000 | 104,000 | 109,085 | 108,523 | 110,900 | 125,731 | 129,847 | 132,119 | |
| Taxes expense | | 9,208 | | | 3,374 | 300 | | | 2,190 | 4,732 | |
| Interest Expense / Bank Fees | 591 | 16,642 | 9,000 | 9,000 | 8,506 | 9,616 | 6,555 | 10,318 | 8,838 | 8,595 | |
| **Net Income** | (433,194) | (590,149) | (423,000) | (345,000) | (448,213) | (400,089) | (454,206) | (502,522) | (597,715) | (3,267,928) | |
| Capitalized Payroll | | | | | | | | | | | |

(1) This amount reflects customer orders for purchases that never were included as orders available for these orders, but the call to ATG correctly showed the inventory was not available in Mozu. This is occurring as vendor fees updating inventory are not live.
October 2016:

(2) Reflects extraordinary costs related to replatforming

# Bluefly Acquisition LLC

Income Statement

| | Dec-18 |
|---|---|

**GMV**

GMV prior to Order Reduction Issues (1)

GMV Orders Lost for Tech Issues (1)

GMV

GMV Pop Up

**Total GMV**

Gross Product Revenues

Pop Up Revenue

Shipping Revenues (offset cost future)

Ports/Other Revenues

**Total Gross Revenues**

Bad Debts & Appeasements

Coupons Reserves

Retail Returns/Other Reserves

**Total Net Revenues**

Cost of Sales-MP

Cost of Sales-Pop Up

Shipping Costs & Other

**Total Net Sales (Gross Profit)**

Special Promotions Discount

Variable Commission Expense (Channel Advisor, etc.)

Direct Card ("CC") Costs

**Total Net Sales less Credit Card Costs & Variable Commissions**

Net Payroll

Marketplace Overhead(s)

Customer Service

Design

Production

E-Commerce

Marketing

Technology & Development

Merchandising

G&A

Pop Up Store

Capitalized Software Assets written off via Depreciation (2)

Restructuring, Re-platforming & other Once-off Operating Costs (2)

Pending Expenses

**EBITDA**

Exclude Pop-Up GP & Costs including Allocations

Outside Strategic Consulting

Capitalized Software Assets written off via Depreciation (2)

Restructuring, Re-platforming & other Once-off Operating Costs (2)

**Adjusted EBITDA**

**EBITDA Adjustments to Show Net Income:**

Depreciation & Amortization Expense

Taxes Expense

Interest Expense / Bank Fees

Bank Fees

**Net Income**

Capitalized Payroll

(1) This amount reflects customer orders for purchases that never were included as orders available for these orders, but the call to ATG correctly showed the inventory was not a cancellation in Mozu.   This is occurring as vendor feeds updating inventory are not also October 2016.

(2) Reflects extraordinary costs related to replatforming

**Bluefly Acquisition LLC**
Heacount Expenses in Departments

| Department | Salary |
|---|---|
| Customer Servic | 112,008 |
| Marketing | 220,740 |
| Design | 157,508 |
| IT / Technology | 199,992 |
| G&A | 452,478 |
| Business Intellig | 136,006 |
| Marketplace Ope | 60,008 |
| E-Commerce | 90,012 |
| **Total** | **1,428,752** |

**Bluefly Acquisition LLC**
Balance Sheet

| | Oct-18 |
|---|---|
| ASSETS | |
| Current assets | |
| Cash | 800 |
| Accounts receivable | 1,456,958 |
| Inventory | 391,350 |
| Other current assets | 356,439 |
| **Total Current Assets** | **2,205,546** |
| Property and equipment, net | 1,674,549 |
| Other assets/intangibles | 18,178,131 |
| **Total Assets** | **22,058,227** |
| | |
| LIABILITIES AND EQUITY | |
| Current liabilities | |
| Accounts payable | 2,032,762 |
| Accrued expenses | 5,217,070 |
| Deferred revenue | 182,640 |
| Customer Credits | 95,620 |
| Returns reserve | 241,035 |
| **Total Current Liabilities** | **7,769,127** |
| Loan to Seller | 8,610,737 |
| Deferred rent | 13,609 |
| **Total Liabilities** | **16,393,472** |
| Retained earnings | (12,134,809) |
| Contributed Equity | 17,799,563 |
| **Total Equity** | **5,664,754** |
| **Total Liabilities and Equity** | **22,058,227** |

Bluefly Acquisition LLC

| Past Due Invoices | Total | Current | 30 Days | 60 Days | 90 Days + |
|---|---|---|---|---|---|
| MP | $ 475,900.75 | | $ 329,612.28 | $ 34,414.63 | $ 111,873.84 |
| OPEX | $ 1,161,491.48 | $ 111,839.92 | $ 306,291.64 | $ 203,611.60 | $ 539,748.32 |
| CAPEX | $ - | $ - | $ - | $ - | $ - |
| Sales Tax | $ - | $ - | $ - | $ - | $ - |
| Inventory | $ 120,752.00 | $ - | $ - | $ - | $ 120,752.00 |
| Total | $ 1,758,144.23 | $ 111,839.92 | $ 635,903.92 | $ 238,026.23 | $ 772,374.16 |

| Upcoming Invoices | Total |
|---|---|
| MP | $ 663,868.92 |
| OPEX (including payroll) | $ 313,839.92 |
| CAPEX | $ - |
| Sales Tax | $ 110,000.00 |
| Inventory | $ - |
| Total | $ 1,087,708.84 |

| All Invoices | Total |
|---|---|
| MP | $ 1,139,769.67 |
| OPEX (including payroll) | $ 1,475,331.40 |
| CAPEX | $ - |
| Sales Tax | $ 110,000.00 |
| Inventory | $ 120,752.00 |
| Total | $ 2,845,853.07 |

| Liabilities | |
|---|---|
| Clearlake | $ 8,501,745.37 |
| KIBO | $ 516,888.00 |
| Loan Form Rainbow | $ 6,201,000.00 |
| Loan From APS | $ 3,623,244.47 |
| ATT | $ 364,669.90 |
| Shoe Metro | $ 14,000.00 |
| Law Suit (former employee) | $ 75,000.00 |
| Total | $ 19,296,547.74 |

Checks

| Ck. #: | Date: | | Payee: | Amount: | |
|---|---|---|---|---|---|
| 3598 | 2/15/2018 | 00-P3 | MP Vendor | $ 111,873.84 | MP |
| 5291 | 12/4/2018 | 00-BHFO | MP Vendor | $ 11,711.11 | MP |
| 5302 | 12/4/2018 | 00-SH12 | MP Vendor | $ 7,962.52 | MP |
| 5303 | 12/4/2018 | 00-SH9 | MP Vendor | $ 7,123.40 | MP |
| 5306 | 12/4/2018 | 00-SS6 | MP Vendor | $ 7,617.60 | MP |
| 5310 | 12/5/2018 | 00-4CITE | 4CITE MARKETING, LLC | $ 4,200.00 | OPEX |
| 5316 | 12/5/2018 | 00-CRITEO | CRITEO CORP | $ 6,798.96 | OPEX |
| 5318 | 12/5/2018 | 00-ESTA | ESTATE FIVE MEDIA, LLC | $ 10,000.00 | OPEX |
| 5320 | 12/5/2018 | 00-FISH | FISHER PHILLIPS | $ 1,457.00 | OPEX |
| 5322 | 12/5/2018 | 00-JOBVITE | JOBVITE, INC. | $ 435.50 | OPEX |
| 5324 | 12/5/2018 | 00-NARVAR | NARVAR INC | $ 4,500.00 | OPEX |
| 5330 | 12/5/2018 | 00-SIDECAR | SIDECAR INTERACTIVE, INC | $ 7,664.24 | OPEX |
| 5331 | 12/5/2018 | 00-STELLAS | STELLA SERVICE | $ 816.56 | OPEX |
| 5347 | 12/17/2018 | 00-AB3 | MP Vendor | $ 1,650.04 | MP |
| 5348 | 12/17/2018 | 00-AB4 | MP Vendor | $ 29.99 | MP |
| 5349 | 12/17/2018 | 00-AC6 | MP Vendor | $ 85.12 | MP |
| 5350 | 12/17/2018 | 00-AC7 | MP Vendor | $ 3,772.70 | MP |
| 5352 | 12/17/2018 | 00-AS4 | MP Vendor | $ 560.16 | MP |
| 5353 | 12/17/2018 | 00-AT1 | MP Vendor | $ 36,686.05 | MP |
| 5354 | 12/17/2018 | 00-BA3 | MP Vendor | $ 1,817.34 | MP |
| 5355 | 12/17/2018 | 00-BC | MP Vendor | $ 67.46 | MP |
| 5356 | 12/17/2018 | 00-BE3 | MP Vendor | $ 624.59 | MP |
| 5357 | 12/17/2018 | 00-BELLA | MP Vendor | $ 1,598.00 | MP |
| 5358 | 12/17/2018 | 00-BHFO | MP Vendor | $ 94,405.18 | MP |
| 5359 | 12/17/2018 | 00-BJ4 | MP Vendor | $ 3,511.33 | MP |
| 5360 | 12/17/2018 | 00-BMGIMP | MP Vendor | $ 2,793.00 | MP |
| 5361 | 12/17/2018 | 00-BUNGALO | MP Vendor | $ 41.98 | MP |
| 5362 | 12/17/2018 | 00-BV2 | MP Vendor | $ 2,493.12 | MP |
| 5363 | 12/17/2018 | 00-BW | MP Vendor | $ 348.59 | MP |
| 5364 | 12/17/2018 | 00-CC6 | MP Vendor | $ 3,029.31 | MP |
| 5365 | 12/17/2018 | 00-CHRISFI | MP Vendor | $ 225.00 | MP |
| 5366 | 12/17/2018 | 00-CLOSHOW | MP Vendor | $ 958.81 | MP |
| 5367 | 12/17/2018 | 00-CR | MP Vendor | $ 86.10 | MP |
| 5368 | 12/17/2018 | 00-DB6 | MP Vendor | $ 4,022.41 | MP |
| 5372 | 12/17/2018 | 00-DELMAR | MP Vendor | $ 1,463.04 | MP |
| 5373 | 12/17/2018 | 00-DI | MP Vendor | $ 287.70 | MP |
| 5374 | 12/17/2018 | 00-DL1 | MP Vendor | $ 330.60 | MP |
| 5375 | 12/17/2018 | 00-DS4 | MP Vendor | $ 1,388.04 | MP |
| 5376 | 12/17/2018 | 00-EM1 | MP Vendor | $ 287.98 | MP |
| 5377 | 12/17/2018 | 00-EMPLEAT | MP Vendor | $ 31.49 | MP |
| 5378 | 12/17/2018 | 00-EV2 | MP Vendor | $ 16.79 | MP |
| 5383 | 12/17/2018 | 00-GILO | MP Vendor | $ 1,728.52 | MP |
| 5384 | 12/17/2018 | 00-GLOVESI | MP Vendor | $ 1,220.24 | MP |
| 5385 | 12/17/2018 | 00-GURHAN | MP Vendor | $ 151.20 | MP |
| 5386 | 12/17/2018 | 00-HIDESIG | MP Vendor | $ 479.63 | MP |
| 5387 | 12/17/2018 | 00-HOMCITY | MP Vendor | $ 5,515.92 | MP |
| 5388 | 12/17/2018 | 00-ID2 | MP Vendor | $ 27.99 | MP |
| 5389 | 12/17/2018 | 00-JA1 | MP Vendor | $ 4,422.62 | MP |
| 5391 | 12/17/2018 | 00-JB2 | MP Vendor | $ 3,912.17 | MP |
| 5392 | 12/17/2018 | 00-JOHNBAR | MP Vendor | $ 202.36 | MP |
| 5394 | 12/17/2018 | 00-LABELTH | MP Vendor | $ 3,626.44 | MP |
| 5395 | 12/17/2018 | 00-LE1 | MP Vendor | $ 188.58 | MP |
| 5396 | 12/17/2018 | 00-LE4 | MP Vendor | $ 8,832.40 | MP |
| 5397 | 12/17/2018 | 00-LEJON | MP Vendor | $ 425.88 | MP |
| 5398 | 12/17/2018 | 00-LINDRIC | MP Vendor | $ 6,006.88 | MP |
| 5399 | 12/17/2018 | 00-LL4 | MP Vendor | $ 10,877.20 | MP |
| 5400 | 12/17/2018 | 00-LU2 | MP Vendor | $ 664.51 | MP |
| 5401 | 12/17/2018 | 00-LU3 | MP Vendor | $ 72.00 | MP |
| 5402 | 12/17/2018 | 00-M4D3 | MP Vendor | $ 457.61 | MP |
| 5403 | 12/17/2018 | 00-MA12 | MP Vendor | $ 200.97 | MP |
| 5404 | 12/17/2018 | 00-ML2 | MP Vendor | $ 124.60 | MP |
| 5405 | 12/17/2018 | 00-MUNDI | MP Vendor | $ 506.36 | MP |
| 5406 | 12/17/2018 | 00-MW | MP Vendor | $ 171.20 | MP |

| | | | | | | |
|---|---|---|---|---|---|---|
| 5407 | 12/17/2018 | 00-MX1 | MP Vendor | $ | 915.76 | MP |
| 5408 | 12/17/2018 | 00-NP1 | MP Vendor | $ | 2,527.68 | MP |
| 5409 | 12/17/2018 | 00-NS2 | MP Vendor | $ | 2,518.40 | MP |
| 5410 | 12/17/2018 | 00-NULOOM | MP Vendor | $ | 1,860.95 | MP |
| 5411 | 12/17/2018 | 00-NYWDMKT | MP Vendor | $ | 1,186.98 | MP |
| 5413 | 12/17/2018 | 00-PALMBEA | MP Vendor | $ | 4,036.48 | MP |
| 5414 | 12/17/2018 | 00-PANOCEA | MP Vendor | $ | 44.80 | MP |
| 5417 | 12/17/2018 | 00-PP3 | MP Vendor | $ | 1,267.95 | MP |
| 5418 | 12/17/2018 | 00-RESULT | MP Vendor | $ | 1,267.98 | MP |
| 5419 | 12/17/2018 | 00-RI2 | MP Vendor | $ | 139.21 | MP |
| 5421 | 12/17/2018 | 00-S&GFOOT | MP Vendor | $ | 1,035.58 | MP |
| 5422 | 12/17/2018 | 00-SAFA | MP Vendor | $ | 95.13 | MP |
| 5423 | 12/17/2018 | 00-SBF | MP Vendor | $ | 1,147.46 | MP |
| 5424 | 12/17/2018 | 00-SE2 | MP Vendor | $ | 334.57 | MP |
| 5425 | 12/17/2018 | 00-SG3 | MP Vendor | $ | 427.87 | MP |
| 5426 | 12/17/2018 | 00-SH12 | MP Vendor | $ | 17,535.16 | MP |
| 5427 | 12/17/2018 | 00-SH8 | MP Vendor | $ | 16,824.84 | MP |
| 5428 | 12/17/2018 | 00-SH9 | MP Vendor | $ | 15,828.03 | MP |
| 5429 | 12/17/2018 | 00-SHERALV | MP Vendor | $ | 6,787.53 | MP |
| 5430 | 12/17/2018 | 00-SKINTIE | MP Vendor | $ | 116.92 | MP |
| 5431 | 12/17/2018 | 00-SS6 | MP Vendor | $ | 15,725.84 | MP |
| 5432 | 12/17/2018 | 00-ST1 | MP Vendor | $ | 5,003.40 | MP |
| 5433 | 12/17/2018 | 00-ST4 | MP Vendor | $ | 11,764.64 | MP |
| 5436 | 12/17/2018 | 00-TA3 | MP Vendor | $ | 42.84 | MP |
| 5437 | 12/17/2018 | 00-TH1 | MP Vendor | $ | 190.26 | MP |
| 5438 | 12/17/2018 | 00-THEROND | MP Vendor | $ | 217.84 | MP |
| 5441 | 12/17/2018 | 00-TS8 | MP Vendor | $ | 1,261.12 | MP |
| 5442 | 12/17/2018 | 00-VF | MP Vendor | $ | 367.34 | MP |
| 5443 | 12/17/2018 | 00-VL1 | MP Vendor | $ | 434.70 | MP |
| 5444 | 12/17/2018 | 00-WB1 | MP Vendor | $ | 685.46 | MP |
| 5445 | 12/17/2018 | 00-WHOLESA | MP Vendor | $ | 3,594.36 | MP |
| 5452 | 1/2/2019 | 00-CYBERSO | CYBERSOURCE CORPORATION | $ | 3,216.54 | OPEX |
| 5453 | 1/2/2019 | 00-EXPERIA | CHEETAH DIGITAL INC | $ | 34,510.66 | OPEX |
| 5454 | 1/2/2019 | 00-IESI | WASTE CONNECTIONS | $ | 706.28 | OPEX |
| | | | | $ | 550,206.49 | |

| Invoice | Div | Sort | Vendor | Name | Invoice Date | Due Date | Disc Date | Posting Date | Terms | Hold | Balance | Discount | Sales Tax | Freight | Tax Class | Tax Schedule | Comment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8F1 | 0 | OPEX | THREAD | THREAD ADVISORS LLC | 4/1/2017 | 4/1/2017 | | 3/31/2017 | No Terms | No | $177,090.46 | $0.00 | $0.00 | $0.00 | | | SUCCESS FEE RELATED TO ENGAGEMENT LETTER |
| V15F1 | 0 | OPEX | TRONV | VTN TRANBUDA LLC | 10/1/2018 | 10/1/2018 | | 10/1/2018 | No Terms | No | $13,725.00 | $0.00 | $0.00 | $0.00 | | | |
| 16024 | 0 | OPEX | BOUNCE | BOUNCE EXCHANGE INC | 4/1/2017 | 4/1/2017 | | | 45 Day Terms | No | $18,323.81 | $0.00 | $0.00 | $0.00 | | | DEC BOUNCE EXCHANGE |
| 16676 | 0 | OPEX | BOUNCE | BOUNCE EXCHANGE INC | 12/24/2017 | 2/7/2018 | 2/7/2018 | 12/31/2017 | 45 Day Terms | No | $57,677.82 | $0.00 | $0.00 | $0.00 | | | NBEX RETARGETING |
| BF-NY2016-2 | 0 | OPEX | TEKKTR | TEKK TREE CONSULTING LLC | 12/22/2017 | 2/10/2018 | | 12/31/2017 | 45 Day Terms | No | $5,355.00 | $0.00 | $0.00 | $0.00 | | | NBEX RETARGETING | Jan-18 upcoming |
| 16563 | 0 | OPEX | BOUNCE | BOUNCE EXCHANGE INC | 1/31/2018 | 2/7/2018 | | 1/31/2018 | 14 Day | No | $18,325.81 | $0.00 | $0.00 | $0.00 | | | NBEX RETARGETING | 30 |
| 17312 | 0 | OPEX | HARTFOR | THE HARTFORD | 12/2/2018 | 3/30/2018 | | 1/31/2018 | 45 Day Terms | No | $57,677.82 | $0.00 | $0.00 | $0.00 | | | 2016 INSURANCE - Premium | 90 |
| 1190SUV | 0 | OPEX | BOUNCE | BOUNCE EXCHANGE INC | 3/14/2018 | 4/20/2018 | | 3/31/2018 | 20 Days | No | $18,325.70 | $0.00 | $0.00 | $0.00 | | | Water, Guard Service, Tax & Sprinkler | 60 |
| 17334 | 0 | OPEX | BOUNCE | BOUNCE EXCHANGE INC | 2/24/2018 | 4/10/2018 | | 3/31/2018 | 45 Day Terms | No | $18,325.81 | $0.00 | $0.00 | $0.00 | | | NBEX RETARGETING (FEBRUARY 2018) |
| 17354 | 0 | OPEX | BOUNCER | BOUNCE EXCHANGE INC | 2/27/2018 | 4/13/2018 | | 3/31/2018 | 45 Day Terms | No | $37,317.82 | $0.00 | $0.00 | $0.00 | | | NBEX RETARGETING (FEBRUARY 2018) |
| 8342218 | 0 | OPEX | ADAMS | ADAMS & CO REAL ESTATE LLC | 8/1/2018 | 8/5/2018 | | 8/9/2018 | Net 30 | No | $31,826.52 | $0.00 | $0.00 | $0.00 | | | |
| CHANGE ORDER #29 | 0 | OPEX | ADAMS | ADAMS & CO REAL ESTATE LLC | 8/4/2018 | 9/8/2018 | | 9/9/2018 | Net 30 | No | $330.00 | $0.00 | $0.00 | $0.00 | | | Elevators Painting |
| #5 | 0 | OPEX | DYNAMIC | DYNAMIC CONSTRUCTION SERVICES INC | 9/7/2018 | 9/7/2018 | | 10/7/2018 | No Terms | No | $10,750.81(xx) | $0.00 | $0.00 | $0.00 | | | CHANGE ORDER 29 |
| 20180919 | 0 | OPEX | MATZ | Matzen Consulting Group | 9/19/2018 | 9/19/2018 | | 11/20/2018 | 10 Days | No | $1,200.00 | $0.00 | $0.00 | $0.00 | | | CORP Analysis-Sept 2018 |
| 1593 | 0 | OPEX | HARITON | FERRO MANAGE | 9/18/2018 | 10/20/2018 | | 9/9/2018 | 15 Days | No | $2,861.10 | $0.00 | $0.00 | $0.00 | | | Open Matrix |
| GL-12842 | 0 | OPEX | UPS | UPS SCS-PARCEL | 9/20/2018 | 10/5/2018 | | 11/5/2018 | 15 Days | No | $1,189.00 | $0.00 | $0.00 | $0.00 | | | DDPR Analysis-Sept 2018 |
| GT-12842 | 0 | OPEX | UPS | UPS SCS-PARCEL | 9/20/2018 | 10/5/2018 | | 11/4/2018 | 15 Days | No | $3,234.23 | $0.00 | $0.00 | $0.00 | | | DUTY & TAX 10/8/18-10/15/18 |
| 4360 | 0 | OPEX | CSLTD | CSS LIMITED LLC | 11/9/2018 | 11/9/2018 | | 11/9/2018 | No Terms | No | $22,261.40 | $0.00 | $0.00 | $0.00 | | | SHIPMENTS 10/1-10/6 |
| 29500 | 0 | OPEX | KIBO | KIBO SOFTWARE, INC | 11/9/2018 | 11/9/2018 | | 11/9/2018 | No Terms | No | $33,300.34 | $0.00 | $0.00 | $0.00 | | | SHIPMENTS 10/1-10/6 |
| 2018/146 | 0 | OPEX | OPT | OPTIMIST CONSULTING | 11/2/2018 | 11/2/2018 | | 11/9/2018 | 15 Terms | No | $927.55 | $0.00 | $0.00 | $0.00 | | | DUTY & TAX 10/1-10/5 |
| 141103-002 | 0 | OPEX | BUCHAL | BUCHALTER | 10/1/2018 | 11/15/2018 | | 11/9/2018 | 15 Days | No | $4,302.23 | $0.00 | $0.00 | $0.00 | | | DUTY & TAX 10/1-10/5 |
| 85 | 0 | OPEX | MATZ | Matzen Consulting Group | 11/5/2018 | 11/5/2018 | | 11/9/2018 | No Terms | No | $1,099.00 | $0.00 | $0.00 | $0.00 | | | FOREIGN TRADEMARK GENERAL |
| 2018/149 | 0 | OPEX | BUCHAL | OPTIMIST CONSULTING | 11/5/2018 | 11/15/2018 | | 11/9/2018 | 15 Days | No | $2,200.00 | $0.00 | $0.00 | $0.00 | | | FOREIGN TRADEMARK GENERAL |
| IN300006561 | 0 | OPEX | SIDECAR | SIDECAR INTERACTIVE LLC | 10/1/2018 | 11/15/2018 | | 11/15/2018 | No Terms | No | $27,500.00 | $0.00 | $0.00 | $0.00 | | | PUB RELO 9/15-10/15 KERN V EVENT |
| 19401 | 0 | OPEX | BRY | BRY MEDIA CO | 11/9/2018 | 11/9/2018 | | 11/9/2018 | No Terms | No | $5,331.75 | $0.00 | $0.00 | $0.00 | | | PUB RELO 9/15-10/15 KERN V EVENT |
| INV06777 | 0 | OPEX | JOINTE | JOINTE, INC | 11/25/2018 | 11/24/2018 | | 11/30/2018 | 15 Days | No | $5,000.00 | $0.00 | $0.00 | $0.00 | | | Fox & Friends Nov 2018 | Oct-18 |
| 108463 | 0 | OPEX | JOINTE | PREVENTION CORP PERFORMANCE | 11/25/2018 | 11/24/2018 | | 11/30/2018 | No Terms | No | $544.30 | $0.00 | $0.00 | $0.00 | | | SERVICES FROM 10/25/18-11/24/18 |
| 18099 | 0 | OPEX | ABLE | HORIZON GROUP LTD | 10/20/2018 | 11/29/2018 | | 10/5/2018 | Net 30 | No | $169.22 | $0.00 | $0.00 | $0.00 | | | ABLE FIRE INSPECTION & INSTALL |
| 23872 | 0 | OPEX | PURFH | ACT-E MARKET INC | 10/1/2018 | 11/30/2018 | | 10/5/2018 | Net 30 | No | | $0.00 | $0.00 | $0.00 | | | | Aug 18 |
| 3209879073 | 0 | OPEX | ADGU | AdGuru | 10/1/2018 | 11/30/2018 | | 10/5/2018 | Net 30 | No | | $0.00 | $0.00 | $0.00 | | | | Oct-18 |
| CN54000097425 | 0 | OPEX | KENSTAR | GOOGLE INC REGISTAR WG | 10/17/2018 | 11/30/2018 | | 10/5/2018 | Net 30 | No | $26,856.74 | $0.00 | $0.00 | $0.00 | | | | Oct-18 |
| 20181101 | 0 | OPEX | ADAMS | ADAMS & CO REAL ESTATE LLC | 11/1/2018 | 12/17/2018 | | 11/30/2018 | Net 30 | No | $3,827.06 | $0.00 | $0.00 | $0.00 | | | Monthly Utilities | Oct-18 |
| 16501 | 0 | OPEX | PERFH | HORIZON GROUP LTD PERFORMANCE | 11/1/2018 | | | 11/30/2018 | Net 30 | No | $5,333.33 | $0.00 | $0.00 | $0.00 | | | NOVEMBER 2018 PUBLISHER OVERRIDE | $5,463,442.58 $ |

| Invoice | Div | Sort | Vendor | Name Entity Vendor.com | Invoice Date | Due Date Date | Disc Date | Posting Date | Terms | Hold | Balance | Discount | Sales Tax | Freight | Tax Class | Tax Schedule | Comment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IDU1R81958094 | 0 | OPEX | INDIA | IDU.COM | 11/2/2018 | 11/2/2018 | | 10/31/2018 | Net 30 | No | $444.56 | $0.00 | $0.00 | $0.00 | | | PHOTO EDITING SERVICES |
| 9239 | 0 | OPEX | ITAS | MANAGEMENT GROUP IT ASSET | 11/8/2018 | 12/8/2018 | | 11/7/2018 | Net 30 | No | $444.56 | $0.00 | $0.00 | $0.00 | | | DISPOSAL CHARGE |
| IN0001306498 | 0 | OPEX | TRUST | TRUST INC | 11/11/2018 | 12/10/2018 | | 11/10/2018 | 89 Days | No | $10,010.00 | $0.00 | $0.00 | $0.00 | | | 12/11/18-2/28/19 |
| 12162000 | 0 | OPEX | PHILLIPS | FISHER PHILLIPS | 11/14/2018 | 11/14/2018 | | 10/31/2018 | Net 30 | No | $2,573.00 | $0.00 | $0.00 | $0.00 | | | Services through 10/31/18 |
| 16939 | 0 | OPEX | PERF-H | PERFORMANCE HORIZON GROUP LTD | 11/15/2018 | 12/15/2018 | | 11/15/2018 | Net 30 | No | $12,919.93 | $0.00 | $0.00 | $0.00 | | | SEPTEMBER 2018 FUEL-SHIFT COMMISSION |
| IN000000607 | 0 | OPEX | SUPERCAR | SUPERCAR INTERACTIVE INC | 11/30/2018 | 12/15/2018 | | 11/30/2018 | 15 Days | No | $5,215.19 | $0.00 | $0.00 | $0.00 | | | Nov 18 |
| 1111397881 | 0 | OPEX | CBIZ | CBIZ MHM, LLC | 12/18/2018 | 12/18/2018 | | 12/17/2018 | No Terms | No | $6,725.00 | $0.00 | $0.00 | $0.00 | | | 2017 Tax Returns |
| IN-05140 | 0 | OPEX | LOWE | JOBNITURE | 11/20/2018 | 12/20/2018 | | 11/19/2018 | Net 30 | No | $544.28 | $0.00 | $0.00 | $0.00 | | | Dec-18 |
| 3307173 | 0 | OPEX | AMEX | AMERICAN EXPRESS | 11/25/2018 | 12/25/2018 | | 11/25/2018 | Net 30 | No | $17,250.01 | $0.00 | $0.00 | $0.00 | | | AMEX DEC 2018 |
| 23232 | 0 | OPEX | ACME | ACME MARKETING, LLC | 11/30/2018 | 12/30/2018 | | 11/30/2018 | Net 30 | No | $32,573.00 | $0.00 | $0.00 | $0.00 | | | |
| 22955 | 0 | OPEX | ADQ | ADQ INC | 11/20/2018 | 12/20/2018 | | 11/20/2018 | Net 30 | No | $979.20 | $0.00 | $0.00 | $0.00 | | | Nov 2018-Jan |
| DNS-0000101323 | 0 | OPEX | NEUSTAR | NEUSTAR INC | 11/30/2018 | 12/30/2018 | | 11/30/2018 | Net 30 | No | $735.00 | $0.00 | $0.00 | $0.00 | | | |
| 201181201 | 0 | OPEX | ADAMS | ALWAYS & CO. REAL ESTATE LLC | 12/1/2018 | 12/1/2018 | | 12/1/2018 | Net 30 | No | $30,659.24 | $0.00 | $0.00 | $0.00 | | | Dec Rent & Utilities |
| 158707216 | 0 | OPEX | AWS | AMAZON WEB SERVICES, INC | 12/3/2018 | 1/2/2019 | | 12/2/2018 | Net 30 | No | $38,231.93 | $0.00 | $0.00 | $0.00 | | | Nov-18 |
| 2401023064 | 0 | OPEX | ASSURED | ASSURED ENVIRONMENTS | 12/4/2018 | 1/3/2019 | | 12/4/2018 | Net 30 | No | $370.53 | $0.00 | $0.00 | $0.00 | | | Dec-18 |
| 17015 | 0 | OPEX | PLUSH | WASTE CONNECTIONS | 11/4/2018 | 12/4/2018 | | 11/3/2018 | Net 30 | No | $1,786.00 | $0.00 | $0.00 | $0.00 | | | Dec-18 |
| 254350 | 0 | OPEX | SD | LS DIRECT MARKETING | 11/4/2018 | 12/4/2018 | | 11/4/2018 | 45-Day terms | No | $35,202.46 | $0.00 | $0.00 | $0.00 | | | 12/11/18-2/29/19 |
| 254350 | 0 | OPEX | SD | LS DIRECT MARKETING | 11/4/2018 | 12/4/2018 | | 11/4/2018 | 45-Day terms | No | $8,700.00 | $0.00 | $0.00 | $0.00 | | | POSTCARD ABANDONERS |
| 1224494 | 0 | OPEX | FISH | FISHER HORIZON GROUP LTD | 11/30/2018 | 12/30/2018 | | 11/30/2018 | Net 30 | No | $195.00 | $0.00 | $0.00 | $0.00 | | | |
| 3089404 | 0 | OPEX | MIKRAO | MIKRAO | 12/12/2018 | 1/2/2019 | | 12/12/2018 | Net 30 | No | $29,400.00 | $0.00 | $0.00 | $0.00 | | | Services through 11/30/18 |
| 158707216 | 0 | OPEX | SAPPHIRE | SAPPHIRE OFFICE SOLUTIONS | 12/18/2018 | 1/9/2019 | | 12/18/2018 | Net 30 | No | $594.46 | $0.00 | $0.00 | $0.00 | | | Dec-18 |
| 301849 | 0 | OPEX | SAPPHIRE | SAPPHIRE OFFICE SOLUTIONS | 12/16/2018 | 1/9/2019 | | 12/15/2018 | Net 30 | No | $36,231.95 | $0.00 | $0.00 | $0.00 | | | Base Rate Charge 12/3-3/2 * overage |
| 100973128 | 0 | OPEX | UUNE | UUNE | 12/10/2018 | 1/9/2019 | | 12/10/2018 | Net 30 | No | $257.07 | $0.00 | $0.00 | $0.00 | | | Basic |
| 16370700 | 0 | OPEX | AWS | AMAZON WEB SERVICES, INC | 12/1/2018 | 1/1/2019 | | 12/1/2018 | Net 30 | No | $19.51 | $0.00 | $0.00 | $0.00 | | | AWS Support December 2019 |
| 1012 | 0 | OPEX | GERARDO | GERARDO CARLUCO | 12/15/2018 | 1/14/2019 | | 12/15/2018 | 15 Days | No | $378.00 | $0.00 | $0.00 | $0.00 | | | Ken Valenti Voltage Photos |
| 6-415-50372 | 0 | OPEX | FEDEX | FEDERAL EXPRESS SERVICES, INC | 12/11/2018 | 1/4/2019 | | 12/11/2018 | 15 Days | No | $4,000.00 | $0.00 | $0.00 | $0.00 | | | 12/3/18-12/21/19 |
| 6-415-57222 | 0 | OPEX | FEDEX | FEDERAL EXPRESS | 12/21/2018 | 1/4/2019 | | 12/21/2018 | 15 Days | No | $4,500.00 | $0.00 | $0.00 | $0.00 | | | 12/3/18-12/21/19 |
| 102-3900 | 0 | OPEX | STELLAS | STELLA SERVICE | 12/15/2018 | 1/15/2019 | | 12/15/2018 | Net 30 | No | $816.95 | $0.00 | $0.00 | $0.00 | | | 12/20/18-34/20/6-9014 |
| IN000001095 | 0 | OPEX | SULLIVAN | RX-NYMAR INC | 12/1/2018 | 1/1/2019 | | 12/1/2018 | Net 30 | No | $300.63 | $0.00 | $0.00 | $0.00 | | | Jan-May 2019 Quarterly Fees |
| IN-08760 | 0 | OPEX | NAVYAR | NAVYAR INC | 12/6/2018 | 1/1/2019 | | 12/6/2018 | Net 30 | No | $3,000.00 | $0.00 | $0.00 | $0.00 | | | Dec-18 |
| 22373 | 0 | OPEX | ACME | ACME MARKETING, LLC | 12/24/2018 | 1/24/2019 | | 12/24/2018 | Net 30 | No | $3,086.57 | $0.00 | $0.00 | $0.00 | | | Dec 2018 Digital Services |
| E-645028-E+11 | 0 | OPEX | CYBERSO | CYBERSOURCE CORPORATION | 12/31/2018 | 12/31/2018 | | 12/31/2018 | Rec | No | $33,086.57 | $0.00 | $0.00 | $0.00 | | | Dec-18 |
| 3032619943 | 0 | OPEX | GOOGLE | GOOGLE, INC | 12/31/2018 | 12/31/2018 | | 12/31/2018 | Rec | No | $9,973.06 | $0.00 | $0.00 | $0.00 | | | Dec-18 |
| 23202-5716 | 0 | OPEX | MIRAAQ | PERFORMANCE VENDOR | 12/31/2018 | 1/30/2019 | | 12/31/2018 | Net 30 | No | $3,190.11 | $0.00 | $0.00 | $0.00 | | Travel-Oct18-Nov18 | Dec-18 |
| IN-07942 | 0 | OPEX | EXPERIA | CHEETAH DIGITAL, INC | 1/1/2019 | 1/31/2019 | | 12/31/2018 | Net 30 | No | $33,117.06 | $0.00 | $0.00 | $0.00 | | | Dec-18 |
| 94-33652422 | 0 | OPEX | MCRSFT | MICROSOFT ONLINE INC | 1/2/2019 | 1/31/2019 | | 1/2/2019 | Net 30 | No | $5,261.19 | $0.00 | $0.00 | $0.00 | | | Dec-18 |
| 102200557 | 0 | OPEX | AWS | AMAZON WEB SERVICES, INC | 1/3/2019 | 2/2/2019 | | 1/2/2019 | No | No | $18,267.30 | $0.00 | $0.00 | $0.00 | | | Dec-18 |

| | | | | | | | Not entered | Net 30 | $1,003,250.46 | | | | | |
| | | | | | | | Amazon | Returns | $322,254.78 | $0.00 | | | | |
| | | | | | | | Vertical | 28 - Dec | $24,610.00 | $0.00 | | | | |
| | | | | | | | Vertical | | 55,800.50 | | | | | |
| | | | | | | | Term AP | Design | $20,752.00 | | | | | |
| | | | | | | | | | $1,121,967.74 | | | | | |

# Bluefly Acquisition LLC

Headcount Before Stop in Operations

| Department | Title |
|---|---|
| Operations & Customer Service | Customer Service Representative & Lead Trainer |
| Operations & Customer Service | Customer Service & Operations Associate |
| Marketing | VP Marketing |
| Design | Senior Designer |
| Design | Associate Art Director |
| IT | CTO |
| Ecommerce | Ecommerce Manager |
| Finance/Credit | Controller |
| Marketing | Marketing Analyst |
| BI | Director of Business Intelligence |
| Operations & Customer Service | Head of Onboarding-CA |
| Finance/Credit | Manager-Fraud Prevention |
| Executive | President |

EXHIBIT "Q"



900 W. 48th Place, Suite 900, Kansas City, MO 64112-1895 · 816.753.1000

January 11, 2019

Daniel S. Dooley
(816) 360-4358
(816) 572-5358 Fax
ddooley@polsinelli.com

**VIA FEDERAL EXPRESS**
**VIA EMAIL**

Jeffrey Kapor, Esq.
Buchalter Nemer
1000 Wilshire Blvd., Suite 1500
Los Angeles, CA  90017
jkapor@buchalter.com

**VIA FEDERAL EXPRESS**

Bluefly Acquisition, LLC
42 West 39th Street
New York, NY 10018

McGann Holdings Ltd.
c/o Bluefly Acquisition, LLC
42 West 39th Street
New York, NY 10018

> Re:   **Loan in the original principal amount of $12,250,000.00 (the "Loan"); Term Note, dated March 7, 2017, executed by Bluefly Acquisition, LLC; General Security Agreement, dated March 7, 2017, executed by Bluefly Acquisition, LLC, as amended, supplemented and otherwise modified from time to time; Trademark Security Agreement, dated March 7, 2017, executed by Bluefly Acquisition, LLC; and Pledge Agreement dated March 7, 2017, executed by McGann Holdings Ltd.**

Ladies and Gentlemen:

This Firm is counsel to Total Fashion, Inc. ("**Lender**"). On January 11, 2019, Lender became the owner and holder of the above-referenced Loan by assignment from Clearlake Capital Partners II (Master), L.P. and Clearlake Capital Partners III (Master), L.P (collectively, "**Original Lenders**"). Lender is now the owner and holder of the documents described below.

In connection with the Loan, Bluefly Acquisition, LLC ("**Borrower**") executed and delivered to Original Lenders that certain Term Note, dated as of March 7, 2017, in the original principal amount of $12,250,000.00 (as at any time modified or amended, the "**Note**"). The Note evidences a commercial loan made to Borrower in the original principal amount of $12,250,000.00 (the "**Loan**").

polsinelli.com

Atlanta    Boston    Chicago    Dallas    Denver    Houston    Kansas City    Los Angeles    Nashville    New York    Phoenix
St. Louis    San Francisco    Silicon Valley    Washington, D.C.    Wilmington
66782239.2
Polsinelli PC, Polsinelli LLP in California



Bluefly Acquisition, LLC
January 11, 2019
Page 2

As security for the Note, Borrower executed and delivered to Original Lenders that certain General Security Agreement, dated as of March 7, 2017, under which Borrower granted Original Lenders a first-priority security interest in substantially all of Borrower's assets. Also as further security for the Note, Borrower executed that certain Trademark Security Agreement, dated as of March 7, 2017, under which Borrower granted Original Lenders a first-priority security interest in Borrower's trademarks and other intellectual property.

As further security for the Note, McGann Holdings Ltd. ("**Pledgor**") executed and delivered to Original Lenders that certain Pledge Agreement, dated as of March 7, 2017, under which Pledgor granted Original Lenders a first-priority security interest in all of Pledgor's ownership interests in Borrower. The Note, the General Security Agreement, the Trademark Security Agreement, the Pledge Agreement, and all other documents further evidencing, securing or executed in connection with the indebtedness owed under the Loan, as at any time amended or supplemented, are sometimes referred to herein collectively as the "**Loan Documents**." The property described in the Loan Documents as securing the Note is referred to herein collectively as the "**Collateral**." As the current owner and holder of the Loan Documents, Lender has the right to enforce all terms of those documents and holds the security interests granted under those documents.

Under the Loan Documents, Borrower is obligated to make payments of debt service and other amounts on a monthly basis. Borrower has failed to make payment in the amounts as and when called for under the Note and other Loan Documents for the month of December 2018 (the "**Payment Default**"). On January 2, 2019, Original Lenders provided written notice to Borrower of the Payment Default. In addition, Borrower has failed to provide quarterly financial information for several quarters as required under the Loan Documents (the "**Financials Defaults**"). On November 20, 2018, Original Lenders provided written notice to Borrower regarding the Financials Defaults. In addition, Original Lenders incurred expenses and costs relating to above-referenced defaults. Under the Note and the other Loan Documents, Original Lenders demanded repayment of those fees and costs. Borrower has failed to pay the fees and costs demanded by Original Lenders, and such failure is a further default under the Loan Documents (the "**Costs Default**").

Borrower has failed to cure the Payment Default, the Financials Defaults and the Costs Default, and therefore remains in default under the Loan Documents. **This letter constitutes formal notice to Borrower of Lender's acceleration of the indebtedness owed under the Note and the other Loan Documents. Demand is hereby made on Borrower for the immediate payment, in full, of all indebtedness owed under the Note and other Loan Documents.**



Bluefly Acquisition, LLC
January 11, 2019
Page 3

Lender may pursue any and all available rights and remedies under the Loan Documents or at law or in equity, without further notice or demand. Such rights and remedies include the appointment of a receiver to take control of and administer the Collateral.

Any partial payment or partial performance made by Borrower, or acceptance of any partial payment or partial performance by Lender or any of its representatives or loan servicing agents at any time, of any amount that is not sufficient to cure as required herein or that is not sufficient to satisfy any future obligation under the Loan Documents (or which is made subsequent to any acceleration by Lender hereafter) is not intended, and shall not be deemed, to constitute a waiver of Lender's rights, remedies or recourse under the Loan Documents or at law or in equity. Any application of any such payment is not intended, and shall not be deemed, to be a modification, rearrangement, reinstatement or extension of the existing Loan Documents. Any such payment shall be applied in such order as Lender may elect in its sole discretion as allowed under the Loan Documents, without any waiver by Lender of its right to pursue any of its rights and remedies under the Loan Documents or at law or in equity.

Any past or future negotiation between you or your representatives or agents on the one hand and Lender and its representatives or agents on the other do not and shall not constitute a waiver of Lender's rights to exercise its rights and remedies under the Loan Documents or at law or in equity. Any alleged waiver of any of Lender's rights shall not be effective unless in writing duly executed by an authorized representative of Lender.

Nothing set forth herein is intended and shall not be deemed to modify, limit, release, reduce or waive any of Lender's rights, remedies, or privileges under the Loan Documents, or at law or in equity, all of which are hereby specifically reserved. Furthermore, the enumeration of any specific default herein is not intended and shall not be deemed to waive other defaults that may currently exist under the Loan Documents.

Sincerely,

Daniel S. Dooley

cc:    Behdad Eghbali (via email)
       Arta Tabaee (via email)
       Fred Ebrahemi (via email)
       Dilshat Erkin (via email)
       Brett Anders (via email)
       Randye Soref (via email)

EXHIBIT "R"

Bluefly.

# We Will Return Shortly

We apologize for the inconvenience, we're performing some maintenance.
Please refresh your browser in a moment to access our site.
Thank you for your patience.



EXHIBIT "S"

1   POLSINELLI LLP
    Randye B. Soref (SBN 99146)
2   Noel S. Cohen (SBN 219645)
3   2049 Century Park East, Ste. 2900
    Los Angeles, CA 90067
4   Phone: 310-551-1800
    Fax: 310-551-1801
5   rsoref@polsinelli.com
6   nscohen@polsinelli.com

7   *Attorneys for Plaintiff*

8

9                SUPERIOR COURT OF THE STATE OF CALIFORNIA

10           COUNTY OF LOS ANGLES – SANTA MONICA COURTHOUSE

11  TOTAL FASHION, INC.                    Case No. 19SMCV00102

12                  Plaintiff,
                                           [PROPOSED] ORDER GRANTING
13      v.                                 APPOINTMENT OF A RECEIVER;
                                           TEMPORARY RESTRAINING
14  BLUEFLY ACQUISITION, LLC and           ORDER; AND ORDER TO SHOW
15  McGANN HOLDINGS, LTD.                  CAUSE RE PRELIMINARY
                                           INJUNCTION
16                  Defendants.
                                           [Filed Concurrently with Ex Parte
17                                         Application for Appointment of
18                                         Receiver]

19                                         **Ex Parte Hearing**
20                                         Date: January 31, 2019
                                           Time: 8:30 a.m.
21                                         Dept.: )

22                                         Action Filed: January 16, 2019
23                                         Trial Date: None

24

25        Total Fashion, Inc. ("**Lender**") has filed a renewed ex parte application for

26  appointment of a receiver; or in the alternative for mandatory injunction, temporary

27

28                                    -1-
                        [PROPOSED] ORDER APPOINTING RECEIVER

67094875.1

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

JAN 31 2019

Sherri R. Carter, Executive Officer/Clerk

By _____ Deputy
    P. Aryanker

1  restraining order and for order to show cause re: preliminary injunction, or in the

2  alternative, for appointment of a receiver (the "**Application**").

3      On January 31, 2019, the Court heard the Application. Having considered the

4  Application and any opposition thereto, the Court being duly advised in the premises and

5  for good cause shown, the Court hereby makes the following Order:

6                              **Order Appointing Receiver**

7      IT IS HEREBY ORDERED that the Application is granted. The Court appoints

8  Thomas Jeremiassen (the "**Receiver**") as receiver to take control of and administer

9  Borrower's assets (collectively, the "**Business Assets**"). In order to carry out the purposes

10 of the receivership, the Court further orders as follows:

11     1.     The Receiver is authorized, subject to control of this Court and the laws

12 regarding receivership, to do any and all acts necessary for the proper and lawful conduct of

13 the receivership. Specifically, the Receiver is authorized as follows:

14     (a)    The Receiver is appointed to act and serve as receiver with respect to the

15 Business Assets and with respect to the proceeds and income therefrom, whether now

16 existing or hereafter collected, including rents, profits and income generated by the

17 Business Assets;

18     (b)    effective immediately, the Receiver shall take and have complete and

19 exclusive control, possession and custody of the Business Assets, which shall include, but

20 not be limited to, all bank accounts, credit card receipts, demand deposits, reimbursement

21 rights, bank deposits, security deposits, and all other forms of accounts, accounts

22 receivable, payment rights, cash, and cash equivalents, web based systems, social media

23 sites, chattle paper, commercial tort claims, documents, equipment, general intangibles,

24 intellectual property, goods, instruments, inventory, investment property, letter of credit

25 rights, all proceeds and products of any of the foregoing, and together with any other

26 information necessary to operate the Business Assets, including but not limited to all

27 security codes, combinations, passwords and other access codes, all of which shall be

28

1  delivered to the Receiver by Borrower, its agents and the banks maintaining Borrower's and
2  any of Borrower's agent's accounts;

3      (c)    the Receiver is authorized to retain, hire or discharge employees at the
4  Business without any liability to the Receiver;

5      (d)    the Receiver shall undertake an immediate review of all readily available
6  assets of Borrower in order to determine the economic viability of the receivership.  If upon
7  initial review, the Receiver determines that readily available assets are insufficient to
8  maintain the receivership, then the Receiver shall have the authority to borrow funds in the
9  form of one or more Receiver Certificates, and seek authority for such borrowings and/or
10  request to modify the duties and responsibilities of the receiver based upon the sufficiency
11  of funds in the receivership estate, including the authority to surrender the Business Assets
12  to Lender;

13      (e)    the Receiver is authorized to receive and collect any and all sums due and
14  owing to Borrower with respect to operation and administration of the Business Assets,
15  whether the same are now due or hereafter become due and owing, and to deposit such
16  sums into an account in the Receiver's name (which sums shall not be commingled with
17  any other funds) established and maintained by the Receiver (the "**Receiver's Account**");

18      (f)    the Receiver is authorized to make payments and disbursements from the
19  Receiver's Account in the ordinary course of business, as may be needed and proper for the
20  preservation of the Business Assets;

21      (g)    the Receiver is authorized (1) to maintain appropriate insurance, (2) to
22  continue any current insurance policies in place, which Borrower shall not act to
23  discontinue or impair in any way, (3) to add itself and/or Lender as an additional insured
24  under any current insurance policy, and Borrower shall fully cooperate with the Receiver in
25  Receiver's efforts to do so, and (4) with further approval of either Lender or the Court, to
26  purchase further insurance as the Receiver deems appropriate (but the Receiver is not
27  obligated to do so);

28

[PROPOSED] ORDER APPOINTING RECEIVER

67094875.1

1    (h)    the Receiver is authorized to pay any taxes and assessments owed by
2   Borrower in connection with administration of the Business Assets to the extent there are
3   sufficient funds in the Receiver's Account;

4    (i)    the Receiver is authorized to pay all utilities, expenses and other obligations
5   secured by, or which may give rise to, liens, and all other outstanding obligations to
6   suppliers and servicers in the ordinary course of business, including obligations incurred
7   prior to the commencement of the receivership so long as the Receiver has determined that
8   it is prudent to do so in order to maintain business relationships that are beneficial to the
9   conduct of the receivership and to the extent there are sufficient funds in the Receiver's
10  Account;

11   (j)    the Receiver may apply and utilize income from administration of the
12  Business Assets, subject to the lien rights of Lender, as follows: (1) to pay the Receiver's
13  approved fees and expenses, including the fees and expenses of the Receiver's retained
14  professionals; (2) to pay current operating expenses of the receivership incurred by the
15  Receiver in the ordinary course of business; and (3) to pay the obligations owed to Lender
16  under the subject loan documents (the "**Loan Documents**") or otherwise;

17   (k)    the Receiver is authorized to maintain sufficient cash on hand to enable the
18  Receiver to meet expenses, in an amount to be agreed to between the Receiver and Lender;

19   (l)    the Receiver is authorized to take possession of all licenses, permits or other
20  government issued documents necessary for the continued operation of the Business Assets
21  and, if the issuing agency requires that the Receiver apply for a new license, permit or other
22  document, the Receiver shall be allowed to continue to operate under the current permit
23  until the new one is issued to ensure no disruption of service occurs;

24   (m)    the Receiver is authorized to operate under and negotiate any current
25  trademark, license or franchise agreement, or, in the Receiver's discretion, enter into a new
26  trademark, license or franchise agreement, and pay any fees deemed reasonably necessary

27

28

-4-
[PROPOSED] ORDER APPOINTING RECEIVER

67094875.1

1  to secure or maintain any such agreement, which shall include, but not be limited to,

2  application fees, trademark fees, license fees, and franchise fees;

3       (n)    the Receiver is authorized to negotiate, make, and enter into contracts – not to

4  exceed one year in length unless approved by this Court – the Receiver reasonably believes

5  are necessary for the operation of the Business Assets, and the Receiver is also authorized

6  to modify or amend any contracts or agreements affecting any part or all of the Business

7  Assets, and to terminate any existing contract, agreement, or instrument which is not

8  commercially reasonable or beneficial to the operation of the Business Assets with no

9  further obligation or liability (including termination fees) under the terminated contract;

10      (o)    the Receiver is authorized to employ such firms and persons, that are not

11  insiders of or related to Borrower, as the Receiver deems necessary to perform its services

12  hereunder, including, but not limited to, attorneys, accountants, marketing agents,

13  maintenance personnel, leasing agents and management firms, and to pay such persons

14  reasonable compensation from the Receiver's account without further order of the Court;

15      (p)    the Receiver is authorized to bring such proceedings as are necessary to

16  enforce the provisions hereof; including issuance of subpoenas to compel testimony or

17  production of documents as to the existence or location of assets or any other information

18  pertinent to the business, financial affairs, and other transactions of receivership the

19  Business;

20      (q)    the Receiver is authorized to institute, prosecute, defend, compromise,

21  intervene in and become a party, either in the Receiver's own name or in the name of

22  Borrower, to such suits, actions or proceedings as may be necessary for the protection,

23  maintenance, recoupment or preservation of the Business Assets, or in his custody, in his

24  discretion, without further order of the Court; and

25      (r)    the Receiver is authorized to treat any and all gift cards or other customer

26  deposits as a claim against the Borrower pursuant to California Code of Civil Procedure

27  Section 1204.5 despite the receivership not being an assignment for the benefit of creditors.

28

-5-

67094875 1

1 Any customer credit(s) are claims against the Business and are not customer deposits and
2 are no different than any unsecured creditor claim.  Nothing herein shall require the
3 Lenders to use the proceeds of its collateral to pay such customer deposit claims.

4     2.      The Receiver shall be vested with, and is authorized, directed and empowered
5 to exercise, all of the power of Borrower, its officers, directors, shareholders, general
6 partners or persons who exercise similar powers and perform similar duties; and Borrower
7 and its officers, agents, employees, representatives, directors, successors in interest,
8 attorneys in fact and all persons acting in concert or participating with them, are hereby
9 divested of, restrained and barred from exercising any of the powers vested herein in the
10 Receiver.

11     3.      The Receiver shall be paid an hourly rate of $575.00.  The Receiver shall be
12 entitled to reimbursement of any out-of-pocket costs, including the cost of bond, courier,
13 express shipping, and postage costs, and reimbursement of expenses incurred outside the
14 ordinary course and scope of operating the Business Assets.  The Receiver is authorized to
15 employ Development Specialists, Inc. (**"DSI"**) as a consultant to the Receiver.  The
16 employees of DSI shall charge an hourly rate of between $230.00 and $630.00, together
17 with reimbursement of its out of pocket expenses.  The foregoing shall be the sole
18 compensation payable to the Receiver and DSI notwithstanding any engagements made by
19 the Receiver and notwithstanding any amount of monies that may be distributed by the
20 Receiver to Lender or any other person or entity in the course of the receivership.

21     4.      The Receiver, the Receiver's employees and agents, and professionals
22 employed by the Receiver, are entitled to monthly payment of interim compensation for
23 services rendered, at their normal hourly rates, and monthly reimbursement for all expenses
24 incurred by them on behalf of the receivership estate. Interim monthly fees paid shall be
25 subject to review and approval by this Court on a quarterly basis and to final review of the
26 Court in connection with the Receiver's Final Report and Account.  This Court retains

27

28

67094875 1

1    jurisdiction to award a greater or lesser amount as the full, fair and final value of such

2    services.

3         5.      The Receiver shall cooperate fully with the California Department of

4    Corporations, and any other state and federal law enforcement and regulatory agencies

5    having jurisdiction over matters relating to the conduct or business of Borrower so as not to

6    impair the ability of said state and federal law enforcement regulatory agencies to perform

7    their duly authorized investigative and enforcement duties.

8         6.      The Receiver's powers shall be in addition to, and not by way of limitation

9    of; the powers described in Corporations Code Section 29540 and 25530(a), Financial Code

10   Section 17607, and Government Code Section 13975.1 and Code of Civil Procedure

11   Sections 564, et seq.

12        7.      Effective immediately, Borrower, and all persons acting under its direction,

13   including any member, owner, manager or agent of Borrower, shall deliver control of the

14   Business Assets to the Receiver, without any right of offset or recoupment, including: (a)

15   all keys; (b) all leases and communication and correspondence files relating thereto; (c) any

16   and all accounts receivable and accounts payable reports; (d) any and all documents

17   pertaining to any ongoing litigation; (e) any and all documents pertinent to any licenses

18   maintained in connection with the Business Assets, and all communications and

19   correspondence pertinent thereto; (f) any and all documents pertinent to any agreements

20   entered into in connection with the Business Assets, and all communications and

21   correspondence pertinent thereto; (g) any and all contracts in effect with respect to any

22   portion of the Business Assets, including contracts for the use of software, and all

23   communications and correspondence pertinent thereto; (h) any and all payroll records,

24   employee files, applications and other materials relevant to those persons employed by

25   Borrower; (i) any and all bank statements relating to any accounts maintained by Borrower;

26   (j) Borrower's federal employer identification numbers; (k) all open invoices for services or

27   goods relating to the administration of the Business Assets; (l) any and all insurance loss

28

-7-
[PROPOSED] ORDER APPOINTING RECEIVER

67094875.1

1   histories and/or claims involving Borrower; and (m) any other records pertaining to the
2   management of the Business Assets as requested by the Receiver.

3

4       8.      Effective immediately, Borrower, and all persons acting under its direction,
5   including any member, owner, manager agent or affiliate, are enjoined from in any manner
6   disturbing the Receiver's control of the Business Assets, and are prohibited and restrained
7   from (a) interfering with any portion or aspect of the Business Assets, (b) taking any actions
8   that would, directly or indirectly, have an adverse impact on the value of the Business
9   Assets, (c) canceling, reducing, or modifying any and all insurance coverage in existence
10  with respect to the Business Assets, and (4) collecting any sums due to Borrower, all until
11  further order of the Court.

12      9.      The Receiver is directed to file with the Court within 45 days of entry of this
13  Order, and not less than quarterly thereafter, and within 30 days after termination of the
14  receivership, full and complete reports, under oath, setting forth: (i) all receipts,
15  disbursements, cash flow, and all changes in the assets in the Receiver's charge, or interests
16  in or claims against the assets, that have occurred during the preceding month; (ii) (a)
17  balance sheet, statement of income and expenses, statement of cash flows, and budget vs.
18  actual comparison report; (b) an aged payables report and an aged receivables report; (c) a
19  capital expenditures report including the type and amount of each capital expenditure made
20  or proposed during the reporting period; and (d) bank statements with monthly
21  reconciliations for the reporting month; (iii) the condition of the Business Assets; (iv) any
22  recommendations as to actions needed to preserve and protect the Business Assets or to
23  otherwise carry out the Receiver's duties; (v) the current status of all trademarks, licenses,
24  permits and other governmental entitlements and/or approvals; and (vi) any other
25  information the Receiver determines is relevant to the receivership and/or the Business
26  Assets. The Receiver is further directed to serve copies of each such report on the attorneys
27  of record for Lender, Borrower, and any other party who submits a written request to the
28

-8-
[PROPOSED] ORDER APPOINTING RECEIVER

1  Court and the Receiver to be served with copies of such requests within fifteen calendar

2  days following the end of each calendar month. Any party having an objection to the

3  Receiver's report shall file a written objection with the Court no later than ten (10) business

4  days after the date of the Receiver's filing of the report. Any objection not filed within the

5  time prescribed by this Order shall be deemed waived. At the option of Lender, such

6  reports may be submitted to the Clerk of the Court under seal and shall not be available for

7  public inspection without further order of the Court.

8      10.    The Receiver is not required to post a bond in this case, and any requirement

9  to post such a bond is waived.

10     11.    No person or entity may file suit against the Receiver, in his capacity as

11  Receiver, unless otherwise authorized in advance by this Court.

12     12.    Except by leave of this Court and during the pendency of this receivership, all

13  claimants, creditors, lessors and other persons seeking relief of any kind, in law or in

14  equity, from Borrower, and all others acting on behalf of any such persons, including

15

16  sheriffs, marshals, servants, agents and employees, are restrained and enjoined, directly or

17  indirectly, from:

18     (a)    Commencing, prosecuting, continuing or enforcing any suit or proceeding,

19  within this Court's jurisdiction, except by motion before this Court;

20

21     (b)    executing or issuing or causing the execution or issuance of any court

22  attachment, subpoena, replevin, execution or other process for the purpose of impounding

23  or taking possession of or interfering with or creating or enforcing a lien upon any property

24  owned or in the possession of Borrower, its subsidiaries or affiliates, or the Receiver

25  appointed herein, wherever situated;

26

27     (c)    commencing or continuing judicial or non-judicial foreclosure proceedings or

28                                          -9-
67094875.1

1  proceedings for the appointment of a receiver for any property owned or claimed by

2  Borrower in this action;

3      (d)    creating, perfecting, or enforcing any lien or encumbrance against any real or

4

5  personal property;

6      (e)    accelerating the due date of any obligation or claimed obligation;

7      (f)    exercising any right of set-off;

8      (g)    taking, retaining, retaking or attempting to retake possession of any real or

9

10 personal property;

11     (h)    withholding or diverting any rent or other obligation; and

12     (i)    doing any act or thing whatsoever to interfere with the possession of or

13 management by the Receiver herein and of the Business Assets, or to in any way interfere

14 with the Receiver or to interfere in any manner during the pendency of this proceeding with

15 the exclusive jurisdiction of this Court over Borrower and the Business Assets.

16     13.    The Receiver, and those agents and any consultants acting under the

17 Receiver's control, including DSI, shall have no personal liability in connection with any

18 obligations owed by Borrower to its creditors, and no creditor of Borrower shall seize or

19 attempt to seize any collateral delivered to the Receiver hereunder, and no creditor,

20 including any utility company, shall act to terminate any existing service, either as a means

21 of attempting to collect an obligation of Borrower or on account of Borrower's obligation.

22     14.    The Receiver, and those agents and any manager acting under its control,

23 including DSI, shall have no personal liability in connection with their conduct in the

24 course of this receivership, except for claims due to their gross negligence, gross or willful

25 misconduct, malicious acts, or failures to comply with the orders of this Court.

26

27

28
                              -10-
   67094875.1

15.    The Receiver is authorized to undertake all actions specifically set forth in this Order, as well as to exercise the usual and customary powers accorded to a receiver under California law (except as otherwise limited by any order of the Court).

16.    The Receiver may be removed upon 15 days written notice by Lender that Lender desires such removal upon payment of all amounts due and owing to Receiver and to Receiver's professionals, with a copy of such notice lodged with the Court, or upon an order of the Court, in which event the Court shall appoint a substitute receiver to be recommended by Lender.

17.    Nothing contained in this Order shall be construed as obligating the Receiver to advance its own funds in order to pay the costs and expenses of the receivership that have been approved by the Lender and the Court.

18.    The entry of this Order shall not in any manner prejudice any of the other rights and remedies of Lender under its Loan Documents or under applicable law.

19.    The entry of this Order shall not in any manner preclude any consensual resolution that may be reached between Lender and Borrower, and the Receiver shall abide by the terms of any such consensual resolution.

20.    Any action of the Receiver authorized in this Order shall require the consent of Lender if and when such action, if undertaken by Borrower, would require Lender's consent or authorization under any Loan Document.

21.    To the extent the Receiver continues the services of any current employees, agents or other personnel with respect to the Business Assets, neither the Receiver nor any person or entity engaged by the Receiver hereunder shall be liable for any claims of any nature whatsoever of such employees, agents, or other personnel that arose prior to the date and time of the entry of this Order, which claims include, but are not limited to, unpaid but accrued wages, unpaid but accrued sick time, unpaid but accrued vacation time, unpaid but accrued overtime and/or any and all other liabilities related to unemployment and/or worker's compensation claims.

1    22.    The Receiver shall take an oath, and reduce such oath to writing, in
2 connection with his duties as receiver in this case, and file such written oath with the Court
3 within five days of the date of the issuance of this Order.

4                    **Order Granting Temporary Restraining Order**

5        IT IS HEREBY ORDERED that the Application is granted. The Court hereby issues
6 a temporary restraining order as set forth below:

7        A.    Bluefly Acquisition, LLC ("Borrower") and any of Borrower's agents, and
8 employees, parent companies, affiliates and all those acting in concert with them, and each
9 of them, shall be enjoined and prohibited from engaging in, or performing, directly or
10 indirectly, any or all of the following pending a full hearing on Lender's request for
11 preliminary and mandatory injunction:

12        (i)    In any way ceasing or materially altering Borrower's daily business
13 operations or otherwise acting outside the ordinary course of business, and to the extent
14 such operations have ceased, Borrower shall restart the daily operation of its business;

15        (ii)    in any way diverting or using any of the profits, income, issues, or lease
16 payments emanating from the Borrower's business, or any portion thereof;

17        (iii)    transferring, concealing, destroying, or defacing all or altering any of the
18 instruments, documents, ledger parts, books, records, printouts, or any other writings
19 relating to the Borrower's business, or any of the assets of Borrower;

20        (iv)    transferring, conveying, assigning, pledging, deeding, selling, renting,
21 leasing, encumbering, changing ownership, vesting of title to, or otherwise disposing of, the
22 any of Borrower's business or any of the assets of Borrower;

23        (v)    demanding, collecting, receiving, or in any other way diverting and using any
24 of the profits, income, issues, or payments, emanating from Borrower;

25        (vi)    transferring, concealing, destroying, defacing, or altering any of the
26 instruments, documents, ledger cards, books, records, printouts, or other writings relating to
27 Borrower; or

28
                                    -12-
67094875.1

1       (vii)   transferring, conveying, assigning, pledging, deeding, selling, renting,

2  leasing, encumbering, changing ownership, vesting of title to, or otherwise disposing of

3  Borrower or Borrower's assets. *at 8:30am in Dept. O*

4       B.    The parties shall appear before the Court on *February 13,* 2019 and

5  Borrower shall show cause why *the appointment of a receiver should not be confirmed and* ~~a preliminary injunction~~ should not issue with the same

6  terms as this Order.

7     **IT IS SO ORDERED.**          JAN 5 . 2019

8                       Dated this __ day of _____, 2019.

9

10                     JUDGE OF THE SUPERIOR COURT

11                         M. JAY FORD

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER APPOINTING RECEIVER

67094875.1

1          **PROOF OF SERVICE**

2          I, Jill A. Serena, declare as follows:

3          I am employed in Los Angeles County, Los Angeles, California. I am over the age
   of eighteen years and not a party to this action. My business address is 2049 Century Park East,
4  Suite 2900, Los Angeles, California 90067. On January 30, 2019, I served the within:

5          **[PROPOSED] ORDER GRANTING APPOINTMENT OF A
           RECEIVER; TEMPORARY RESTRAINING ORDER; AND
6          ORDER TO SHOW CAUSE RE PRELIMINARY
           INJUNCTION**

7
   on the interested parties in this action addressed as follows:
8
           Bernard Bollinger
9          Jeffrey H. Kapor
           Jeff Wruble
10         Buchalter
           1000 Wilshire Boulevard, Suite 1500
11         Los Angeles, California 90017-1730
           T: (213) 891-5003
12         Email: bbollinger@buchalter.com
           Email: jkapor@buchalter.com
13         Email: jwruble@buchalter.com
14

15
       ☒    **(BY ELECTRONIC MAIL)** By transmitting such document(s) electronically
16          from my e-mail address, jserena@polsinelli.com at Polsinelli LLP, to the person(s)
            at the electronic mail addresses listed above.
17

18         I declare under penalty of perjury under the laws of the State of California that the
   foregoing is true and correct and that this declaration was executed on January 30, 2019, at
19  Los Angeles, California.

20

21         _____

22                              Jill A. Serena

23

24

25

26

27

28

                              [PROPOSED] ORDER
   66949719.1